Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
------------------------------------------------------------------X

ROVIER CARRINGTON,

        Plaintiff,

    - against -

BRIAN GRADEN, BRIAN GRADEN MEDIA, LLC,
VIACOM, INC., VIACOM INTERNATIONAL, INC.,
PARAMOUNT PICTURES CORPORATION,
BRAD GREY, BRAD GREY ESTATE,
BRAD ALAN GREY TRUST,

        Defendants.
------------------------------------------------------------------X

**SUMMONS**

Index No. _____

Plaintiff's Designate
New York County as
Place of Trial

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a
copy of your answer, or, if the complaint is not served with the summons, to serve a notice of
appearance of the day of service. If this summons is not personally served upon you, or if this
summons is served upon you outside of the State of New York, then your answer or notice of
appearance must be served within thirty (30) days. In case of your failure to appear or answer,
judgment will be taken against you by default, for the relief demanded in the complaint.

    The basis of venue is CPLR 503.

Dated:    New York, New York
        May 1, 2018

                Respectfully submitted,

                **THE LANDAU GROUP, PC**

                Kevin A. Landau
                45 Rockefeller Plaza, Suite 2000
                New York, New York 10111
                (212) 537-4025
                kevin@thelandaugroup.com

                *Attorneys for Rovier Carrington*

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY
-----------------------------------------------------------------------X
ROVIER CARRINGTON,

**COMPLAINT**

        Plaintiff,

Index No. _____

    - against -

BRIAN GRADEN, BRIAN GRADEN MEDIA, LLC,
VIACOM, INC., VIACOM INTERNATIONAL, INC.,
PARAMOUNT PICTURES CORPORATION,
BRAD GREY, BRAD GREY ESTATE,
BRAD ALAN GREY TRUST,

        Defendants.
-----------------------------------------------------------------------X

Plaintiff Rovier Carrington ("Plaintiff" or "Carrington") by and through his undersigned

attorneys, the Landau Group, PC, as and for his complaint against Defendants Brian Graden

("Graden"), Brian Graden Media, LLC ("BGM"), Viacom, Inc., Viacom International, Inc.

("Viacom"), Paramount Pictures Corporation ("Paramount"), Brad Grey, Brad Grey Estate,

Brad Alan Grey Trust ("Grey"), (collectively "Defendants"), alleges as follows:

## I.    PRELIMINARY STATEMENT.

1. The instant case, is yet another example of depravity existing throughout an industry now

synonymous with sexual deviancy. It however, is not a story of the 'buxom blond' or 'graceful

starlet', but of a **young man**, who left to the devices of a powerful few – became the toy, a prop;

used at the pleasure of those who could, and was discarded just as unceremoniously, with only

the memory of horrific acts, resentment of having his intellectual property stolen, recipient of

indefinite illusory promises used as vehicles for manipulation, and the pain that never goes away

from being anally raped, and assaulted in a drug-induced state. This is Plaintiff's reality and he

demands justice.

1

## II.     JURISDICTION, PARTIES AND VENUE.

2.   Defendant Brian Graden served as the President of Programming at MTV Networks for 13 years and facilitated the launch of Logo Network, while serving as its initial President of Programming. MTV Networks and Logo Networks are both properties of Defendant Viacom, and Mr. Graden maintains a long-standing, powerful relationship with Viacom, and its executives, and networks. Graden also helped develop, and was the executive producer for the television show South Park. Graden is the founder and owner of Brian Graden Media, LLC. Graden is a resident of Los Angeles, California and New York, New York, owning residences, and conducting business, in both states.

3.   Defendant Brian Graden Media, LLC ("BGM"), is a California Limited Liability Company, conducting business, principally, in Los Angeles, California, and New York, New York. Defendant BGM is a television production company, which has produced multiple television series, namely, for Viacom brands, such as: MTV, VH1, and Logo. BGM and Brian Graden recently produced a series entitled "Finding Prince Charming", which is one of the only original programs on Logo, and is directly related to this action.

4.   Defendant Viacom, Inc., and Viacom International, Inc. ("Viacom"), are Delaware Corporation(s), operating, and conducting business in New York, New York, and throughout the world. Viacom's headquarters is located at 1515 Broadway, New York, NY 10036. Viacom is a public multinational media company, with interests primarily in cinema and cable television. Defendant Viacom owns and operates, among other properties, MTV Networks, Logo Network, and Paramount Pictures. Paramount Pictures Corporation ("Paramount") is a movie studio, and engages in home entertainment, digital and television distribution activities worldwide, and is owned, and operates, as a subsidiary of Viacom, Inc.

2

5.  Defendant, and decedent, Brad Grey, is the former chairman and Chief Executive Officer of Paramount Pictures, a position he held until shortly before his death on May 14, 2017. During his life, Defendant conducted business and owned a residence in New York County, New York.

6.  Defendant Brad Grey Estate, and The Brad Alan Grey Trust, is a trust devised during Mr. Grey's lifetime, and which hold his assets, and real property, including real property located in New York, New York.

7.  The Defendants to this action resided in, or had offices, or real property, located in the County of New York for the State of New York, at all relevant times herein, and a substantial part of the events or omissions giving rise to Plaintiff's claims involve individuals and companies operating in the same. As such, Plaintiff has designated New York County as the placed of trial for this action. Therefore, venue is proper in this court under CPLR 503.

8.  This Court has jurisdiction over the Defendants pursuant to CPLR 301 and CPLR 302 as Defendants maintain a continuous and systematic course of doing business in New York, with a fair measure of permanence and continuity. This Court also has jurisdiction over Defendants pursuant to CPLR 302, as all the defendants, directly or through an agent, transact business within New York, and contract to supply goods or services in New York, have offices, or own real property, located in New York, and conduct their business in New York, and all of the defendants, or through an agent, committed tortious acts within New York.

## III.   STATEMENT OF FACTS.

9.  In September and October of 2010, Mr. Carrington wrote, starred in, and produced a pilot for a reality television show entitled "The Life of A Trendsetter" (hereafter, also, "Trendsetter") In mid-October 2010, a teaser or sizzle reel, of the pilot was released onto YouTube.

3

10. Within a week of the teaser going up, Plaintiff received a call from an individual named Reno Logan, who claimed to be an executive from Paramount Pictures.

11. Mr. Logan explained that he had viewed the Plaintiff's trailer, and that Paramount was interested in producing the reality show and wanted Plaintiff to come down to the Paramount lot.

12. Prior to this correspondence, but also in 2010, Plaintiff had appeared in other productions, and  previously met in Manhattan at the MTV offices with Liz Gately, Senior MTV Vice President of Series Development, to discuss another project that Plaintiff was working on.

