I7HVCARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROVIER CARRINGTON,

                Plaintiff,

        v.                    18 CV 4609 (KPF)

BRIAN GRADEN, ET AL,

                Defendants.        CONFERENCE

------------------------------x

                                     New York, N.Y.
                                     July 17, 2018
                                   4:50 p.m.

Before:

                HON. KATHERINE POLK FAILLA,

                                    District Judge

                       APPEARANCES

THE LANDAU GROUP
      Attorneys for Plaintiff
BY:  KEVIN LANDAU
      ZACHARY R. LANDAU

RUSS AUGUST & KABAT
      Attorneys for Defendants Brian Graden
       and Brian Graden Media, LLC
BY:  STANTON L. STEIN
      DIANA A. SANDERS

SHEARMAN & STERLING
      Attorneys for Defendants Viacom Inc.,
       Viacom International, and Paramount Pictures Corporation
BY:  STEPHEN R. FISHBEIN
      CHRISTOPHER L. LaVIGNE

LOEB & LOEB
      Attorneys for Defendants Brad Grey, Brad Grey Estate,
       and Brad Alan Grey Trust
BY:  WOOK J. HWANG
      SARAH SCHACTER

I7HVCARC

1    (Case called)

2    THE COURT:  Before we begin, let me thank all of you

3    for your patience.  I'm sure you realize that the cases we

4    have, all the cases we have are very important; but the cases

5    involving criminal defendants are especially important.  That

6    case was not expected to go on as long as it did, but it was

7    important that it did.  I really do thank you for waiting and

8    not being overtly annoyed with the progress of the case.  So

9    thank you for that and let us begin with this case.

10    Thank you.

11    THE DEPUTY CLERK:  Yes, your Honor.

12    In matter of *Carrington v. Graden, et al.*

13    Counsel, please identify yourselves for the record,

14    beginning with plaintiff.

15    MR. K. LANDAU:  Good afternoon, your Honor.

16    Kevin Landau, on behalf of Mr. Carrington.

17    MR. Z. LANDAU:  Zachary Landau, on behalf of Mr.

18    Carrington.

19    THE COURT:  Am I allowed to ask if there is a

20    relationship between the Landaus?  All right, I'm asking.

21    MR. K. LANDAU:  Our parents tell us there is.

22    THE COURT:  Oh, yes.  You have a relation, I

23    understand.  Thank you and welcome.

24    All right.  And representing folks at the back table,

25    sir?

I7HVCARC

1              MR. FISHBEIN:  Steve Fishbein, Shearman & Sterling,

2       for Viacom and Paramount.

3              THE COURT:  Yes, sir.

4              MR. LaVIGNE:  Chris LaVigne, Shearman & Sterling, on

5       behalf of Viacom and Paramount.

6              THE COURT:  All right.  Gentlemen, to which of you

7       should I be directing questions?

8              MR. FISHBEIN:  Well, I'm going to start out, your

9       Honor; and depending on the issue, it will be either me or

10      Mr. LaVigne.

11             THE COURT:  I thank you very much.

12             Sir.

13             MR. STEIN:  Good afternoon, your Honor.

14             Stanton Larry Stein, on behalf of defendant Brian

15      Graden and Brian Graden Media.

16             THE COURT:  Thank you.

17

18             MR. HWANG:  Good afternoon, your Honor.  Nice to see

19      you again.

20             Wook Hwang, Loeb & Loeb, representing the three Grey

21      defendants.

22             THE COURT:  Was it just happenstance that you book --

23      I get you in the morning and the afternoon, sir?

24             MR. HWANG:  Partly, your Honor.  I actually have a

25      full slate of depositions this week, so this was my one day

I7HVCARC

 1   off.

 2           THE COURT:  I'm sorry for the way that you are

 3   spending it, but you are certainly welcome.  Thank you.

 4           MR. HWANG:  Thank you, your Honor.

 5           THE COURT:  Counsel?

 6           MS. SCHACTER:  Sarah Schacter, Loeb & Loeb, also for

 7   the Grey defendants.

 8           THE COURT:  Okay.  Thank you.

 9           Ms. Schacter, should I be directing questions to you

10   or to Mr. Hwang.

11           MS. SCHACTER:  Mr. Hwang.

12           THE COURT:  And he'll turn to you as needed, yes?

13           MS. SCHACTER:  Yes.

14           THE COURT:  Thank you.

15           Counsel?

16           MS. SANDERS:  Diana Sanders; Russ, August & Kabat; on

17   behalf of Brian Graden and Brian Graden Media.

18           THE COURT:  Okay.  Thank you very much.

19           This is our initial conference in this case.  And I

20   don't mind telling you, I get a lot of cases; not all of them

21   have allegations as interesting as this one.  So there's a lot

22   to talk about today.

23           There's also an application from each of the groups of

24   defendants for the ability to file a dispositive motion.

25           So which Landau should I be talking to first?

I7HVCARC

1          MR. K. LANDAU:  Depending on the issues, myself,

2   but --

3          THE COURT:  Sir, one of the things that concerns me,

4   rightly or wrongly, is that there's been an allegation and a

5   lot of documents submitted -- and I'm not going to say that I

6   necessarily credit them, I just want to understand them -- that

7   there are materials in this case or that this case is

8   predicated on fabricated documents.  I appreciate that your

9   client gave me an affirmation saying that they are not.

10          Can you explain how this all arose, sir?  In your

11   joint letter to me there were some what I'll call rhetorical

12   questions -- ah, the other Mr. Landau will handle this.  Okay.

13          There are some rhetorical questions that say, You

14   should ask this individual this question:  Has he ever heard of

15   emails being deleted?  Has he ever heard of things being sent.

16          Cut the rhetorical stuff.  You don't know me, but I'm

17   just not that girl; so let's not do that.

18          Your view is, I believe, not only that there is no

19   basis to believe the documents are fabricated, but that there

20   is no basis even to do an inquiry; is that correct?

21          I'm going to ask you to stand.  Thank you.

22          MR. Z. LANDAU:  At this point in the proceedings,

23   given that we submitted an affidavit from our client and picked

24   apart certain representations made by the expert, the question

25   of authenticate -- I guess the --

6

I7HVCARC

```
1            THE COURT:  Authenticity.

2            MR. Z. LANDAU:  I'll get it.

3            THE COURT:  It's late in the day, sir.

4            MR. Z. LANDAU:  -- is, I think, a little premature.

5       And there's generally one email that's been the focus.

6            THE COURT:  Yes.

7            MR. Z. LANDAU:  And that email is from a nonparty to

8  our client.  We submitted the email from our client; they

9  submitted the declaration and an email from Mr. Darren Stein,

10 who purportedly sent the email.

11           And then there's a third email that was attached to

12 the affidavit of their expert.

13           All three of these emails have different times,

14 there's different spacing on some of them, the header is

15 different.  So there's a variety of questions for that email.

16           THE COURT:  Okay.  But let's follow up on that.

17           First of all, I send emails to people in my life.  And

18 sometimes when I see them or when they've been -- when I have

19 received a reply, the font comes back in a font different than

20 that which I originally sent, and I assume that's got something

21 to do with the email program.

22           With respect to the timing, I'm imagining that

23 sometimes you have to go through a larger network to get to the

24 ultimate recipient.  I can recall being at the Department of

25 Justice and knowing that all of my emails went to, at one
```

I7HVCARC

1    point, Maryland, and, at one point, South Carolina before they

2    made their way to the Southern District of New York, so that

3    added time.  So I guess I'm not as worried about that.

4         I am assuming, sir, that you have brought to your

5    client the allegations, because that is the reason that begat

6    his document to me that all of the emails he had were original

7    and had not been modified in any way; is that correct?

8         MR. Z. LANDAU:  Correct.

9         THE COURT:  You've also explained to him the

10   consequences of submitting a fabricated document in a case, any

11   case; correct?

12        MR. Z. LANDAU:  Yes.

13        THE COURT:  He understands, do you understand, that if

14   I find out later in this case that that document is fabricated,

15   I will dismiss the case, yes?

16        MR. Z. LANDAU:  We have not discussed that issue.

17        THE COURT:  Then let's talk about that.

18        Do we agree that I have a range of sanctions available

19   to me as a judge to deal with abuses of process, and also my

20   inherent ability to manage my own docket; you can agree with

21   that, yes?

22        MR. Z. LANDAU:  Yes, your Honor.

23        THE COURT:  And let's also agree that that particular

24   range of things available to me, the arrows in my quiver, as it

25   were, extend from things like striking a defense or striking an

I7HVCARC

1    argument or finding a particular fact to be true, all the way

2    to the possibility of a default judgment, recognizing that that

3    is a very, very serious thing to do, yes, sir?

4          MR. Z. LANDAU:  Yes, recognizing that there is a range

5    of sanctions.

6          THE COURT:  Indeed.

7          MR. Z. LANDAU:  And the recent amendments to Rule 37,

8    yes.

9          THE COURT:  Yes.

10         Also recognizing that one of the things I need to do,

11   if I'm going to do something as drastic as dismissing the

12   complaint, is to provide notice, yes?

13         MR. Z. LANDAU:  Yes.

14         THE COURT:  Okay.

15         MR. Z. LANDAU:  I would hope so.

16         THE COURT:  Indeed.

17         Also I have the ability -- if I find that people have

18   lied or submitted fabricated documents, I potentially have the

19   ability to refer the matter either to the grievance committee

20   here at the Southern District of New York, if it involves the

21   attorneys or the attorneys were complicit in it.  I also have

22   the ability to make criminal referrals to the United States

23   Attorney's Office or other prosecutorial authorities.

24         Also true?

25         MR. Z. LANDAU:  Yes.

I7HVCARC

1          THE COURT:  Okay.

2          MR. Z. LANDAU:  And just certain of our causes of

3     action would give you the same discretion if they are proved to

4     be true.