13. The reality series Plaintiff produced, and that peaked Paramount's interest, represented a unique approach to the reality show concept, which was quickly becoming the cornerstone  of television programming, especially for networks under Viacom's control, such as MTV, and VH1.

14. Trendsetter, was a reality-show, premised on the trials and triumphs of a particular group of young, good looking kids from wealthy families, living together in a home, spending their parents' money.

15. Everyone Plaintiff cast in the pilot, including himself, were known, or known by extension, through their respective families, or exploits.

16. Mr. Carrington is Hollywood royalty, and is the great-grandson of Moe Howard, one of the 3 Stooges. Further, Plaintiff comes from an exceptionally wealthy family, independent of his grandfather.

17. Based on this background, Plaintiff grew up, in, and around, an extraordinary group of wealthy people, actors, executives, and socialites.

4

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 7 of 36

18. Many of the children from these families had parents who worked in the upper echelons of the entertainment industry, or were titans of their own respective industries and had the money and resources to spend on their children's respective appetites.

19. This is particularly illustrative given that at 21 years young, when most kids were finishing college, or looking for their first professional job, Plaintiff invested around $200,000 to produce a reality show pilot, with known personalities. Further, to achieve network placement of the show, Plaintiff obtained an agent, manager, and expensive, well-connected lawyers, and marketing/PR firms.

20. By the time Trendsetter made its way to Paramount/Viacom, his carefully selected assortment of professionals had already submitted it to competing networks and production companies, and therefore, Plaintiff was a known entity, in demand, and with the necessary relationships, team, and capital to make the reality show a hit, at substantially reduced expense to any studio or production company that acquired the project.

21. However, at the time, despite his mature undertaking of constructing a product, Plaintiff in the machinations of life and industry politics was still only a naïve 21 year old, vulnerable, sheltered, big-eyed and bushy-tailed kid, with stars in his eyes, dreaming of following in his belated grandfather's footsteps.

22. As such, with a pocket full of dough, but zero studio experience to speak of, Plaintiff was easy prey, the executives of Paramount/Viacom wasted little time exploiting a cash cow disillusioned opportunity.

23. Viacom/Paramount, its agents, executives and affiliates, operated like the mafia, led by Brad Grey (deceased), the then Chairman and CEO of Paramount, soon after Plaintiff began working on his pilot, at the Paramount lot.

5

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 8 of 36

## A. BRAD GREY.

24. Throughout October and November of 2010, Carrington spent a substantial amount of time on the studio lot of Paramount Studios, working on the production of the pilot, and meeting with Logan and other executives of the studio. By the time Carrington went to the Paramount lot, he had already produced and fully shot, an entire pilot episode of the reality show.

25. Further, Carrington was also working on a dark comedy series entitled "Inheritance". Carrington had created a television show "Bible" for the series and registered it with the Writers Guild of America (WGA). The idea was to effectively have a multi-show deal with Viacom subsidiaries, whereby Inheritance would be produced by Paramount, while Trendsetter would remain under the auspices of MTV for distribution.

26. Carrington was young, very good looking, mixed-race, charismatic young kid, who happened to be a talented writer and musician, and the grandson of 1/3 of the infamous Three Stooges .

27. Accordingly, Carrington had the pedigree of a star. Identifying the same, Viacom courted Mr. Carrington with dignitaries of its own, having introduced him to Brad Grey, the then Chairman, and CEO of Paramount in December 2010, less than two months into the parties' association.

28. In December 2010, Grey invited Paramount's new celebrity-in-the-making to dinner, at the Polo Lounge. Carrington accepted. Dinner was professional and gave Carrington confidence that his career was moving in the right direction.

29. After dinner, however, beginning around 11pm, Grey drove the two back to Carrington's residence and parked his car, whereupon Grey began kissing Carrington all over his face, neck and mouth.

6

30. Simultaneously therewith, Carrington told Grey to "stop", he declined and instead, the executive became physically violent, slamming Plaintiff's face into the window and restraining him by his seatbelt, which was still buckled.

31. The abruptness of Grey's personality from dinner until that moment completely took Plaintiff off-guard and he did not know how to react. Grey indicated to Carrington, that if he did not have sex with him, he would destroy any chance Plaintiff had of building a career in the entertainment industry.

32. Carrington, defeated, and still in the vehicle, allowed Grey to pull his pants down and perform oral sex upon him.

33. Once completed, Grey admonished Carrington to keep their sexual acts "strictly private".

34. Following this incident, Grey invited Carrington to the movie premiere of "The Fighter" and no incident ensued. Carrington continued to work on the Paramount lot.

35. Grey went to New York City for other Paramount business, however, the two continued to correspond, and speak with each other on the phone.

36. In January 2011, Grey invited Carrington to attend the Golden Globe Awards -After Party at the Beverly Hills Hilton.

37. At the party, Grey demanded that Carrington leave and go wait for him in his hotel room as he had "studio business" to discuss. Carrington accepted this at face value.

38. When Grey arrived in the hotel room, he demanded that Carrington have sexual intercourse with him. Carrington declined. Grey responded that if Plaintiff did not have sex with him, he would no longer be affiliated with Paramount or any other Viacom affiliate (this included MTV).

7

Case 1:18-cv-04609-KPF  Document 1-1  Filed 05/24/18  Page 10 of 36

39. Carrington as expected, was conflated; crying, scared and did not want to go through with having sex. Grey demanded Carrington drink alcohol to make it easier, at which point he proceeded to pour the spirit down Carrington's throat, ripped off his clothes, and proceeded to anally rape him, without a condom.

40. Throughout this incident, Carrington was screaming, crying, and begging Grey to stop.

41. Grey refused, and instead continued to rape Carrington until he ejaculated his semen into Plaintiff's anus.

42. Once Grey finished raping Plaintiff he got up and left the hotel suite, returning to the Golden Globes After Party.

43. When Grey left the hotel room, Carrington's clothes were ripped, his pants were down about his ankles, he was bruised throughout his body and bleeding from his rectum. .

44. In May and June of 2011, human resources from Viacom contacted Mr. Carrington several times.

45. Carrington was asked to sign a non-disclosure agreement ("NDA"), and told that he would receive an envelope filled with money.

46. Mr. Carrington refused to sign the document presented by Paramount, or accept any money.

47. As a result of not signing the NDA, Plaintiff's relationship with Viacom was effectively terminated. Plaintiff was not allowed back on the Paramount lot, negotiations and production of his pilot ceased, and all the money and time that had already been spent on the project was wasted (none returned to Carrington); which amounted to hundreds of thousands of dollars, and thousands of man hours. Further, this effectively destroyed the project and made Carrington look ridiculous to his investors, cast and crew.