5          THE COURT:  Indeed.

6          You don't even want me to look into the *bona fides* of

7     these emails; you want me to accept, because your client, upon

8     being remonstrated by you and upon discussing these issues, has

9     maintained, has asseverated, that these emails are accurate and

10    have not been modified.  Correct?

11         MR. Z. LANDAU:  Correct, your Honor.

12         If I can just clarify something.

13         THE COURT:  Please.

14         MR. Z. LANDAU:  There are obviously many defendants in

15    this case.

16         THE COURT:  Indeed.

17         MR. Z. LANDAU:  And the subject email that we're

18    discussing right now only refers to one defendant, and it's not

19    even an email that's sent from that defendant.

20         THE COURT:  Okay.

21         MR. Z. LANDAU:  So also with Rule 37 and all of the

22    other sanctions that you've laid out, they've gotten a

23    declaration from the person who sent the email, and he's said

24    it's one thing, we've said it's another.  Under a lot of case

25    law, that would create a question of fact, and I think that's

I7HVCARC

| | |
|---|---|
| 1 | an appropriate matter for discovery before staying all of the |
| 2 | proceedings. |
| 3 | THE COURT:  Okay. |
| 4 | But I just want to make sure -- because sometimes you |
| 5 | don't know until we're in the midst of discovery that there are |
| 6 | problems with discovery.  There could be problems that have |
| 7 | nothing to do with malice. |
| 8 | MR. Z. LANDAU:  Problems in discovery?  That never |
| 9 | happens. |
| 10 | THE COURT:  Indeed, sir. |
| 11 | But I don't normally, at the very inception of the |
| 12 | case, get told, now in two separate rounds of premotion |
| 13 | letters, that there is, in fact, a fabricated document at the |
| 14 | heart of the case.  You can dispute whether it's at the heart |
| 15 | of the case; you certainly dispute, I understand, that it is |
| 16 | fabricated. |
| 17 | But I just want to make you aware that if I accept |
| 18 | your suggestion that I not conduct discovery at the front end, |
| 19 | and I find out in discovery that there is some sort of |
| 20 | shenanigan -- that is a legal term -- the documents that are at |
| 21 | the heart of this case, I have and will use to some degree, |
| 22 | including possibly the very strong degree of a default, I have |
| 23 | the ability to use things, I will.  I just want to make that |
| 24 | clear and I want your client to know. |
| 25 | MR. Z. LANDAU:  I think he's entitled to know and we |

I7HVCARC

1    have advised him of that.  Obviously coming from the judge

2    takes on a different meaning.

3            THE COURT:  Yes.  Message:  I care.  That's the thing

4    that you can send to him, and say that I've made very clear

5    that I am taking these very seriously.  I would hope that they

6    would not get an expert from TransPerfect to make statements

7    about the metadata and the content of the emails that would be

8    erroneous or, worse yet, false, but I don't know.

9            So why don't I put that to the side for the moment and

10   maybe you can hand the baton back to the other Landau and we

11   can talk about this case.

12           Tell me about this case, sir.

13           MR. Z. LANDAU:  Well, I guess -- do you want to take

14   it or --

15           THE COURT:  I'll take from whichever of you wishes to

16   speak, but someone has to decide.

17           MR. K. LANDAU:  Sure.

18           THE COURT:  Okay.

19           MR. K. LANDAU:  Your Honor, as we fairly detailed laid

20   out in the underlying complaint, there are several different

21   causes of action against numerous defendants; some overlap,

22   some are distinct unto themselves.  I don't know how much

23   detail you would like for me to go in, but I'm happy to answer

24   any questions if you have any specific allegations to address.

25           THE COURT:  Well, I think you mean specific claims.

I7HVCARC

1          Some of them that, I guess, I find more difficult to

2    understand -- well, let me start with one:  Unlawful restraint

3    of trade.  It may be that your client has issues and maybe that

4    your client has actual viable criminal claims or a possible

5    complaint against some of these folks.  I don't know that I

6    understand the restraint of trade.  That's something that I

7    find difficult to understand.  So if you could help me on that

8    first.

9          MR. K. LANDAU:  Yes, your Honor.

10          MR. Z. LANDAU:  Your Honor, if I may just briefly,

11   because I think we switched it up.

12          THE COURT:  Yes, sir.

13          MR. Z. LANDAU:  The Sherman Act claims involve

14   essentially blacklisting.  And there's a line of cases that go

15   into how that is an antitrust injury.

16          THE COURT:  Yes.

17          MR. Z. LANDAU:  And based on this blacklisting, the

18   restraint of trade is that our client is not able to seek

19   employment in his chosen field of -- in his chosen field.  And

20   that, I think, we can suggest is an antitrust injury which

21   allows us to assert a claim under the Sherman Act.

22          THE COURT:  Okay.  Let's begin by I do know what the

23   Sherman Act is and I understand antitrust law.  I'm telling

24   you -- and maybe I'll just be a little less diplomatic in doing

25   so -- that I don't find much traction in this particular claim.

I7HVCARC

1   I think you have other claims that may well survive a motion to

2   dismiss, but that's one where I'm just not so sure.  So I'll

3   just leave it at that.

4          Why don't I do this:  It's not fair to ask you to

5   argue against motions where I haven't yet had the defense

6   counsel who are proposing them speak a little bit to the

7   issues.  So if there are things that you'd like me to know

8   independent of the contemplated motions to dismiss, why don't

9   you talk to me about those now.

10          MR. Z. LANDAU:  Are we still off of the antitrust?

11          THE COURT:  We're off of all claims.

12          I'm going to say this again:  I will hear from the

13   folks at the back table about their contemplated motions; I

14   will then give you an opportunity to respond.  But right now,

15   before we start talking about the motions, if there's anything

16   about the case that you think I might not have gleaned from the

17   complaint, from the premotion letters, from the joint letter of

18   the parties, I want to make sure I understand.

19          MR. Z. LANDAU:  Yes, your Honor.

20          I think one important aspect is also that -- I think

21   one important aspect of some of the initial issues that are

22   raised is that Plaintiff and Mr. Graden had a relationship that

23   was intimate in nature and they had a relationship for the

24   better part of a year or two.

25          THE COURT:  Yes.

I7HVCARC

1          MR. Z. LANDAU:  So these are not strangers.  These

2   emails and communications, correspondence, they are not coming

3   out of nowhere.  I think it's important, based on their

4   relationship, that if we are going to get into those types of

5   issues initially, that we be allowed the same type of

6   discretion as to email accounts and emails and that kind of

7   thing because there's a challenge to one email.  So the other

8   emails that we submitted help, I think, authenticate some of

9   the other emails.  But we would just ask for the same type of

10   latitude.

11          THE COURT:  I'm not sure what you mean.  Are you

12   suggesting to me that if I find out the defense has fabricated

13   something --

14          MR. Z. LANDAU:  Not fabricated.

15          THE COURT:  Okay.

16          MR. Z. LANDAU:  No, we don't have any evidence to

17   suggest that.  But there is a history and a relationship to the

18   parties that we are not fully ready to argue today because we

19   haven't gotten into it as deep as they have.

20          THE COURT:  Your client was one of the two parties in

21   the relationship, yes?

22          MR. Z. LANDAU:  Yes.

23          THE COURT:  Did he keep the emails?

24          MR. Z. LANDAU:  The email from --

25          THE COURT:  Any emails.

I7HVCARC

1          Sir, I'm not fighting with you.  I'm trying to

2     understand what you mean when you say you want the same

3     discretion.

4          MR. Z. LANDAU:  Oh, sorry.

5          THE COURT:  What do you mean?

6          MR. Z. LANDAU:  Sorry.

7          Just that it's not a one-way street.  So if they

8     challenge certain things, then based --

9          MR. K. LANDAU:  A matter of access, your Honor.

10         THE COURT:  I'm sorry?

11         MR. K. LANDAU:  Access as to the email accounts.  If

12    there's access provided to our clients, we would appreciate the

13    reciprocation as to Mr. Graden or whatever party is

14    challenging.

15         THE COURT:  Okay.  Well, do you have an expectation

16    that you're not going to get responsive emails or is your

17    concern that they are not going to be produced in a format that

18    is useful to you?  I guess I'm just trying to understand.

19         MR. K. LANDAU:  Our concern is that they are

20    unilateral requests as opposed to an actual mutuality of

21    discovery.  So provided that we open whatever metadata that is

22    required of our client, that the same be available of theirs as

23    well.

24         THE COURT:  So that's a very long way of saying that

25    to the extent there is ESI discovery, you would want the same

I7HVCARC

1  protocols to be in place going each way.

2       MR. K. LANDAU:  Yes, your Honor.

3       THE COURT:  Okay.

4       But I want to get back to something the other Landau

5  said, and that was with respect to the nature of the

6  relationship.

7       Is there some reason to believe that your adversary

8  counsel has more information about the relationship and about

9  the communications in that relationship than you have?

10      MR. K. LANDAU:  Not to my knowledge.

11      We haven't engaged in discovery, so I can only speak

12  to myself.  But I think he knows more about his client and the

13  surrounding conduct of his client as we know about ours.

14      THE COURT:  Is there a reason why your client -- did

15  your client ever consider bringing criminal charges against any

16  of the defendants in this case?

17      MR. K. LANDAU:  He has and we've been speaking to him

18  about that as well.

19      THE COURT:  I see.

20      Right now today, no such charges have been brought?

21      MR. K. LANDAU:  To my knowledge, I don't believe that

22  there have.  I believe he previously attempted, but those were

23  not continued under the circumstances.