8

48.  However, what Mr. Carrington was unaware of at the time, was that his refusal to sign the NDA not only resulted in being blacklisted from Viacom, but extended throughout the entertainment industry.

49.  For the next 3 years, Carrington was stone-walled by every producer and studio he approached.

**B. BRIAN GRADEN.**

50.  In July through September 2014, Carrington was able to secure interest in his series "Inheritance" from HBO.

51.  To assist him with signing a deal with HBO, Carrington hired a notable entertainment attorney, Bob Burke, who worked with him, and the President of Programming at HBO, Michael Lombardo.

52.  In July 2014 Carrington exchanged several emails with Mr. Lombardo's assistant relative to Lombardo's interest and desire to proceed with "Inheritance."

53.  In one such email, dated July 29, 2014, Lombardo's assistant, Garret McKay, stated to Carrington, that Mr. Lombardo was out of the office but **"requested that you contact him to discuss business doings with Brad Grey of Paramount before moving forward."**

54.  Around this same period, Mr. Carrington also began corresponding with a producer named Ross Breitenbach, who also showed interest in Carrington's projects, and cast.

55.  Mr. Breitenbach had produced reality shows for MTV, and was under contract to produce a reality show for the network. However, Breitenbach had worked with various other networks, and was never an employee or executive of any of Viacom's networks, and was unaware of Carrington's prior relationship with Viacom, and Brad Grey.

9

Case 1:18-cv-04609-KPF  Document 1-1  Filed 05/24/18  Page 12 of 36

56. In September 2014, Brian Graden reached out to Carrington through a gay social media dating website called Adam4Adam.com.

57. Graden maintained an active relationship with MTV, and was aware of Carrington's dealings with Breitenbach, when he contacted him.

58. Carrington explained to Graden that he believed he was blacklisted from Viacom, but that Breitenbach was not aware of the ban at that time.

59. Graden suggested to Carrington that he terminate his relationship with Mr. Breitenbach, fire the cast from his reality show, and then he would contact Sumner Redstone and have Carrington released from Viacom's Blacklist.

60. Graden did not immediately contact Redstone, instead, he

offered to produce Carrington's show, under his company, Brian Graden Media.

61. Once Graden agreed to produce the show, Carrington, agreed to terminate his relationship with Mr. Breitenbach, and fire the cast.

62. Carrington also mentioned to Graden that he was working with Michael Lombardo and HBO, and that Mr. Lombardo was very interested in his dark comedy series, but that he would not move forward, given Viacom's ban.

63. Without his permission, Graden contacted Mr. Lombardo. After this communication, Mr. Lombardo's office stopped returning any calls related to Carrington, which destroyed Carrington's relationship with Lombardo and HBO.

64. In September 2014, Carrington informed Breintenbach that Graden agreed to take on his show and had to proceed accordingly.

65. Breitenbach understood and stated that it was "a perfect move."

10

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 13 of 36

66. Following these initial interactions with Graden, and after terminating his relationship with Breitenbach, Graden started to request Carrington have sex with him and Graden's boyfriend, Ted Sun, a celebrity/fashion photographer.

67. In September 2014, Graden requested Carrington to join him and Mr. Sun, and others, younger than Carrington, at a sex party at Graden's home. Plaintiff declined.

68. After this request, several days later, Graden requested that Carrington meet him at the Standard Hotel in Hollywood, to have sex with him. Graden indicated to Carrington that if he wished to move forward with his reality show, and come off Viacom's banned list, that he would be required to have sex with Graden, Carrington agreed, as having sex with Graden was now his only option if he wanted to work in the entertainment industry.

69. When Mr. Carrington arrived at the Standard, Graden was waiting, with a cocktail already made.

70. The cocktail did not incapacitate Carrington, but upon information and belief, contained a drug, that restricted his inhibitions, and allowed Graden to control him, and sexually assault him.

71. Throughout the rest of the month, Graden continued to request sex from Carrington and became more possessive sexually.

72. Graden continued to represent to Carrington that he would executive produce his reality show.

73. The concept of this reality show was essentially a show centered on following Montana Fishburne, daughter of famed actor Laurence Fishburne, and Carrington, as a bi-sexual couple, building their careers in Hollywood.

74. Graden and Carrington continued to correspond with each other relative to Carrington's show. However, in October 2014, Graden became distant.

11

75. In April of 2015, Carrington was diagnosed with a sexually transmitted disease, that, upon information and belief, he acquired from Graden.

76. Carrington contacted Graden to advise him of this. At first, Graden refused to acknowledge that he gave Carrington an STD. However, in 2015, he had Carrington sign a non-disclosure agreement ("NDA"). In conjunction with the NDA, Graden tendered Carrington a contract with Brian Graden Media to produce Carrington's reality show, and dark comedy.

77. The contracts were mutually executed, whereupon Graden finally made a phone call to Sumner Redstone, requesting that Carrington be released from his ban with Viacom.

78. Graden spoke directly with Redstone. Thereafter, Carrington was released from Viacom's Blacklist, and was able to work again with Viacom, and its subsidiaries, and producers, which included Brian Graden.

79. In May 2015, Graden insisted that Carrington hire a publicist to build his image in the media, and gain a following, so the audience would be familiar with him, prior to filming the reality show.

80. Carrington did as Graden instructed, and spent more than $80,000.00 in expenses, and went through three separate publicists, finally landing with Jane Owen PR.

81. Jane and Simon Thomas of Jane Owen PR were aware of Carrington's business with Graden, and Ms. Fishburne, and emails were shared amongst the parties about the direction of Ms. Fishburne and Mr. Carrington coming out as a couple.

82. Graden was very interested in the concept, and several executives from his company, were also excited, as the concept and plot for the show had not been done before.

83. In June and early July 2015, Graden requested that Mr. Carrington have sex with him, at his home. Carrington acquiesced.

12

84. Graden had a drink waiting for Carrington when he arrived and insisted that Carrington drink it.

85. Carrington did as Graden instructed. After finishing the cocktail, Carrington started to have trouble breathing, and instead of passing out, he felt like he was dying.

86. Carrington wished to call an ambulance, and reached for his phone, however, Graden refused, and took the phone away. It then became evident that Graden drugged Carrington against his will.

87. Graden placed Carrington in the shower and called him an Uber to take him home.

88. Carrington's Uber driver witnessed the state that Mr. Carrington was in and asked him if he wanted to go the hospital.