24      THE COURT:  I need you to raise your voice please.

25      MR. K. LANDAU:  Pardon me.

I7HVCARC

```
 1          I believe that previous attempts were made, but not
 2    exactly certain as to the circumstances as why they weren't
 3    followed through at that particular point in time.  We have had
 4    several discussions and he has been responsive.  But it's a
 5    very difficult decision for him to make, and so we're allowing
 6    him to make that independent of everything else that's going on
 7    in his life right now.
 8          THE COURT:  You're not representing him in any
 9    criminal matter, sir?
10          MR. K. LANDAU:  We are not.
11          THE COURT:  Does he have separate criminal counsel of
12    which you are aware?
13          MR. K. LANDAU:  No.
14          THE COURT:  Okay.
15          I'm sorry, is that no, you don't know, or no, you
16    don't believe he has any?
17          MR. K. LANDAU:  I don't believe he has any.  I'm not
18    aware that any actions have been commenced.
19          THE COURT:  Right now today, what is your client doing
20    to support himself?
21          MR. K. LANDAU:  He manages real estate.  It's a family
22    business.  He receives a trust fund as well.  So I think that
23    there is certain obligations he has to that trust.
24          THE COURT:  When you say he manages real estate, is
25    this property that belongs to his family?
```

I7HVCARC

1          MR. K. LANDAU:  I believe so, your Honor.

2          THE COURT:  I see.

3          And in managing it, is he -- I don't know what

4  "managing" means; it can mean many different things.  Is he

5  caretaking, is he putting on the market, is he keeping the

6  lights on and the bills paid, or you don't know?

7          MR. K. LANDAU:  What I know is that he receives a

8  monthly allowance from his family.  And I don't know the

9  extent, but I know that he is involved in some type of real

10  estate management.  I don't know if that's just a manner in

11  which he tells people instead of saying, I'm a trust fund rep.

12          THE COURT:  Okay.  Thank you.  I appreciate your

13  candor.  We'll work better if you continue to be that candid.

14          There are several -- don't sit down just yet.

15          MR. K. LANDAU:  Oh, okay.

16          THE COURT:  There are several programs that were set

17  up or made reference to in your complaint.  A series called

18  *Inheritance*, a series called *The Carrington Diaries*, a series

19  called *Heiristocracy*.

20          Right now today is there anything going on with any of

21  those programs, whether involving your client or not?

22          MR. K. LANDAU:  No, your Honor.

23          There was another one called *Finding Prince Charming*.

24          THE COURT:  Yes.  Thank you for reminding me.  That's

25  at an earlier paragraph, yes.

I7HVCARC

1            And?

2            MR. K. LANDAU:  And I don't know if that season has

3     been continued or if it's been canceled, but I know at least,

4     if memory serves correctly, it was on as late as last season;

5     so it was picked up for at least a season or two.

6            THE COURT:  Okay.  And I guess I should have mentioned

7     *The Life of a Trendsetter,* that was a pilot that did not make

8     it to --

9            MR. K. LANDAU:  I believe so.  I believe that it was a

10    sizzle reel type of pilot.

11           THE COURT:  I beg your pardon, a?

12           MR. K. LANDAU:  A sizzle reel/pilot episode.  So I

13    don't know if it had the duration of a pilot, but the intent

14    was to have it produced.

15           THE COURT:  Understood.

16           All right.  Anything else I should know about, sir?

17           MR. K. LANDAU:  Not at this time, your Honor.

18           THE COURT:  Thank you so much.

19           Mr. Fishbein, you have a motion you wish to bring.  Do

20    you wish to discuss it with me?

21           MR. FISHBEIN:  Yes, your Honor.

22           I'd like to address the email issue first, if I could.

23           THE COURT:  You may.

24           MR. FISHBEIN:  Your Honor, we have very serious

25    concerns about authenticity of the emails attached to the

I7HVCARC

1  amended complaint.  And it's not just one email or one

2  defendant, as I will outline for your Honor.

3          What we are asking for here, as we mentioned in the

4  joint status letter, is we do think it's appropriate to have a

5  short, upfront period -- we're only talking about ten emails

6  that are attached to the amended complaint.  And within 30

7  days -- we've already propounded discovery requests; I will

8  describe them to your Honor.  I think within 30 days, if

9  plaintiff is required to comply with these discovery requests,

10  we'll get to the bottom of it.

11          And look, we're going to raise very serious concerns.

12  We have not come to an ultimate conclusion.

13          THE COURT:  But the problem, sir -- excuse me for

14  cutting you off -- is that I have lots of cases where the

15  parties are in dispute about what happened or didn't happen and

16  how I should interpret one thing or another.  And it's not

17  often the case that I have some sort of discovery preliminary

18  to motion practice.

19          In this case, for better or worse, the plaintiff has

20  said in response to your allegations that these are legitimate,

21  nonfabricated emails kept in the manner in which they were

22  received or sent.  So I'm not sure why I should be getting

23  behind that in this case.

24          I've made clear my views as to what happens if you're

25  right and they're wrong; but I am worried about why I should,

I7HVCARC

| | |
|---|---|
| 1 | in this case, as distinguished from other cases, actually have |
| 2 | this targeted discovery. |
| 3 | MR. FISHBEIN:  Your Honor, I understand that.  And I |
| 4 | think this case is unusual. |
| 5 | First let me say the rules do contemplate it; Rule 26 |
| 6 | talks about stage discovery and whether it's appropriate.  If |
| 7 | there are discrete issues that up front can be dealt with that |
| 8 | may have greater impact on the case, it's appropriate to do |
| 9 | that. |
| 10 | What's unusual about this case is, again, there are |
| 11 | these ten emails that are attached.  The emails purport to |
| 12 | support the factual allegations.  It's not a question of he |
| 13 | said/she said, which, you're right, often, at the end of the |
| 14 | day, that's the subject of depositions and discovery. |
| 15 | We have third parties who are not involved in the |
| 16 | case; Darren Stein is not a party.  Darren Stein saw an email |
| 17 | in the complaint, and he has now submitted an affidavit saying, |
| 18 | I did not write that email.  I have the email.  I have the |
| 19 | original email that I sent, I have the native copy, and it's |
| 20 | not what is said in the complaint.  We have that with respect |
| 21 | to that email. |
| 22 | We have an IT expert who has collected Mr. Graden's |
| 23 | emails, Exhibits 9 and 10, and said, I see the original emails; |
| 24 | I see the dates and the times.  And the ones in the complaint |
| 25 | are altered; they take a sentence from this one and a sentence |

1   from that one and then put them together and add language

2   that's not in the original.

3          So when we are talking about potential obstruction of

4   justice, potential fabrication, that's different; that's a

5   potential fraud on the court, which I think is different than

6   parties disagreeing about underlying factual matters.

7          And so we have Darren Stein, an independent third

8   party.  We have an IT professional who says that he harvested

9   the emails from Brian Graden's account and that the original

10  native versions don't square with what's in the complaint.

11         THE COURT:  But the response, sir, is that certain of

12  these emails may have been deleted by Mr. Graden and therefore

13  could not be reviewed.  Did your IT professional have the

14  ability to recover emails that may have been deleted years and

15  years ago?

16         MR. FISHBEIN:  No, no, of course not.  The IT

17  professional was just looking at Brian Graden's email account.

18         THE COURT:  I believe what Mr. Landau -- one of the

19  Mr. Landaus -- was saying was that that email does -- it did

20  exist at one point and may have been deleted.  That is why the

21  IT person might not be able to locate it.

22         Is that not a possibility?

23         MR. FISHBEIN:  I think we're talking about different

24  things.  I think with Darren Stein, he did find the email; it

25  just didn't have the phrase that's in the complaint, which is

I7HVCARC

after talking to Brian Graden, which is, of course, critical,

because the plaintiff is trying to say that there's

blacklisting; and that Brian Graden went to Darren Stein and

told him not to work with the plaintiff.  And so as support for

that, he cites an email which Darren Stein says, After talking

to Brian Graden, I'm not interested in your work.

Darren Stein is saying, I have the email, but it

doesn't say "after talking to Brian Graden."  I have it; it's

just different.  It leaves out a key phrase.

So that's the Darren Stein issue.  So I don't think

there's an issue about a missing email there.

On the Brian Graden emails, it's slightly different.

The forensic expert found emails around the same date that have

several of the same sentences that appear in the emails in the

amended complaint.  But then there's additional language in the

emails in the amended complaint that are not in the native

emails that were found in Brian Graden's emails.  So that's

another circumstance where there appears to be fabrication.

Your Honor, there's more.

There's a gentleman named Reno Logan who was another

third party not named in the complaint, not a party.  And there

were emails with him.  As we pointed out in the letter, one of

them from 2011, they refer to this Harvey bullshit in

connection with sexual assault.  That was in 2011, years before

the Harvey Weinstein issues came up, again, just indications

I7HVCARC

1    that this may not be what it purports to be.

2            THE COURT:  If the Harvey comment refers to

3    Mr. Weinstein, you don't think that was known prior to --

4            MR. FISHBEIN:  It's possible, your Honor.  But I think

5    when we started adding these things up, this is the nature of

6    our concern.

7            THE COURT:  I'm telling you that last one doesn't have

8    any traction for me at all.  But keep going.  Keep going.

9            MR. FISHBEIN:  Your Honor, we've been in touch with

10   Reno Logan.

11           THE COURT:  Yes.

12           MR. FISHBEIN:  We do not have an affidavit.

13           He has told us and we are going to pursue in

14   discovery -- and that's part of what we would do in the 30

15   days.  He has told us that the emails are false.  That's a

16   representation he made to us in an email not under oath, so we

17   have not submitted it to the Court.  But that is something that

18   we would pursue.

19           Your Honor, I think you add these things up and then,

20   you know, the first thing we did here is we went to plaintiff's

21   counsel.  We did not come running to the Court; we did not make

22   Rule 11.  We have brought all of this to the attention of

23   plaintiff's counsel.  We said, Can you please preserve your

24   client's emails.  Can you just give us the natives of ten

25   emails.  It's not very burdensome.  We will pay for a forensic

25

I7HVCARC

1    expert to preserve and identify and collect the emails.