89. Graden begged Carrington not to go to the hospital or call the police and he obliged.

90. In June 2015, Graden held a party at his home, which he invited Carrington to.

91. In August 2015, Graden finally started discussing moving forward with his reality show. However, even when discussing Carrington's show, or his professional career, Graden still demanded that Carrington have sex with him and requested Carrington to have sex with his boyfriend, Mr. Sun, and other people that Sun may ask to join through his photography business.

92. An email exchange, that took place between Carrington and Graden on August 9 and 10, 2015, crystallizes the parties' relationship, and the fraud, and coercion, being used by Graden, to manipulate and control Plaintiff, for his own sexual gratification.

On Sun, Aug 9, 2015 at 12:31 PM, Rovier Carrington <roviercarrington@gmail.com> wrote:

Hello Brian,
Here's the dramatic series I was discussing with you. I appreciate you finally moving forward with both shows. Especially with our contract in place.

From: Brian Graden <brian.graden@gmail.com> Date: August 10, 2015 at 12:52:47 AM PDT
To: Rovier Carrington

13

&lt;roviercarrington@gmail.com&gt;

Subject: Re: Inheritance "TV Project"

I'll present the material to my business associates and we'll figure out how to combine the reality show with the series. **You keep me happy and we'll do well together. :) (emphasis added).**

93. Carrington's publicists indicated to Carrington that they felt that Graden was not living up to his contract, and that Carrington was wasting $4,000.00 a month in Public Relations fees.

94. Carrington's publicist, Ms. Jane, suggested that Carrington should start a website showcasing his writing abilities.

95. Carrington started a website entitled "TheCarringtonDiaries.com.", which over time has accumulated to a following of more than 500,000 fans.

96. Throughout October and November 2015, Graden continued to request more sex from Carrington. Multiple text messages were exchanged between the parties indicating the same.

97. Many of the text messages exchanged between Carrington and Graden, are graphic, requesting sexual favors, and some include pictures from Graden where he is masturbating, completely naked, and fully erect.

98. The text messages exchanged between Graden, one of the most powerful producers in the entertainment industry, and Carrington, reveal how Graden was able to control, and manipulate Carrington for two years.

99. Graden used coercion and extortion-type tactics to induce Carrington into continuing to have sex with him, when Graden demanded, and under the threat, that if Carrington failed, or refused to enage, he would have Carrington blacklisted, thereby destroying any chance Carrington would have to work in the entertainment industry.

100. From September 2015 to January 2016, Graden continued to request Carrington, to have sex with him. The two exchanged several text messages during this period.

14

Case 1:18-cv-04609-KPF  Document 1-1  Filed 05/24/18  Page 17 of 36

101. At this point, Ms. Fishburne had grown tired of Graden not moving forward with the reality show and decided to pursue other opportunities.

102. Carrington requested that Graden honor his contract and produce the reality show. This did not take place.

103. Instead, Graden continued the same behavior and demands as detailed herein.

104. As it turns out, the reality was that Graden had no intention of producing Carrington's show, or working with him in any professional capacity, and it is now clear that Graden was simply manipulating Carrington, extorting him, and using him as his convenient rag doll.

105. Notwithstanding the foregoing, throughout November 2015 to January 2016, Graden continued to request sex from Carrington and continued to request that Carrington have sex with Graden's boyfriend.

### C. FINDING PRINCE CHARMING.

106. In May 2015, Carrington began pitching Graden on a reality series concept that Carrington was developing.

107. The concept was an extension of Trendsetter, in that the show followed Carrington around, while he dated both male and female partners from a rich and famous community, as an "It boy" through scandals and drama.

108. Carrington tweaked this concept into a reality dating show, whereby Carrington would be the star, whereby male and female contestants would compete for his love, while a social media component (i.e reporting of scandals), would keep the audience engaged when the show was not airing.

109. Carrington emailed the concept to Graden in May 2015, and Graden loved it.

110. Carrington and Graden continued to discuss the concept throughout 2015 and 2016.

15

111. At one point, Carrington changed the content to men competing for his love.

112. During this period, Plaintiff and Graden continued to exchange text messages, and in April 2016, Graden even indicated that he was struggling to come up with material, in addition to executives leaving his production company. In response, Carrington offered to help, and reiterated that Graden had seen his various show concepts.

113. Months later, on or around July 12, 2016, Logo announced that it ordered production of a reality dating show, entitled "Finding Prince Charming" featuring non-heterosexual male contestants, hosted by pop singer Lance Bass, and starring Robert Sepulveda, as the suitor for the first season.

114. This concept is substantially like the one proposed by Plaintiff, and actively discussed with Graden.

115. The executive producer of the show was Brian Graden and the production company was Brian Graden Media.

116. The series premiered on September 7, 2016. A week before the premiere, the scandal involved with the show broke. The scandal was relative to Mr. Sepulveda being a paid escort, which was reported on various internet sites and blogs.

117. Upon information and belief, Mr. Sepulveda had served as Graden's escort, which is one of the reasons that he was cast in the show. Further, upon information and belief, at least one other cast members of the show, also served as an escort, which is why these cast members were cast in the show as well.

118. Upon information and belief, Logo and Viacom, were aware that Mr. Sepulveda and others from the cast previously served as Graden's escorts.

16

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 19 of 36

119. Graden did not give Carrington credit for the show; failed to compensate him when it was sold to LOGO; and refused to give him any role in the production of the show.

120. Accordingly, in selling and producing the show, Graden misappropriated Carrington's intellectual property, labor and expenditures, breached his contract with Mr. Carrington, and defrauded him out of a show that he pitched to Graden for himself.

121. In July 2016, Graden revealed to Carrington that Logo had signed "Finding Prince Charming." The same night Graden revealed this to Carrington, Graden ripped up Carrington's contract.

122. Carrington was understandably furious with Graden, and the two began to argue.

123. In August 2017, Carrington exchanged emails with Graden relative to Graden misappropriating Plaintiff's concept for the "Meeting Prince Charming." Graden was evasive, but did not deny Carrington's claim.

124. In September 2017, Carrington began pitching a new series entitled "Heiristocracy." Most of the material for Heirstocracy was posted on Carrington's website.

125. Carrington contacted producers Darren Stein and Peter Marc Jacobson to produce the series.

126. The material of Heirstocracy is based in part on true life events that occurred between Carrington and Graden.

127. Graden became aware of this and contacted said producers to thwart the production of this series. In an email, dated October 24, 2017, Darren Stein reflects Graden's interference, stating as follows:

> "Hey Rovier, I had a chance to take a look. I enjoyed the vision and the visuals, but after speaking with Brian Graden, I'm focusing on my own projects at the moment."

17

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 20 of 36

128.   Accordingly, Viacom, its agents and executives, including, Brad Grey (deceased) and

Brian Graden, destroyed Plaintiff's ability to work within the entertainment industry, the effects

of which continue to the present.