2            No response.

3            They objected to our discovery responses.  They said

4    it's premature, it's not appropriate.  He sent an affidavit

5    saying that these things are authentic.  Your Honor, that

6    troubles us too.  I would think that plaintiff's counsel would

7    also want to get to bottom of it.

8            But my point is, your Honor, that fundamentally this

9    is different from parties arguing over whether there was a

10   contract or there wasn't a contract, that type of legal or even

11   factual dispute.  If the suggestions turn out to be the case --

12   and again, we have third party Darren Stein not involved,

13   coming in and saying, That's not the right email -- then it's a

14   serious matter; it's a fraud on the court, it's obstruction.

15           I just don't see why the parties should spend the time

16   and the effort with discovery -- frankly with motion practice

17   on the motion to dismiss -- when in the matter of a few

18   weeks -- and if plaintiff's counsel had cooperated with us, we

19   would have already done it -- we'd get the natives of ten

20   emails; it's just ten emails.  We want the natives of the ten

21   emails, and we want to be able to examine the computers solely

22   with respect to those ten emails so that we know that we are

23   getting the actual natives with metadata.  That's it.

24           THE COURT:  What do you mean examine the computers

25   with respect to those emails?  Did I hear you incorrectly?

I7HVCARC

1          MR. FISHBEIN:  No, no.

2          So we made two discovery requests:  One is to produce

3   the native versions of the ten emails.  That's one.

4          THE COURT:  Yes, I understand.

5          MR. FISHBEIN:  And the other one, since there is some

6   indication that maybe what happened here is that there were

7   different emails that were taken, and a sentence from this one

8   and a sentence from that one were maybe cobbled together, what

9   we said is we'd like to conduct a forensic review of any

10  computer or other device that the plaintiff has that was used

11  to send or receive or access the ten emails.  We're only

12  talking about the ten emails.  And again, we'll pay for this

13  forensic review.

14         And the review would simply be to find out whatever

15  audit trail, metadata, remnants, copies of these ten emails are

16  on plaintiff's devices.  So we would limit this exercise to the

17  ten emails.

18         We may pursue some of the third parties and serve them

19  with Rule 45 subpoenas.  But in a very, very short period of

20  time I think we will get to the bottom of it.  And I think we

21  can then move forward with an understanding of whether the

22  motion to dismiss and everything else should be based on the

23  complaint as authentic or, if there's really an issue about

24  fabrication and obstruction, which, as your Honor says, is a

25  serious matter.

I7HVCARC

1          So I just think in terms of time, in terms of burden,

2     we're not asking for very much, and we have an unusual record

3     from third parties and forensic experts that there really may

4     be an issue here.

5          THE COURT:  How quickly can you get a sworn statement

6     from Mr. Logan?  Mr. Logan is a Mr.?

7          MR. FISHBEIN:  Yes.

8          MR. STEIN:  Your Honor, may I speak to that?  Because

9     I actually spoke to Mr. Logan.

10         THE COURT:  You may, sir.

11         MR. STEIN:  Might as well hear it from the horse's

12    mouth.

13         THE COURT:  As it were, yes.

14         You can stay there, if that's easier for you, sir.

15         MR. STEIN:  Thank you, your Honor.

16         I actually have an email now from Mr. Logan that he

17    sent to me and my associate where he says, I declare under the

18    penalty of perjury that the foregoing is true and correct, and

19    where he says the claims by Rovier Carrington are all

20    fabricated.  He looked at the emails; they are completely false

21    and hold no merit.  I never suggested what he says.  I didn't

22    have this in a formal affidavit to support and present to the

23    Court, so I didn't; I didn't want to do that.  But I have

24    spoken --

25         THE COURT:  You may.  But may I ask you please, if you

I7HVCARC

```
 1    have not already, show that document to your adversaries and
 2    then may I look at it.
 3            MR. STEIN:  Certainly, your Honor.
 4            THE COURT:  Thank you very much.
 5            I don't know if you have extra copies.
 6            MR. FISHBEIN:  We do.
 7            THE COURT:  Sir, I do want to hear from you.
 8            I'll just note that I perceive a difference -- and it
 9    may be a very small point -- between saying that the claims are
10    false or without merit and that the emails that are attached as
11    Exhibits 1 to 6, I think you might need to connect a few dots
12    for me.  I think you'd need to tell me -- sure, he's going to
13    disagree with the claims, that I don't care about.  People have
14    different views about the facts.  But if he were to say that
15    the documents attached as Exhibits 1 through 6 are themselves
16    fabricated based on his receipt or his participation in the
17    conversation, I might be interested.
18            MR. STEIN:  I understand, your Honor.  And that's what
19    we intend on doing through an affidavit.
20            I just want you to know that we did speak at length
21    with him, my associate Ms. Sanders and I on the phone, and he
22    did say that they were not accurate emails; that they were
23    fabricated; that he would never have suggested that
24    Mr. Carrington do what Mr. Carrington says the emails say he
25    should do.
```

I7HVCARC

1          I also spoke to Darren Stein at length before he

2    prepared his affidavit.  And I spoke to both of these gentlemen

3    through their counsel first and also to them directly, with

4    their counsel permitting me to do so.  And Darren Stein also

5    said, I never said that because of Brian Graden I wasn't going

6    forward with this.  That is absolutely a fabricated email.  I

7    never sent it to him.  I never wrote it in an email.  It's not

8    true.

9          THE COURT:  And so Mr. Stein was shown the email in

10   question, sir?

11         MR. STEIN:  Yes, your Honor.

12         THE COURT:  He says that the words "after speaking

13   with Brian Graden" were inserted by someone other than him in

14   his email?

15         MR. STEIN:  Correct, your Honor.

16         THE COURT:  I see.

17         MR. STEIN:  He denied that he wrote that.  He said

18   he's never written that.  It's not true and therefore he would

19   never have written it in the first place.

20         Incidentally, Darren Stein is not related to me, your

21   Honor; just happen to have the same last name.

22         THE COURT:  That's okay.

23         Sir, would you take offense if I spoke as well with

24   Ms. Sanders?

25         MR. STEIN:  No, of course not.

I7HVCARC

1          THE COURT:  She might not get to talk in court, so why

2   not let her do it here.

3          MR. STEIN:  Wonderful.

4          She actually took copious notes of the conversation.

5          THE COURT:  All right.

6          Ms. Sanders, were you present on these telephone

7   calls?

8          MS. SANDERS:  I was.

9          THE COURT:  May I ask you to stand, because otherwise

10  there's a monitor that blocks you.  Thank you.

11         Ms. Sanders, what is your recollection of these

12  conversations?

13         MS. SANDERS:  Which one?

14         THE COURT:  Start please with Mr. Stein, and then go

15  please to Mr. Logan.

16         And let me explain to you my concerns.

17         As I have been suggesting in my conversations with

18  some of the other attorneys, I understand if people draw

19  different conclusions or different interpretations from a set

20  of words on a page.  That doesn't bother me and I'm not

21  permitting discovery if that's the issue.

22         What I'm hearing and what I'd like you to speak to, if

23  you can, is whether someone is saying that words were put on a

24  page and attributed to them that they did not say.

25         Do you understand?

I7HVCARC

1          MS. SANDERS:  Yes, your Honor.

2          THE COURT:  May I hear first -- well, whichever came

3     first, your conversation with Mr. Logan, your conversation with

4     Mr. Stein, just let me know which is which please.

5          MS. SANDERS:  So the conversation with Mr. Stein came

6     first.

7          THE COURT:  Yes.

8          MS. SANDERS:  And this Mr. Stein and I spoke first

9     with his attorney, who advised us that Darren Stein had

10    contacted him and advised him that there was an email that he

11    had seen in the complaint filed by Rovier Carrington that was

12    false and fabricated; and he would like to speak with us; and

13    sent us the email.  And so we saw the actual email.

14          And then we subsequently spoke with Darren Stein

15    himself, this Stein and I.  He told us that he never sent such

16    an email; as he said, he never would have sent anything that

17    had the language "after speaking with Mr. Graden"; and that he

18    checked his own emails and he reviewed all his emails that he

19    ever exchanged with Rovier Carrington.  And that confirmed to

20    him that he never sent such an email.

21          And the only email he did have with Mr. Rovier

22    Carrington he sent to us.  And then he signed his affidavit,

23    which also says those things to that effect.  And that any

24    language in there referring to speaking with Mr. Graden must

25    have been inserted into an email that was sent from him,

1     because he did not write those words.

2           THE COURT:  Did you discuss with him the possibility

3     that emails may have -- he may have deleted emails, not

4     maliciously, but just because you get a lot of emails and you

5     don't save all of them.  Is there a possibility that this

6     language might be included in a version or in an email that was

7     deleted that he just is now not recalling?

8           MS. SANDERS:  Your Honor, the emails that the

9     forensics professional recovered from Mr. Darren Stein's

10    account and the email that he sent that doesn't have those

11    words were all within the same few seconds or one or two

12    minutes.  So the likelihood that that could have happened is --

13    well, it's very unlikely, one; but he unequivocally stated that

14    he sent this one email and that was it.

15          THE COURT:  Okay.

16          And then you spoke thereafter with Mr. Logan?

17          MS. SANDERS:  Yes.  Thereafter we spoke with

18    Mr. Logan, and this was very recently.

19          Mr. Logan reached out to Larry Stein, and we spoke

20    with him on the phone.  He said that he was advised that his

21    name was mentioned in a lawsuit.  And he looked into the

22    lawsuit.  And he again denied the allegations.  And we asked

23    him to review the exhibits and the paragraphs within the first

24    amended complaint, and to advise us of whether or not he has

25    such emails or does not have such emails and if anything is

I7HVCARC

1    accurate.