## CAUSE OF ACTION ONE
### ACTION BY VICTIM OF CONDUCT CONSTITUTING CERTAIN SEXUAL OFFENSES AND ACTS PURSUANT TO CPLR § 213-C: FOR RAPE IN VIOLATION OF PENAL LAW §130.35; CRIMINAL SEXUAL ACTS IN VIOLATION OF PENAL LAW §130.50; AND AGGRAVATED SEXUAL ABUSE IN VIOLATION OF PENAL LAW §130.70
### (Against Defendants Graden and Grey, and Grey Trust and Estate)

130.Plaintiff repeats, repleads and incorporates by reference each and every allegation of

paragraphs 1 through 129 of this Complaint as though set forth in full herein.

131. As set forth more fully above, the acts of Defendant Graden against Plaintiff was rape

under Penal Law §130.35(1) because he engaged in sexual intercourse with Plaintiff by forcible

compulsion.

132. As set forth more fully above, the acts of Defendant Graden against Plaintiff were

criminal sexual act(s) in the first degree, under Penal Law §130.50(1), because Defendant

Graden engaged in anal sexual conduct with Plaintiff by forcible compulsion.

133. As set forth more fully above, the acts of Defendant Graden against Plaintiff was

aggravated sexual abuse in the first degree, under Penal Law §130.70(1), because he inserted a

foreign object into Plaintiff's anus, by forcible compulsion, causing him physical injury.

134. As set forth more fully above, the acts of Defendant Graden against Plaintiff was

aggravated sexual abuse in the first degree, under Penal Law §130.70(1), because Graden

inserted a foreign object into Plaintiff's anus, by forcible compulsion, causing him physical

injury.

18

FILED: NEW YORK COUNTY CLERK 05/01/2018 08:40 PM
Case 1:18-cv-04609-KPF Document 1-1 Filed 05/24/18 Page 21 of 36
INDEX NO. 154060/2018

NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 05/01/2018

135. As set forth more fully above, the acts of Defendant Grey against Plaintiff was rape under Penal Law §130.35(1) because he engaged in sexual intercourse with Plaintiff by forcible compulsion.

136. As set forth more fully above, the acts of Defendant Grey against Plaintiff were criminal sexual act(s) in the first degree, under Penal Law §130.50(1), because Defendant Grey engaged in anal sexual conduct with Plaintiff by forcible compulsion.

137. As set forth more fully above, the acts of Defendant Grey against Plaintiff was aggravated sexual abuse in the first degree, under Penal Law §130.70(1), because he inserted a foreign object into Plaintiff's anus, by forcible compulsion, causing him physical injury.

138. As set forth more fully above, the acts of Defendant Grey against Plaintiff was aggravated sexual abuse in the first degree, under Penal Law §130.70(1), because Grey inserted a foreign object into Plaintiff's anus, by forcible compulsion, causing him physical injury.

139. Plaintiff sustained severe physical injuries, including extensive bruising throughout his body, and bleeding from his anus, and upon information and belief, a sexually transmitted disease from Defendant Graden.

140. In addition to the foregoing injuries and damages, Plaintiff has sustained, and continues to suffer, traumatic and enduring damages and injuries, as a result of Defendants' actions, including, but not limited to: wage loss, loss of professional advancement and educational opportunities, severe mental anguish emotional distress, pain and suffering, anxiety, depression, post traumatic stress disorder, Rape Trauma Syndrome, major depression, generalized anxiety disorder, panic and anxiety attacks, past, present, and future medical expenses, loss of sleep, nightmares, difficulty concentrating, fear, inability to trust, difficulty with relationships, thoughts

19

of suicide, and extreme humiliation, powerlessness, hopelessness, and embarrassment from the reprehensible actions of Defendants.

141. The conduct of Defendants was intentional, and in wanton and deliberate disregard of Plaintiff's rights, therefore, the imposition of exemplary and punitive damages is warranted, and should be assessed against Defendants to punish Defendants for such appalling, and  criminal acts.

142. Defendants collectively, and each of them individually, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, safety and welfare of Plaintiff, thereby justifying the award of punitive and exemplary damages.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.  Actual and compensatory damages in an amount in excess of $50,000,000.00;

b.  Exemplary and Punitive Damages in an amount in excess of $50,000,000;

c.  Attorney Fees, costs, and interest, in an amount to be determined by the Court; and

d.  For such other relief that the court deems proper.

### CAUSE OF ACTION TWO
### FRAUD IN THE INDUCMENT
### (Against Defendants Viacom, Paramount, BGM, Graden, and Grey)

143.  Plaintiff repeats, repleads and incorporates by reference each and every allegation of paragraphs 1 through 142 of this Complaint as though set forth in full herein.

**a.  Defendant Graden.**

144.  As set forth more fully above, Defendants Graden and BGM, presented a Non-Disclosure Agreement ("NDA"), and separate production agreement with BGM, under the

20

illusion that it was required as part of Plaintiff's production agreement, and relationship, with Defendants Graden and BGM.

145. This was a knowing misrepresentation by Defendant Graden and Defendant BGM, which was intended to deceive Plaintiff, so that Defendant Graden could get away with continuing to sexually exploit and manipulate Plaintiff, under the guise of an NDA, and the promise of producing Plaintiff's shows, when in reality Defendant Graden had no intention of ever producing any shows by Plaintiff, or in advancing his professional career, and was only concerned with satisfying his own sexual desires, continuing to manipulate and abuse Plaintiff, and in stealing Plaintiff's ideas and concepts.

146. Further, Defendants Graden and BGM used the NDA, and production agreement, in an attempt to hide his sexually abusive and coercive relationship with Plaintiff, so that he could continue to effectively rape and have sex with Plaintiff, without consequence or liability, in secret, and without fear of prosecution, or other disclosure.

147. As such, Defendant Graden made knowing misrepresentations of material present fact relative to the NDA, and production agreement, which was intended to deceive Plaintiff and induce him to act on it, resulting in injury to Plaintiff thereto.

**b. Defendant Grey.**

148. Defendant Viacom, Paramount, Grey, and others employed by Viacom, or associated with the company, or its networks, fraudulently induced Plaintiff into a relationship with Viacom, under the illusion, that Paramount or MTV were interested in producing Plaintiff's reality show, and working with him in a professional capacity.

21

149. In reality, Defendants and their agents, or people employed by Viacom, or Paramount, who scouted Plaintiff, and brought him onto the lot, for the express purpose of being a sexual pawn, of Defendant Grey, or other executives at Viacom, or Paramount.