2         He sent us this email on Saturday advising us that he

3    reviewed the complaint's paragraphs and he believes that this

4    is all false; he doesn't have any such emails and would never

5    have sent those emails.

6         But as Mr. Stein said, we want to dig into it and get

7    an actual formal statement from him as to all of the

8    allegations and the actual exhibits that are attached to the

9    first amended complaint.

10        THE COURT:  It's your contemplation that that

11   affidavit and that review can take place very quickly?

12        MS. SANDERS:  Yes, I believe so.

13        THE COURT:  I want it to be accurate, mind you, and I

14   don't want to delay.  But he, Mr. Logan, is suggesting to you

15   that emails attributed to him are fabricated.

16        MS. SANDERS:  Yes.

17        THE COURT:  Can I ask that you ask both of these

18   gentlemen if there's -- to exclude the possibility that there

19   are deleted emails that they may have forgotten about -- I

20   appreciate what you have said about the few seconds or maybe a

21   minute; I get it.  I would feel better knowing that the

22   question had been asked.  If you haven't, can you?

23        MS. SANDERS:  Absolutely.

24        THE COURT:  Thank you.

25        Anything else you'd like me to know?

I7HVCARC

 1          MS. SANDERS:  That's all.

 2          THE COURT:  Mr. Stein, I'm going back to you, sir.

 3          MR. STEIN:  Yes.

 4          THE COURT:  Yes?

 5          MR. STEIN:  I will just let you know that I was called

 6   even as late as this afternoon in another meeting by Reno Logan

 7   saying, Did you get my email, because this guy has --

 8          THE COURT:  Which guy?

 9          MR. STEIN:  This Carrington has misrepresented me in

10   what I've said in emails; and I want to make sure it's cleared

11   up.  If there's anything else I can do to accomplish that, I

12   would be happy.  So I believe that we can, in very short order,

13   get an affidavit from him answering all of the questions the

14   Court has.

15          The other thing is, your Honor, I'm very interested in

16   the motions to dismiss because I think most, if not all of

17   them, should be granted due to statutes of limitations or

18   failure -- for instance, there is allegedly contracts, and yet

19   none of the details of the contracts specify --

20          THE COURT:  Sir, stop assaulting my microphones

21   please.

22          MR. STEIN:  Yes.

23          And your Honor, but what I'm asking for -- I represent

24   an individual who has been accused of heinous acts.

25          THE COURT:  Yes.

I7HVCARC

1            MR. STEIN:  And it has very adversely affected his

2    ability to conduct business in the Hollywood community, because

3    it was, as they expected, I assume, when they wrote the

4    complaint, with all of this gory detail within it, which was,

5    incidentally, totally unnecessary -- but in any event, when

6    they did this, it was published very widely.  And so my client

7    has now had great difficulty in conducting his business as a

8    result of these allegations.

9            In addition, he is expending a great deal of money in

10   order to defend himself and do the investigations that we've

11   done and perform the legal services.

12           So I would just ask the Court on a very personal basis

13   on behalf of my client to consider the fact that if we were to

14   just go on with this case as any other case, without getting to

15   the fundamental issue of the falsity of these emails, the

16   impact that this would have on my client over a period of time

17   would continue to be significant.  I would ask the Court on a

18   personal basis to please allow us to expedite this discovery in

19   a very limited fashion.

20           We now have two individuals -- neither of whom are

21   involved with this case and don't have any reason not to be

22   truthful -- who have said these are false.  To my knowledge, I

23   have asked plaintiff's counsel what investigation, if any,

24   they've done, and all they've done is go back to their client

25   and have him sign an affidavit.  They could do IT

I7HVCARC

1    investigations; we are.  I would assume they would want to.

2    But we are willing to pay for it, your Honor.  We are willing

3    to conduct it.

4           THE COURT:  What are you willing to do to reciprocate?

5    For example, are there native format emails that your clients

6    suggest are the actual emails that you're willing to turn over

7    for their analysis?

8           MR. STEIN:  Oh, absolutely.  The emails that are in

9    question, we will get the natives from ours, the natives from

10   there, from every -- from Darren Stein, from Reno Logan.

11   Whatever natives are accumulated, your Honor, they are welcome

12   to them; I want them to see them as well.

13          THE COURT:  Is it not also important though that they

14   have access to the devices from which the emails were sent?

15          MR. STEIN:  Your Honor, there are specific emails at

16   issue here --

17          THE COURT:  Yes.

18          MR. STEIN:  -- which are the foundation of their case.

19          If my client sent an email to Rovier Carrington

20   saying, I had a wonderful time last night, okay, that is not

21   relevant to this case.

22          THE COURT:  Of course not.

23          But Mr. Carrington may have sent out a comparable

24   email saying, The fish was great last night.  You don't want

25   that one either, but you're still asking to look at devices

I7HVCARC

1    from which emails were sent.

2              MR. STEIN:  But only to look at the devices for

3    purposes of looking at those ten emails which are the subject

4    of, we believe, fabrication.

5              THE COURT:  Recognizing that you represent neither

6    Mr. Stein nor Mr. Logan, do you believe either of those

7    gentlemen would be willing to allow a similar access for a

8    similarly limited purpose to you and to plaintiff's counsel?

9              MR. STEIN:  Yes.  They've already done that.

10   Mr. Stein has already done that with our IT -- we told our IT

11   person that we wanted him to go in and obtain the native from

12   Mr. Stein; and Mr. Stein and his counsel agreed to that.  I am

13   confident Mr. Logan would do the same.

14             THE COURT:  They would allow similar access for a

15   professional if Mr. Carrington's counsel were to have a

16   professional to make the same --

17             MR. STEIN:  Absolutely.  Absolutely.

18             THE COURT:  I see.

19             MR. STEIN:  It's only fair.

20             THE COURT:  All right.

21             Sir, on the limited issue of the authenticity or the

22   genesis of these documents, do you have anything else to tell

23   me?

24             MR. STEIN:  No, your Honor.

25             THE COURT:  Mr. Hwang, do you have anything else to

I7HVCARC

```
 1   add, sir?  Each side has given their view; I don't want to
 2   deprive you of the opportunity.
 3            MR. HWANG:  Thank you, your Honor.
 4            Certainly we agree with the other defendants that the
 5   issue of authenticity and potential fraud on the court is the
 6   threshold issue.  I think Mr. Fishbein and Stein have gone over
 7   those issues very thoroughly.
 8            A couple of points I will add is during our Rule 26(f)
 9   conference with plaintiff's counsel, it was represented to us
10   the emails in question -- at least some of them -- were
11   forwarded to Mr. Landau, one of the Mr. Landaus, presumably at
12   a time when plaintiff contemplated gnashing and certainly had a
13   duty to preserve.
14            So we are not talking about, unlike Mr. Graden, having
15   to search back seven years in his memory or in his email to
16   find the native versions of these emails.  These were recently
17   forwarded to plaintiff's counsel.  He had them in native format
18   presumably within the last several months; knows where they
19   are.  I would emphasize the lack of burden in providing those
20   ten emails in native format to defendants' counsel to determine
21   what we all view is the threshold issue as to whether fraud on
22   the court, in fact, has been perpetrated.
23            THE COURT:  To play devil's advocate, sir, what we all
24   at the back table agree is a threshold issue.  I don't think
25   the folks at the front table believe it's necessary, because
```

I7HVCARC

1   they remonstrated with their client and been given an affidavit

2   in which he says that these things were maintained in the form

3   in which they were produced to his attorneys.

4          So I appreciate what you are saying.  I'm not yet

5   willing to say -- I'm not going to say that is not a burden.

6   What I'm entertaining right now is the possibility that there's

7   a showing that it is a burden that should be undertaken at this

8   stage in the litigation.  So let's make that clear.

9          I also do think it is and would be something of a

10  burden to allow the access to Mr. Carrington's computer.  But

11  let's please save that for another day.

12          What else would you like me to know?

13          MR. HWANG:  Your Honor, I certainly don't disagree

14  that it's more burden to provide access to Mr. Carrington's

15  computer.  And I would propose potentially a middle ground

16  where the ten native emails, which are easily exported out of

17  Mr. Carrington's gmail account, be provided.

18          To the extent those native emails that were recently

19  forwarded to plaintiff's counsel no longer exist, at that point

20  we can discuss whether an application to forensically examine

21  Mr. Carrington's computer is more appropriate.  If those emails

22  do exist in native format and say what the emails attached to

23  the complaint reflect, then there's no issue here and then all

24  of a sudden -- then the legal issues on 12(b)(6) motions become

25  more relevant.

I7HVCARC

1          But if the threshold issue of fraud to the court is

2     proven or at least the emails that go, in your Honor's words,

3     to the heart of this case, turn out to have been spoliated

4     following the duty to preserve having arisen, then all of a

5     sudden I would propose that the access to the computer is more

6     appropriate.

7          But in terms of getting the ten native emails, there's

8     almost no burden associated with that; it's well within your

9     Honor's discretion to order the stage discovery pursuant to

10    Rule 26.

11         THE COURT:  Mr. Hwang, will you engage with me in

12    something of a rumination?  The answer is yes.

13         Here is my concern.  And I'm not saying it's

14    dispositive; I just want you to aid me as I go through this

15    concern, and then I'm going to turn to the gentlemen at the

16    front table.

17         There is a bit of an optics issue here.  There is a

18    single plaintiff represented by counsel at the front table.  At

19    the back there are -- and he's not a man of no means, but he

20    certainly does not have the stature or the finances of some of

21    your clients.  And so there is a little bit of a

22    David-and-Goliath issue here that concerns me.  And there is a

23    little bit of an issue that this is something that is unusual

24    for me to do at this stage in a case.