150. Neither Viacom, Paramount, MTV, nor Defendant Grey, had any intention of ever producing Plaintiff's shows, and instead, Grey simply wanted to control, manipulate, and sexually exploit Plaintiff, for his own sexual gratification, and under the threat that if he failed to to allow Grey to perform oral sex on Plaintiff, or refused to have sexual intercourse with him, that Plaintiff's shows would not be produced, and he would be blacklisted by Viacom, and his ability to work within the entertainment industry would be placed in peril.

151. This was a knowing misrepresentation by Defendant Grey and Defendant Viacom, which was intended to deceive Plaintiff, so that Defendant Grey could get away with sexually exploiting Plaintiff, and raping him, under the promise of producing Plaintiff's shows, and threat of being blacklisted, when in reality neither Defendant Viacom, Paramount, or Grey, had any intention of ever producing any shows by Plaintiff, or in advancing his professional career, and were only concerned with satisfying the sexual desires of its CEO, and protecting itself from liability, which is why Defendant Viacom offered Plaintiff an NDA, and bags of cash, and blacklisted him from the entertainment industry, when he refused to sign the NDA, or accept a cash settlement.

152. As demonstrated by the foregoing, Defendant Viacom fosters a corporate culture of systemic deviancy, that its executives, and Chairman were aware of, and in some cases, actively participated in, and encouraged, as a means of manipulation and control.

153. Defendant Viacom's blacklisting of Plaintiff only ceased once Plaintiff agreed to have sex with Defendant Graden, and obey him, for months, under his manipulation and control, until

22

finally Graden directly called Sumner Redstone, and Plaintiff was purportedly removed from Viacom's blacklist. However, once a controversy arose between Graden and Plaintiff, Plaintiff was placed back on Viacom's blacklist, and his ability to work within the entertainment industry, was once again placed in peril.

154. As demonstrated by the foregoing, Defendant Viacom fosters a corporate culture of systemic deviancy, that its executives, producers, and even Chairman were aware of, and in some cases, actively participated in.

155. As such, Defendants made knowing misrepresentations of material present fact, which was intended to deceive Plaintiff and induce him to act on it, resulting in injury to Plaintiff thereto.

156. Plaintiff has sustained, and continues to suffer, traumatic and enduring damages and injuries, as a result of Defendants actions, including, but not limited to: hundereds of thousands of dollars in production expenses, thousands of wasted man hours, substantial bruising throughout his body, bleeding from his anus, being raped, sexually exploited and manipulated, wage loss, loss of professional advancement and ability to work within his chosen field and profession, severe mental anguish emotional distress, pain and suffering, anxiety, depression, post-traumatic stress disorder (PTSD), Rape Trauma Disorder, major depression, panic and anxiety attacks, generalized anxiety disorder, past, present and future medical expenses, loss of sleep, nightmares, difficulty concentrating, fear, inability to trust, difficulty with relationships, thoughts of suicide, and extreme humiliation, powerlessness, hopelessness, and embarrassment from the reprehensible actions of Defendants.

157. The conduct of Defendants was intentional, and in wanton and deliberate disregard of Plaintiff's rights, therefore, the imposition of exemplary and punitive damages is warranted, and

23

should be assessed against Defendants to punish them for such appalling, reprehensible, and potentially criminal acts.

158. Defendants by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and disgusting conduct, and acted with willful and conscious disregard of the rights, safety and welfare of Plaintiff, thereby justifying the award of punitive and exemplary damages.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.     Actual and compensatory damages in an amount in excess of $50,000,000.00;

b.     Exemplary and Punitive Damages in an amount in excess of $50,000,000;

c.     Attorney Fees, costs, and interest, in an amount to be determined by the Court; and

d.     For such other relief that the court deems proper.

### CAUSE OF ACTION THREE
### AIDING AND ABETTING FRAUD
### (Against Defendant Viacom, Paramount, Defendant BGM, and Graden)

159. Plaintiff repeats, repleads and incorporates by reference each and every allegation of paragraphs 1 through 158 of this Complaint as though set forth in full herein.

160. As demonstrated by the foregoing, Defendants Viacom and its subsidiaries, and networks, including Paramount and LOGO, and Defendant BGM, and Graden, were aware of Grey and Graden's misdeeds, encouraged them, and attempted to have them covered up, through NDAs and blacklists.

161. Viacom and BGM acted as Defendant Grey and Graden's accomplice, and aided and abetted their crimes and fraud, by attempting to bribe Plaintiff, through promises of a production deal, and by subsequently blacklisting him.

24

162. Viacom, and their respective agents, executives, and employees, including Graden, used coercive, illegal, and intimidating tactics, to control and manipulate Plaintiff.

163. Defendant Viacom, and BGM, respectively, were aware of the existence of the underlying fraud between Grey and Plaintiff; and between Graden and Plaintiff, subsequently.

164. Viacom, to their own benefit, and to avoid liability, and negative publicity, used this fraud for their own selfish purposes, thereby directly and indirectly substantially assisting Grey and Graden in achievement of its continuation, or to cover it up, which also allowed BGM to misappropriate Plaintiff's creative talents for the Prince Charming show, and sell the show to Viacom and Logo, without having to compensate Plaintiff, or recognize his contributions.

165. Viacom, and Logo, affirmatively assisted, helped conceal, or by virtue of failing to act when required to do so, enabled the fraud to proceed.

166. BGM affirmatively assisted, helped conceal, or by virtue of failing to act when required to do so, enabled the fraud to proceed.

167. The actions of Viacom/Logo, and BGM, respectively, were a proximate cause of the harm on which the primary liability against Graden, and Grey, is predicated, and Plaintiff suffered substantial damages, mental anguish, emotional distress, pain and suffering, and other injuries as a result thereto, as fully set forth above.

168. Defendants collectively, and each of them individually, by engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, engaged in willful, malicious, intentional, oppressive and despicable conduct, and acted with willful and conscious disregard of the rights, safety and welfare of Plaintiff, thereby justifying the award of punitive and exemplary damages.

WHEREFORE, Plaintiff respectfully requests the following relief:

25

a. Actual and compensatory damages in an amount in excess of $50,000,000.00;

b. Exemplary and Punitive Damages in an amount in excess of $50,000,000;

c. Attorney Fees, costs, and interest, in an amount to be determined by the Court; and

d. For such other relief that the court deems proper.

### CAUSE OF ACTION FOUR
### BREACH OF CONTRACT
### (Against Defendant BGM and Graden)

169. Plaintiff repeats, repleads and incorporates by reference each and every allegation of paragraphs 1 through 168 of this Complaint as though set forth in full herein.