25         What I know you're going to tell me is that I can feel

I7HVCARC

1    comfortable that this is that unusual case because two third

2    parties are making identical claims without having any reason

3    to do so other than perhaps fear of being brought into this

4    litigation.

5           But help me on the optics issue.  Why is it that for

6    this single plaintiff I should do what I think is a rather

7    unusual -- I won't say extraordinary, but unusual preliminary

8    bout of discovery?

9           MR. HWANG:  Well, your Honor, I agree it's an optics

10   issue, certainly for the Graden defendants, as well as the Brad

11   Grey defendants.  Brad Grey, who was the CEO of Paramount

12   Studios/Paramount Pictures -- he died a year ago, is no longer

13   here to defend himself -- his reputation, like Mr. Graden's,

14   but posthumously in Mr. Grey's case, has been tarnished by

15   these allegations freely asserted by the plaintiff.

16          So to the extent that these emails have been attached

17   to the complaint and there is evidence, as I think defendants

18   have demonstrated, that at least there's a question as to

19   whether potentially a case dispositive fraud on the court has

20   been perpetrated.

21          Whether he's an individual, a big corporation with a

22   significant means, whether he has a trust fund, I would submit

23   that those issues are irrelevant when we are talking about an

24   issue of fraud on the court that could dispose of this case,

25   vindicating my clients, vindicating Mr. Graden, and vindicating

I7HVCARC

1   Viacom and Paramount, irrespective of the resources that our

2   respective clients have.

3           THE COURT:  All right.  Thank you.

4           Does someone at the front table want to respond to

5   what you've just heard?  I appreciate, gentlemen, that some of

6   this is new to you because -- well, I imagine because it's new

7   to me too.  If you want to just say that you can't speak to it

8   because it is that new, that's fine.  Is that the case?

9           MR. Z. LANDAU:  Yes.

10          THE COURT:  Okay.  Very fair.

11          I guess there's an interesting question for me, and it

12  is the degree to which it makes sense to hear everyone out on

13  the contemplated motions to dismiss.  Let me tell you what I'm

14  thinking, and actually it's what I've thought.

15          I was and may still be reluctant to have the

16  preliminary discovery that's been suggested.  But depending on

17  the detail and the granularity of Mr. Reno -- Reno Logan?

18  That's the gentleman's name?  Excuse me.  I'm sorry, it's two

19  names that could be last names and I'm going to mangle that.

20          Depending on what I get from you all in the very near

21  term, I might change my mind about that.

22          What I'm happy to do is to bring the parties in again,

23  when I've decided the discovery issue, and then talk about the

24  motions to dismiss.  But you're all here; you're all billing it

25  more than I'm earning.  And if you want to talk now, I'd be

I7HVCARC

1   happy to hear from you now.

2          So to the individuals at the back table who have

3   brought the premotion letters, would you like to address them

4   this afternoon?

5          Mr. LaVigne.

6          MR. LaVIGNE:  Yes, Judge.

7          THE COURT:  Okay.  Then let us begin.

8          You are to my left, so I'll start with you.  Go ahead.

9          MR. LaVIGNE:  Your Honor, in our premotion letter we

10  laid out bases as to why each of the claims should be

11  dismissed.  And I'll start with what your Honor first

12  referenced, the Sherman Act.  This is not a Sherman Act place;

13  it's not even close.  It fails on standing, it fails on the

14  fact that they have not identified an appropriate market, and

15  it can't pass the plausibility test.

16         I'm happy to talk about each of those issues, if your

17  Honor has any questions.

18         THE COURT:  I guess the question I have is that they

19  are saying -- and not without some force -- that Mr. Carrington

20  has a much tougher time making his way in the entertainment

21  industry because, he says, of the concerted efforts of the

22  defendants at the back table.  So we can talk about market and

23  we can talk about injury, but he can't earn a living doing what

24  he wishes to do, and he believes that that is caused by the

25  conduct of your clients at the back table.  It's a concerted

I7HVCARC

1    conduct; it's anticompetitive.  Why isn't it antitrust or

2    antitrust-like?

3            MR. LaVIGNE:  Because it's not antitrust injury,

4    Judge.  And there's a whole body of law about this.

5            The plaintiffs cite this Ninth Circuit case in their

6    response that has been distinguished, made clear, it's unique

7    to its set of facts, even by the Ninth Circuit.  And we cite

8    Southern District of New York, one case in our premotion brief

9    specifically, which deals with the medical context and how it's

10   abundantly clear that you have to show anticompetitive injury;

11   you have to show harm to the marketplace.  There are no

12   allegations about that at all.

13           The Sherman Act was not designed to make individuals

14   who may suffer harm as a competitor whole.  That's not the

15   point of the Sherman Act.  The Sherman Act focuses on harm to

16   the market.  You have cases where it's price fixing and

17   consumers suffer because prices get raised.  There is nothing

18   like that at all here alleged, period.  It's not an antitrust

19   case.

20           So they don't have standing.  In addition to not

21   having standing, even if they did, they cannot pass the muster

22   that one has to do at the 12(b)(6) stage for a Sherman Act.

23   You can't simply allege vertical conduct and then throw in a

24   claim that there's a conspiracy.  You can't just show that, for

25   example, the market operates one way and then make this

I7HVCARC

1    broad-based claim that there was a conspiracy.  It doesn't work

2    that way.

3         And here, in their complaint, reading through it, I

4    don't see any instance where they actually can establish or

5    show that there was a cognizable conspiracy.  It's purely based

6    on speculation and claims that there was this black list.  And

7    if you really parse it, in 2011, when they show Brad Grey had

8    this supposed relationship, he then says, For the next three

9    years I suffered -- I could not get employment, therefore

10   there's this big black list antitrust conspiracy.  And that

11   does not pass muster under *Twombly* or the other cases we cited

12   in our letter.

13        THE COURT:  I promise you that I have read your

14   submission and the plaintiff's response to it.  Why don't you

15   use this opportunity, if you will, almost as a reply.  If I

16   were to give you a reply to your premotion letter, why don't

17   you respond to the plaintiff's statements and arguments in

18   opposition to your claims under the motion to dismiss.

19        MR. LaVIGNE:  On all of them or just the antitrust?

20        THE COURT:  Whatever you feel comfortable talking

21   about.  If you want to rest on your papers and think that

22   nothing else needs to be clarified, that's absolutely fine with

23   me.  What I'm saying is it is sometimes the case that after

24   reading the premotion conference letter that is in opposition

25   to yours, there may be things that you wish to clarify and say,

I7HVCARC

```
 1    Oh, well, wait, I can respond to that.  That's what I'm here
 2    for.
 3              MR. LaVIGNE:  Okay.  Well, on that point, the main
 4    response they have is on the Sherman piece.
 5              THE COURT:  Yes.
 6              MR. LaVIGNE:  In the Ninth Circuit case they cite,
 7    where they try and suggest that that case establishes that when
 8    anybody is subject to some type of boycott, they can then bring
 9    a claim for antitrust actions.  That case is different.
10              That deals with the scenario where there actually was
11    an antitrust conspiracy.  There was a whole collusion within
12    the market to decrease prices; the plaintiff wouldn't go on
13    board and, therefore, he said he was blacklisted from his
14    employer.
15              In that case the Ninth Circuit made abundantly clear
16    that that was limited to its set of facts that did, in fact,
17    trigger antitrust concerns, because it contemplated harm to the
18    marketplace as a whole.
19              In the *NFL* case they cited the same type of thing;
20    there's a whole class of players.  The object of the conspiracy
21    was to basically prevent a league from even coming into an
22    existence.  It was not a scenario like this where there's one
23    individual, one individual who's saying, I got harmed,
24    therefore it's a Sherman Act claim.  That's not what the
25    antitrust laws were designed to do.
```

I7HVCARC

1        THE COURT:  Could you speak to the sexual assault

2   issues?

3        MR. LaVIGNE:  The sexual assault issue, they try and

4   charge us as a -- first and foremost, obviously these are grave

5   allegations; very, very serious allegations.  I totally

6   recognize that, Judge.

7        Purely on the law, purely on the law, we are not an

8   accomplice, and they have not come close to alleging that in

9   terms of what we are as an accomplice.  There's no allegation

10  that we we're aware of and then incited, counseled, or induced

11  a sexual assault.

12       THE COURT:  No.  You covered it up and required the

13  NDA, that's what you're alleging.

14       MR. LaVIGNE:  Asked for an NDA.  And I'm not trying to

15  parse things, Judge, but on the statute of limitations, the

16  alleged sexual assault by Brad Grey occurred in 2011 and then

17  it ended.  And that's it.  That's the only involvement we're

18  alleged to have had in the sexual assault.  There's a five-year

19  statute of limitations.  It's out.

20       THE COURT:  What about --

21       MR. LaVIGNE:  The Brian Graden, there's no allegation

22  whatsoever in that complaint that we were somehow involved.

23  There's not even an allegation that we, Viacom or Paramount,

24  knew about it.

25       THE COURT:  What about the gender-motivated protection

I7HVCARC

 1    act claim, where I believe there's a seven-year statute of

 2    limitations?

 3           MR. LaVIGNE:  There's a seven-year statute of

 4    limitations, Judge.  But number one, that fails, just like all

 5    of their New York City claims and their New York State claims,

 6    because plaintiff -- and I've asked for this.  I've served

 7    discovery requests; I still have not gotten confirmation of the

 8    plaintiff's domicile.  But nonetheless, if you look at the

 9    affidavit, it's from California.  If you're a nonstate resident

10    and you try and sue under those statutes, there has to be an

11    impact in the State of New York, and there's nothing like that.

12           This is a New York City -- New York City --

13    Administrative Code that they are trying to rely upon for harm

14    that took place in California.  Even if they could make it,

15    Judge, that's basically a hate crime.  And the *20th Century Fox*

16    case, which they cite repeatedly and claim that their complaint

17    is based on it, if you actually look at the final cause of

18    action, Judge Pauley said the *GMVA* case is not even close.