170. As set forth more fully above, Plaintiff had a contract with Defendant BGM.

171. Defendant BGM breached its agreement with in a variety of ways, including, but not limited to: failing to produce a show by Plaintiff; stealing or misappropriating Plaintiff's creative talents and ideas, namely, relative to Plaintiff's reality show concept and selling said concept to Viacom/Logo, without compensating Plaintiff, casting him, or recognizing him in any way.

172. Defendant Graden, founder and owner of BGM, tore Plaintiff's contract up, and failed to recognize it, which also constitutes a breach.

173. Plaintiff suffered damages as a result of BGM's breach, which Plaintiff will be able to prove with reasonable certainty, and which includes hundreds of thousands of dollars in production expenses, PR fees, other professional fees for services, thousands of man hours, working on said projects; and the fees generated by the sale, production, and distribution of the Logo show Finding Prince Charming.

WHEREFORE, Plaintiff respectfully requests the following relief:

a. Actual and compensatory damages in an amount in excess of $10,000,000.00;

b. Exemplary and Punitive Damages in an amount in excess of $10,000,000;

26

c.      Attorney Fees, costs, and interest, in an amount to be determined by the Court;

d.      For such other relief that the court deems proper.

### FIFTH CAUSE OF ACTION
### UNFAIR COMPETITION: MISAPPROPRIATION OF LABOR, SKILLS AND EXPENDITURES
### (Against All Defendants')

174. Plaintiff repeats, repleads and incorporates by reference each and every allegation of paragraphs 1 through 173 of this COMPLAINT as fully set forth herein.

175. As set forth more fully above, Defendants' misappropriated Plaintiffs' labor, skills, expenditures and good will, and displayed some element of bad faith in doing so.

176. Plaintiff spent several years, and incurred thousands of working hours, and hundreds of thousands of dollars on the ventures, businesses, relationships, creative materials, and intellectual property alleged herein.

177. Defendants' misappropriated Plaintiff out of his labor, skills, expenditures and good will, through fraud, deception and by abusing their relationship with Plaintiff.

178. Defendants' misappropriation was committed in furtherance of Defendants' business and within the scope of their employment of said business.

179. As set forth above, Defendant BGM and Graden specifically used Plaintiff's creative materials, concepts and intellectual property to compete against the Plaintiff's own use of the same property, in selling and producing the Prince Charming reality show to Viacom and Logo.

180. Plaintiffs suffered damages as a result of Defendants' misappropriation, and unfair competition.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      Actual and compensatory damages in an amount in excess of $10,000,000.00;

b.      Exemplary and Punitive Damages in an amount in excess of $10,000,000;

27

Case 1:18-cv-04609-KPF   Document 1-1   Filed 05/24/18   Page 30 of 36

c.      Attorney Fees, costs, and interest, in an amount to be determined by the Court;

d.      For such other relief that the court deems proper.

## SIXTH CAUSE OF ACTION
## MISAPPROPRIATION OF TRADE SECRETS
### (Against Defendant Graden, BGM, and Viacom)

181. Plaintiff repeats, repleads and incorporates by reference each and every allegation of

paragraphs 1 through 180 of this COMPLAINT as fully set forth herein.

182. As set forth more fully above, Plaintiff possessed a trade secret in his television show

concept.

183. Defendant Graden and BGM used Plaintiff's trade secrets in breach of an agreement,

confidential relationship, or as a result of discovery by improper means, namely, Defendants

Graden and GBM acquired the confidential information while in a contractual or confidential

relationship with Plaintiff, purposely caused the project to deadlock, or misled Plaintiff relative

to the production of the project, and Plaintiff's role therein, so that Graden and BGM could steal

Plaintiff's concept, and sell it to Viacom/Logo.

184. Defendants did in fact sell a reality show based on Plaintiff's concept to Viacom/Logo,

which formed the basis of the show Finding Prince Charming.

185. Plaintiff was not given any compensation, credit, or role in the show.

186. Plaintiff suffered damages as a result of Defendants misappropriation.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      Actual and compensatory damages in an amount in excess of $10,000,000.00;

b.      Exemplary and Punitive Damages in an amount in excess of $10,000,000;

c.      Attorney Fees, costs, and interest, in an amount to be determined by the Court;

d.      For such other relief that the court deems proper.

28

## SEVENTH CAUSE OF ACTION
## TORTIOUS INTERFERENCE WITH A PROSPECTIVE EMPLOYMENT
## RELATIONSHIP AND BUSINESS RELATIONSHIP OR EXPECTANCY
### (Against Defendant Graden and Grey)

187. Plaintiff repeats, repleads and incorporates by reference each and every allegation of paragraphs 1 through 186 of this COMPLAINT as fully set forth herein.

188. As set forth more fully above, Plaintiff had a valid business relationship or expectancy, with, among others, HBO and Michael Lombardo; with Ross Breitenbach and his production company; with Darren Stein and Peter Marc Jacobson, and their respective production companies; and with Defendant BGM.

189. Defendant Graden, and Grey, respectively, had knowledge of this business relationship or expectancy.

190. Defendant Graden, and Grey intentionally and wrongfully interfered with Plaintiff's business relationship or expectancy, with, among others, HBO and Michael Lombardo; with Ross Breitenbach and his production company; with Darren Stein and Peter Marc Jacobson, and their respective production companies; and with Defendant BGM.

191. Plaintiff lost out on several opportunities, and many relationships, were destroyed as a result of Grey and Graden's interference. Presently, Plaintiff is unable to work in his chosen field of employment, as a proximate result of Grey and Graden's interference. Therefore, Plaintiff sustained a substantial amount of damages, that continue to the present time, as a result of Defendant Grey and Graden's interference.

192. By engaging in the aforementioned acts and/or in authorizing and/or ratifying such acts, Defendants engaged in willful, malicious, intentional, oppressive and despicable conduct,

29

and acted with willful and conscious disregard of the rights, safety and welfare of Plaintiff,

thereby justifying the award of punitive and exemplary damages.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.      Actual and compensatory damages in an amount in excess of $50,000,000.00;

b.      Exemplary and Punitive Damages in an amount in excess of $50,000,000;

c.      Attorney Fees, costs, and interest, in an amount to be determined by the Court; and

d.      For such other relief that the court deems proper.

### EIGHTH CAUSE OF ACTION
### VIOLATIONS OF SHERMAN ACT (15 USC § 1, et. seq.)
### (Against All Defendants)

193.  Plaintiff repeats, repleads and incorporates by reference each and every allegation of

paragraphs 1 through 192 of this COMPLAINT as fully set forth herein.

194.  In the instant case, it is clear that Plaintiff was blacklisted by Viacom, and its affiliates,

networks, subsidiaries, brands, chairman, executives, employees, agents, and production

partners, which comprises a substantial portion of the entertainment industry.