19    It's basically a hate crime.

20           The allegations for the hate crime -- and I'm arguing,

21    candidly, on Mr. Grey, because he's the one who supposedly did

22    it, but our defenses are derivative -- is essentially that

23    there were comments made about this guy being a man.  That

24    doesn't come close to be a hate crime.  Not even close.

25           THE COURT:  There was something else, but okay.

I7HVCARC

1   Another episode.  But yes, your view is that that itself also

2   does not indicate that there is animus towards men?

3           MR. LaVIGNE:  No.

4           If you look at the *20th Century Fox* case, I think it's

5   on all fours with that.  Simply engaging in an assault against

6   a person in making comments about a person's gender does not

7   then trigger a hate crime enhancement.

8           What I will say is on the fraud and the inducement and

9   the aiding and abetting fraud, in addition to the fact that it

10  fails the particularity requirements, that also is barred by

11  the statute of limitations.  And Judge, I think it's really

12  important to parse these causes of action; because when you

13  really dig into them, it's abundantly clear there's nothing

14  there.

15          The allegations related to fraud and the inducement

16  and aiding and abetting fraud are predicated on the sexual

17  assault.  That's what the case is about, candidly.  There's

18  cases which we cite in our letter which say when you have a

19  case based on sexual assault, you can't then flip it and use

20  fraud.  And that's common sense.  You can't recover in fraud

21  for pain and suffering, and that's the crux of the allegations

22  in the sexual assault.  Even if you could, again, there's a

23  statute of limitations issue; because the object of the fraud

24  was sexual exploitation.

25          They say that Carrington was allowed onto the set in

I7HVCARC

order to be a tool, a sexual tool, of Brad Grey.  Again, that

ended in 2011.  And according to their complaint, their words,

in 2011, their client was told, Go pound sand; you're never

working again.  Fine.  If there was a fraud, the fraud is over,

six-year statute of limitations.

Count Two and Three, easy.  Out.

Count Four and Five, or Five and Six, the

misappropriation/unlawful competition, that's not even close.

That's not even close.

There's no allegation of misappropriation that they

base this on defining Prince Charming that Graden produced.

There's not even an allegation that that logo, which is related

to Viacom, even knew about that.  Again, we cite cases in here

where you have to have more; you have to actually allege

misappropriation.

The final cause of action they assert against my

clients is tortious interference.  That's a very high burden.

They have not alleged any specific employment opportunities or

anything else that Viacom was aware of and prevented him from

doing.  That also has a three-year statute of limitations.

THE COURT:  Sir, let me ask you this:  I will confess

that I paid less attention to the parties' first round of

premotion letters when I understood there was going to be an

amended complaint.

What is the overlap between the statements made in

I7HVCARC

1    your first round of premotion letters and those made here?  Are

2    the arguments the same?  Are they a subset?

3          MR. LaVIGNE:  The arguments are similar.  The

4    arguments are similar, Judge.  The biggest differences are we

5    address in our final premotion letter the sexual assault

6    because we were named as an accomplice for the first time.  And

7    then we address the tortious interference because we were named

8    in the amended complaint.  And then the New York City and New

9    York State employment-based statutes, those were new, so we

10   addressed those for the first time.

11         THE COURT:  Okay.

12         Does someone want to speak?  Mr. Stein -- oh, no, no.

13   I'll hear from you at the end of all three of them.  I thank

14   you very much.

15         MR. STEIN:  Your Honor, I respectfully disagree with

16   arguing the motions at this point.

17         THE COURT:  Well, wait.  Let's be clear.

18         I'm not asking you to argue the motions.  The point is

19   I'm asking if it made sense while we were all together that you

20   would raise any issues you want to that were implicated by your

21   premotion letters.  If you want to stand on your papers,

22   absolutely fine with me.

23         My judge -- the judge for whom I clerked -- used to

24   talk about lawyers suffering from undelivered argument.  I

25   always thought that was a very interesting way of putting it.

I7HVCARC

1    So I never wanted to deprive someone who has prepared to say

2    something to me of the opportunity to say something to me.  But

3    it's totally fine.  Or if you want Ms. Sanders --

4            MR. STEIN:  I'll be very brief.

5            THE COURT:  All right.  Go ahead.

6            MR. STEIN:  I'll be very brief.

7            The difference between the complaint and the amended

8    complaint is just that they added more emails that allegedly

9    supported their positions.  I think it's important that the

10   Court try to parse out, as Mr. LaVigne just said, the various

11   causes of action.

12           If you look at it closely, they'll allege something

13   like interference with advantageous business relations or

14   contractual relations, but they don't establish that they had a

15   relationship.  He was, yes, sending material all over the place

16   to people.  But nobody was seriously taking his material and

17   nobody had a business relationship with it.  The fact that he

18   contacted various people in an unsolicited way often, doesn't

19   mean that there was a business relationship.  You have to have

20   either a contractual relationship or a business relationship in

21   order for there to be an interference.

22           If you look carefully at this complaint, you will see

23   that they've thrown everything in together in the hopes that

24   you will not parse it out and look, what was the relationship

25   with Viacom?  What was the relationship with HBO?  What was the

1    relationship?  There is no relationship there to be the basis.

2    So I want the Court to look there.

3          Secondly, they've alleged a breach of contract in this

4    case.  They haven't said what the contract was going to be.

5    What was his role going to be?  How much was he going to be

6    paid?  What kind of credit would he get?  I deal with these

7    issues all day long in my practice, your Honor.

8          I will tell you, even in California, that has the most

9    loosey-goosey law of anywhere in the country on idea submission

10   cases, even there we require that there's the specifics alleged

11   of what the deal was going to be, because there's no way a

12   court can enforce an agreement or give damages if you don't

13   have the specifics of what the parties allegedly agreed to.

14         If you look at this situation, allegedly there was a

15   contract.  Now, allegedly, Mr. Graden ripped up the contract.

16   But where's Mr. Carrington's copy of the contract?  Are we to

17   assume that they had a contract, but there was not two copies,

18   one for Mr. Carrington, and one for Mr. Graden?  In every

19   situation I've been involved with, both parties have a

20   contract; yet there's never been a contract.  Supposedly there

21   was a nondisclosure agreement.  But wouldn't both parties have

22   the nondisclosure agreement?  We don't know what the terms of

23   the nondisclosure agreement were; we don't know what the terms

24   of the contract were.  There are no specifics being given with

25   regard to any of that information.

I7HVCARC

1          This basically, your Honor, is an allegation of

2    assault and battery of sexual allegations.  The rest of it is

3    all dressing.  And we will establish that it did not happen.

4          But what I want to do, your Honor, is rather than

5    argue motions with them, I want to get to the bottom of this;

6    and that is, are these emails false?

7          THE COURT:  What happens if they are not?  What

8    happens if they are legitimate, and the TransPerfect person is

9    correct, and Mr. Logan has lied -- or has misstated things or

10   misremembered things, and Mr. Stein has done the same?

11         MR. STEIN:  If those emails are accurate, your Honor,

12   then they have good evidence of misconduct on the part of our

13   clients.  Whether it would establish their causes of action is

14   another issue.  But I would think that both sides would want to

15   find out the authenticity.

16         THE COURT:  Sir, I think they do and they believe they

17   have.  That's the point.

18         MR. STEIN:  But your Honor, this is not a situation

19   where two parties, one takes one position, one takes -- this is

20   a matter of science.  This is empirical evidence.

21         We can go to the native emails.  And it isn't a

22   question of opinion; it's not even a question between experts.

23   There will be no diversity between the experts.  Once you have

24   the native emails, once they do their examination, these

25   experts can tell you -- and there will be unanimity among the

I7HVCARC

 1    experts -- as to whether they are real or not.  This is not a

 2    question -- this is a question of science.

 3               THE COURT:  I understand.

 4               MR. STEIN:  It's a question of science.

 5               THE COURT:  I'm chuckling at the idea of unanimity

 6    among experts.

 7               MR. STEIN:  I agree with your Honor.  It would be a

 8    rare circumstance.

 9               THE COURT:  Let us stipulate that you wish not to

10    discuss the motions to dismiss and care more about the issue of

11    the document authenticity.

12               MR. STEIN:  I do very much, your Honor.

13               THE COURT:  Understood.  Thank you.

14               Mr. Hwang, will you or your colleague be arguing the

15    motion to dismiss?

16               MR. HWANG:  I can handle it, your Honor.

17               THE COURT:  Okay.

18               MR. HWANG:  I do share Mr. Stein's view and I think

19    Mr. Fishbein expressed as well earlier that the motions to

20    dismiss should wait until the issue of authenticity of those

21    emails is determined.

22               On issue of authenticity, I don't want to belabor the

23    point, but I will point out one thing.  We did ask that

24    Mr. Landau's firm obtain at least and preserve these ten emails

25    just to avoid the possibility of spoliation by their clients.

I7HVCARC

1    We followed up again and offered to have a neutral third-party

2    e-discovery vendor obtain and maintain and to preserve those

3    emails by a third party without provision to us, at defendants'

4    expense, so that there would be no prejudice to what I

5    understand to be their contention that there shouldn't be this

6    early discovery, but just to avoid the prospect of spoliation.

7          We received no response to both of those.

8          So as far as characterizing Mr. Landau's firm,

9    plaintiff's counsel, as trying to get to the bottom of this and

10   thinking that the affidavit they submitted on behalf of the

11   client did that, I think there is a little bit of what I would

12   characterize as willful blindness on their part as to at least

13   the prospect that these emails are fabricated.

14         With respect to the motion to dismiss, your Honor, of

15   course we would prefer the fraud on the court be proven and

16   that it be shown that the allegations, the salacious

17   allegations, against Mr. Grey be proven false through the

18   evidence we're looking for as to the emails.  But our position,

19   of course, as reflected in our premotion letter, is that

20   notwithstanding the falsity or truth of the allegations, all of

21   the claims fails as a matter of law.