195. Viacom, through its affiliates, networks, subsidiaries, brands, chairman, executives,

employees, and agents, including, Defendants Grey, Graden, and other executives and employees

of Viacom, Logo, MTV, and Paramount acted in concert to keep Plaintiff from working in his

chosen profession or from utilizing his professional talents.

196. Said Defendants conspired together and agreed with each other to blacklist Plaintiff, and

others like him from seeking employment in the film and television industry, who refused to sign

non-disclosure agreements, or have sex with certain powerful executives and producers.

197. Plaintiff was in fact blacklisted by Viacom, and its affiliates, networks, subsidiaries,

brands, chairman, executives, employees, agents, and production partners, including, MTV, VH

30

1, Logo, Paramount, Grey, Graden, and any one connected to these parties, or who does business with them, because he refused to sign an NDA with Viacom, or continue to allow Grey, and subsequently, Graden, to sexually assault him.

198. Said parties comprise a substantial portion of the entertainment industry, and as demonstrated by the foregoing, with one call, could, and did in fact, destroy Plaintiff's ability to pursue his chosen profession in the entertainment industry.

199. Defendants blacklisting of Plaintiff wrongfully injured Plaintiff's right to expect employment in the film and television industry, and to pursue his chosen profession.

200. Defendants interference with Plaintiff's pursuit of an occupation in a chosen field, over which Defendants exercise a substantial amount of power and control, constitutes an anti-trust violation.

201. Further, blacklisting Plaintiff, or maintaining a blacklist, and interfering with his ability to pursue employment in the entertainment industry, is a gross restraint of trade, and constitutes an anti-trust violation.

202. Defendants could put out of work anyone they deem unpopular, or that does not acquiesce to their disgusting demands.

203. As such, Defendants, and others, conspired to blacklist Plaintiff, and others in a similar situation, and refuse to employ, purchase or use the professional products and the technical skills and efforts of such blacklisted persons, including Plaintiff, all to their detriment, and peril, which results in an unreasonable restraint of trade, and gross anti-trust violations.

204. There is a casual connection between the anti-trust violation, and the injuries and damages sustained by Plaintiff.

31

205. The damages to Plaintiff from being blacklisted, are substantial, and include, but are not limited to, $15,000,000 for the lost opportunity to work in the entertainment industry, and over $300,000 in production expenses and professional fees.

206. Further, Defendants should be ordered to pay a substantial amount of damages in punitive damages to deter similar future conduct; and ordered to restrain and enjoin the Defendants from maintaining a policy of blacklisting, restraining employees from asserting their constitutional rights, or pursuing their chosen fields of employment.

WHEREFORE, Plaintiff respectfully requests the following relief:

a.    Actual and compensatory damages in an amount in excess of $15,000,300.00;

b.    Treble damages, attorneys' fees, costs and interest, pursuant to 15 USC § 1, et. seq;

c.    Punitive Damages and Fines not exceeding $100,000,000.00 as to Defendant Viacom, pursuant to 15 USC 1, et. seq.;

d.    Punitive Damages and Fines not exceeding $1,000,000.00 as to every individual defendant, pursuant to 15 USC 1, et. seq.; and

e.    For such other relief that the court deems proper.

Dated:        New York, New York
              May 1, 2018

                        Respectfully submitted,

                        **THE LANDAU GROUP, PC**

              By:

                        Kevin A. Landau, Esq.
                        45 Rockefeller Plaza, Suite 2000
                        New York, New York 10111
                        (212) 537-4025
                        *Attorneys for Plaintiff Rovier Carrington*

32

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF** New York

-------------------------------------------------------------------x

Rovier Carrington

                       Plaintiff/Petitioner,

      - against -                           Index No.154060/2018

Brian Graden, Brian Graden Media, LLC, et. al.

                     Defendant/Respondent.

-------------------------------------------------------------------x

## NOTICE OF ELECTRONIC FILING

        PLEASE TAKE NOTICE that the matter captioned above has been commenced as an electronically filed case in the New York State Courts Electronic Filing System ("NYSCEF") as required by CPLR § 2111 and Uniform Rule § 202.5-bb (mandatory electronic filing). This notice is being served as required by that rule.

        NYSCEF is designed for the electronic filing of documents with the County Clerk and the court and for the electronic service of those documents, court documents, and court notices upon counsel and unrepresented litigants who have consented to electronic filing.

        Electronic filing offers significant benefits for attorneys and litigants, permitting papers to be filed with the County Clerk and the court and served on other parties simply, conveniently, and quickly.  NYSCEF case documents are filed with the County Clerk and the court by filing on the NYSCEF Website, which can be done at any time of the day or night on any day of the week. The documents are served automatically on all consenting e-filers as soon as the document is uploaded to the website, which sends out an immediate email notification of the filing.

        The NYSCEF System charges no fees for filing, serving,  or viewing  the electronic  case record, nor does it charge any fees to print any filed documents. Normal filing fees must be paid, but this can be done on-line.

        **Parties represented by an attorney:** An attorney representing a party who is served with this notice must either: 1) immediately record his or her representation within the e-filed matter on the NYSCEF site; or 2) file the Notice of Opt-Out form with the clerk of the court where this action is pending. Exemptions from mandatory e-filing are limited to attorneys who certify in good faith that they lack the computer hardware and/or scanner and/or internet connection or that they lack (along with all employees subject to their direction) the operational knowledge to comply with e-filing requirements. [Section 202.5-bb(e)]

**Parties not represented by an attorney: Unrepresented litigants are exempt from e-filing. They can serve and file documents in paper form and must be served with documents in paper form.** However, an unrepresented litigant may participate in e-filing.

For information on how to participate in e-filing, unrepresented litigants should contact the appropriate clerk in the court where the action was filed or visit www.nycourts.gov/efile-unrepresented. Unrepresented litigants also are encouraged to visit www.nycourthelp.gov or contact the Help Center in the court where the action was filed. An unrepresented litigant who consents to e-filing may cease participation at any time. However, the other parties may continue to e-file their court documents in the case.

For additional information about electronic filing and to create a NYSCEF account, visit the NYSCEF website at www.nycourts.gov/efile or contact the NYSCEF Resource Center (phone: 646-386-3033; e-mail: efile@nycourts.gov).

Dated: May 2, 2018

Kevin A. Landau

Name

45 Rockefeller Plaza, Ste. 2000

Address

The Landau Group, PC

Firm Name

New York, New York 10111

kevin@thelandaugroup.com

E-Mail

(212) 537-4025

Phone

To: _____

_____

_____

12/14/17