22         THE COURT:  I'll ask you to slow down just a bit, sir.

23         Thank you.

24         MR. HWANG:  Yes, your Honor.

25         And rather than reiterate everything that was stated

I7HVCARC

1    in our premotion letter, I'll just give a broad overview and

2    further to Mr. Stein's point that the allegation against each

3    of the defendants has to be parsed out separately.

4         As against Brad Grey, the only allegation in the

5    complaint that specified any conduct by him are the three

6    purported sexual encounters in 2010 and 2011, the last of which

7    occurred in June of 2011.  That was approximately seven years

8    before the filing of this action.  There are no other

9    allegations against Brad Grey.

10        What the case law post *Twombly* uniformly holds is that

11   you can't simply allege that defendants collectively undertook

12   some conduct.  Those allegations are ineffective plausibly

13   alleged claims specific to any particular defendant.  So as to

14   Grey, Brad Grey and his successors, those allegations are

15   ineffective.  Based on the fact that all of the allegations are

16   from June, and the latest is June of 2011, our position, of

17   course, is that all of the claims are barred by the statute of

18   limitations.

19        With respect to using this as an opportunity to reply,

20   I think the primary argument raised by plaintiff's counsel is

21   that there is a New York EPTL provision.  I believe the law is

22   that it tolls the statute of limitations on any underlying

23   claims upon the death of the defendant; here, Brad Grey.  That

24   provision does not allow a plaintiff to revive a claim that was

25   time-barred at the time the decedent was alive.

I7HVCARC

1              So all of these claims, the CPLR 2013 claim, the fraud

2       claim, unfair competition, misappropriation, the HRL claims,

3       every claim other than the gender discrimination claim were

4       time-barred at the time Brad Grey died.  So you can't revive

5       those claims posthumously, and that's not what that provision

6       stands for.

7              THE COURT:  Could you tell me again please when

8       Mr. Grey passed.

9              MR. HWANG:  May of 2011, your Honor.  Sorry, 2017.

10             THE COURT:  Thank you.

11             Is there someone at the front table who wishes to

12      speak or do you wish to share responses to the premotion

13      articulations of your adversary counsel?

14             MR. K. LANDAU:  Thank you, your Honor.

15             We're going to try to keep it as brief as possible.

16             THE COURT:  Certainly.

17             MR. K. LANDAU:  Yes.  Go ahead.  You can start.

18             THE COURT:  I appreciate there's a lot to digest, so

19      thank you.  But I do promise you that I have read your papers

20      and their papers as well.

21             MR. K. LANDAU:  All right.  Thank you.

22             MR. Z. LANDAU:  Your Honor, just briefly, we would

23      just point out that we amended the complaint; it's upwards of

24      50 pages.  We have distinguished every cause of action per the

25      defendant to help, because there are so many defendants.  So we

I7HVCARC

1   just point that out.

2          THE COURT:  Sir, let me explain something to you.

3          The reason I was asking the question of Mr. LaVigne

4   about whether there was a difference between the premotion

5   submissions is that the thing I am trying to avoid -- and I'm

6   not sure you know this, so let me just say it -- what I'm

7   trying to avoid is a situation where I get a motion to dismiss

8   from your adversary and you respond with a one-page document

9   that attaches Exhibit A, proposed second amended complaint.

10          So if you've already been put on notice of the issues

11  that they purport to identify with your complaint, and you've

12  addressed what you believe need to be addressed, and you have

13  not addressed what you believe do not need to be addressed,

14  that's fine by me.  But I want to know before we schedule

15  motion practice whether you are standing on the complaint that

16  you have filed.  Do you understand?

17          MR. Z. LANDAU:  Yes.

18          THE COURT:  And you are?

19          MR. Z. LANDAU:  We are standing on the complaint that

20  we filed.

21          THE COURT:  I thank you for letting me know.

22          Okay.  Anything else, sir?

23          MR. Z. LANDAU:  The one last thing I would point out

24  is --

25          THE COURT:  Whatever you want me to know.  Don't worry

I7HVCARC

1    about the one last thing.

2           MR. Z. LANDAU:  Relative to the New York City

3    discrimination statutes.

4           THE COURT:  Yes.

5           MR. Z. LANDAU:  There's Second Circuit precedent where

6    the Court has to look at those based on a more liberal view.  I

7    would just point that to the Court.

8           THE COURT:  Okay.  Tell me please where -- no, no, let

9    me ask the questions.  Where does your client live?

10          MR. Z. LANDAU:  Our client lives in Los Angeles.

11          THE COURT:  Okay.  I was just asking for a state, and

12   that's fine.

13          Let me ask it differently.  During the time period

14   from the fall of 2010 through September of 2017, where was your

15   client living?  At all times in California?

16          MR. Z. LANDAU:  Oh, I don't know.

17          THE COURT:  Well, okay.  Let's try it again.

18          At some point in time was any of this conduct

19   occurring in the City of New York?

20          MR. Z. LANDAU:  Oh, I believe there was, because

21   Viacom is based in New York.

22          THE COURT:  What conduct?

23          Sir, there are some rather disturbing allegations --

24          MR. Z. LANDAU:  Yeah.

25          THE COURT:  No, no, no.  I get to talk first, thank

I7HVCARC

1    you.

2           There are some rather disturbing allegations of sexual

3    conduct in this complaint.  Did all of that occur in

4    California?

5           MR. Z. LANDAU:  Yes.

6           THE COURT:  Okay.  What occurred in New York is

7    perhaps discussions about the various programs or entertainment

8    opportunities that were available?

9           MR. K. LANDAU:  Yes, your Honor.

10          THE COURT:  Okay.  That's the New York connection.  Is

11   that what you're saying?  I just want to make sure I understand

12   it.  I'm not disputing it or agreeing with it, I just want to

13   know.

14          MR. K. LANDAU:  Yes, your Honor.

15          To our knowledge, each of the individual defendants

16   also maintained a residence here as well.  So they were from

17   the -- I believe from the single contacts, they would have

18   been -- pardon me.  Strike that.

19          They would have availed themselves of New York

20   jurisdiction as well based upon their contacts to the state.

21          THE COURT:  Sir, if I'm remembering correctly, this

22   case began its life in New York state court and was removed on

23   the basis of the antitrust claim; is that correct?

24          MR. K. LANDAU:  I believe so.

25          MR. FISHBEIN:  Yes, that's correct.

I7HVCARC

1        MR. K. LANDAU:  Was there diversity claimed?

2        MR. FISHBEIN:  No, we were only based in the federal

3   question.

4        THE COURT:  Okay.  So I'm just ruminating for a

5   moment.  If it turns out there is no antitrust claim, is there

6   a reason for this case to remain with me?  I'm not saying I

7   don't want it, I just want to know.

8        MR. K. LANDAU:  I mean we hope it does, but perhaps

9   maybe not.

10       THE COURT:  Perhaps not.  You haven't seen my

11   decisions yet.  That's fine.

12       Does anyone wish to say anything else to me at this

13   time?

14       MR. FISHBEIN:  Your Honor, just yes, very quickly.

15       I understand your Honor is going to reserve on the

16   discovery; you'd like to see the affidavit from Mr. Logan.

17       THE COURT:  I am reserving on everything --

18       MR. FISHBEIN:  Understood.

19       THE COURT:  -- until I see the affidavit from

20   Mr. Logan.

21       MR. FISHBEIN:  Understood.

22       But your Honor, we did serve discovery requests back

23   on June 22nd asking for the ten emails in native form.  They

24   objected on the grounds that it was premature.  I don't think

25   it's premature anymore.  There's no stay of discovery, so it

I7HVCARC

1   just seemed like that's a valid discovery request.  We can make

2   the motion to compel, but that would seem a waste of time.

3   Shouldn't they just give us the ten native emails?

4           It's a valid discovery request that we served.

5           THE COURT:  Calm down, sir.  Calm down.

6           Email to my chambers' email account the discovery

7   requests that have been submitted.

8           MR. FISHBEIN:  Okay.

9           THE COURT:  And when I get Mr. Logan's sworn

10  statement, I will be able to ascertain -- I will assume that

11  you want answers and that the folks at the front table don't

12  believe it's appropriate at this time to give you those

13  answers.

14          I want to make sure you understand something.  It is

15  my practice typically, when doing motions to dismiss, that I

16  stay discovery.

17          MR. FISHBEIN:  I see.

18          THE COURT:  Normally the folks on your side of the

19  table are very fine with that, because they don't want to

20  engage in wholesale document collection and all of that fun

21  stuff if it turns out the case is going to be dismissed.

22          This is the rare bird in which you both want discovery

23  and want to dismiss the case.  So I want to figure out what

24  discovery you've already sought.

25          MR. FISHBEIN:  Okay.

I7HVCARC

1          THE COURT:  Mr. Fishbein, anything else?

2          MR. STEIN:  Nope.  We will submit them to your Honor.

3          THE COURT:  Okay.

4          May I understand from someone at the back table,

5     Mr. Fishbein, that you will order on an expedited basis the

6     transcript of this proceeding?  By "expedited" I don't need it

7     tomorrow, but I would like to have it somewhat

8     contemporaneously with receiving whatever submission I'm going

9     to get from Mr. Logan, so perhaps in a week or so?

10          MR. FISHBEIN:  Certainly.  Yes.

11          THE COURT:  All right.  And off the record.

12          (Off record)

13          THE COURT:  Back on the record.

14          Anything else from anyone else?

15          MR. STEIN:  Thank you, your Honor.

16          THE COURT:  Thank you all very much for your patience.

17          Have a good evening.

18                         *    *    *

19

20

21

22

23

24

25