I9I9CARC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ROVIER CARRINGTON,

                    Plaintiff,

          v.                              18 CV 4609 (KPF)

BRIAN GRADEN, ET AL,

                    Defendants.           CONFERENCE

------------------------------x
                                          New York, N.Y.
                                          September 18, 2018
                                          2:10 p.m.

Before:

                 HON. KATHERINE POLK FAILLA,

                                          District Judge

                         APPEARANCES

THE LANDAU GROUP
     Attorneys for Plaintiff
BY:  KEVIN LANDAU

RUSS AUGUST & KABAT
     Attorneys for Defendants Brian Graden
      and Brian Graden Media, LLC
BY:  STANTON L. STEIN via Speakerphone
     DIANA A. SANDERS

SHEARMAN & STERLING
     Attorneys for Defendants Viacom Inc.,
      Viacom International, and Paramount Pictures Corporation
BY:  STEPHEN R. FISHBEIN
     CHRISTOPHER L. LaVIGNE

LOEB & LOEB
     Attorneys for Defendants Brad Grey, Brad Grey Estate,
      and Brad Alan Grey Trust
BY:  WOOK J. HWANG
     SARAH SCHACTER

I9I9CARC

```
 1              (Case called)
 2              MR. LANDAU:  Good afternoon, your Honor.
 3              Kevin Landau on behalf of plaintiff.
 4              THE COURT:  Good afternoon, sir.
 5              MR. LaVIGNE:  Good afternoon, your Honor.
 6              Christopher LaVigne and Stephen Fishbein on behalf of
 7    Viacom, Inc., Viacom International, and Paramount Pictures.
 8              THE COURT:  Sir, to which of you should I be directing
 9    my questions?
10              MR. LaVIGNE:  Myself, your Honor.
11              THE COURT:  Ms. Schacter.
12              MS. SCHACTER:  Yes.  Sarah Schacter from Loeb & Loeb
13    with Wook Hwang who will be addressing your Honor.
14              THE COURT:  OK.  Mr. Hwang, I should be directing
15    questions to you?
16              MR. HWANG:  Yes, your Honor.  Thank you.
17              THE COURT:  OK.  Thank you.
18              MS. SANDERS:  And Diana Sanders of Russ August & Kabat
19    on behalf of Brian Graden and Brian Graden Media, and my
20    colleague, Larry Stein, is on the phone.
21              THE COURT:  Mr. Stein, are you there, sir?
22              MR. STEIN:  I am, your Honor.
23              THE COURT:  Mr. Stein, I'm understanding that you are
24    participating by listening; is that correct?
25              MR. STEIN:  That's correct, your Honor, as I
```

I9I9CARC

1    understand the Court's instructions.

2              THE COURT:  Why I'm asking that is I have a microphone

3    that is directed to your phone and I'm actually going to move

4    it because it's the one that I would be using.

5              So if you have any problems hearing what's going on

6    you'll let me know, all right, sir?

7              MR. STEIN:  Thank you, your Honor.

8              THE COURT:  Thank you.  All right.  I've gotten two

9    letters.  Can I -- let me first be sure that I only have the

10   two letters.  I have a letter on Shearman & Sterling stationery

11   that I received yesterday in the morning; and then in the

12   afternoon I received a letter from Mr. Landau.

13             Was there anything else I should be expecting?

14             MR. LANDAU:  Not from plaintiffs, your Honor.

15             MR. LaVIGNE:  Not from the defendants, your Honor.

16             THE COURT:  Mr. LaVigne, let me begin with you, sir.

17             I'm a little surprised because I find that the two

18   what I'll call experts, the two forensic folk are not in

19   complete agreement.  What I think -- you may, sir.

20             I want to make sure I understand precisely what was

21   done by both experts so I want to hear about what FTI did and

22   I'm assuming, sir, you've seen what the plaintiff's expert from

23   Progressive has done; is that correct?

24             MR. LaVIGNE:  That's correct, your Honor.  I saw that

25   last night.

I9I9CARC

1          THE COURT:  Have you had an opportunity -- and I

2    understand if you haven't -- to share that report, the

3    Progressive report with your -- with the expert at FTI?

4          MR. LaVIGNE:  We have not, your Honor.

5          THE COURT:  OK.  Let me understand what you want me to

6    take away from the FTI report.

7          MR. LaVIGNE:  From the FTI report, which is confirmed

8    with the plaintiff's expert's report, is basically three

9    things, Judge.  Neither expert -- both experts cannot identify

10   any of the native at-issue communications that are in dispute.

11         THE COURT:  Let me make sure I understand what you

12   mean by that.  I'll think what I understand you to be saying is

13   there are in the world electronic -- there are e-mails in an

14   electronic format that were sent to Mr. Landau and the other

15   Mr. Landau and so at least these e-mails exist in an electronic

16   format but they appear to be a forwarded e-mail.  And what

17   you've been unable to find is the original version of the

18   e-mail that was forwarded to counsel.  Am I correct?

19         MR. LaVIGNE:  That's right, Judge.

20         Basically there are 40 e-mails in various chains that

21   are Exhibits 2 to 11 in plaintiff's amended complaint.

22         Out of those 40 e-mails, FTI could find one, one

23   e-mail that was in its what we call native original form.

24         THE COURT:  Let's make sure we're speaking from --

25   about the same thing.  Native and original means what?  It's in

I9I9CARC

the form -- it's in the -- for example, if it were Outlook, if

it were Gmail, it's in that format, and it is as it was when it

was sent?

MR. LaVIGNE:  Correct.  If you opened up your inbox,

Judge, and if a lawyer -- like the e-mail I sent you last night

if it's residing in that inbox, that's original native form.

So those 39 e-mails, none were found.

Now one reason is because what we found out literally

on the day that was the deadline for plaintiff to comply with

the order turning over all relative communications was that one

of the core accounts, the trendsetter@gmail account, and this

was the account that allegedly was used to correspond with Reno

Logan and encompasses e-mails that are Exhibits 2 to 7 of the

amended complaint, that e-mail account apparently, according to

plaintiff, was deactivated and nobody has been able to access

it.  So that's a second point on which both experts agree.

They cannot identify the at-issue communications.  They cannot

access this trendsetter account.

THE COURT:  Tell me again please, sir, which exhibits

are from the --

MR. LaVIGNE:  Two to seven.

Essentially all of those communications involve the

defendant Brad Grey and Paramount and Viacom by virtue of Brad

Grey's employment.

Now the third main takeaway I got from the FTI report,

I9I9CARC

1  and I certainly got from Mr. Landau's expert report, is they

2  can't explain why they cannot find these e-mails.

3          Judge, to put this in perspective.  This has been

4  going on now for seven weeks.  And I'm not trying to make light

5  of anything.

6          THE COURT:  Please don't.

7          MR. LaVIGNE:  I won't.

8          Our request has been very simple, what we've asked

9  from the Court.  We've been very, very measured.  Show us the

10  original e-mails.  That's what we have asked.  Show us the

11  natives.

12          They were important enough for Mr. Landau and his

13  client to append them to an amended complaint in July.  Show

14  them to us.

15          Because we have put forth good faith sworn testimony

16  that these are fake.  A nonparty, Darren Stein, came in; put in

17  an affidavit and said that e-mail, Exhibit 11, that e-mail has

18  language that I did not send.  That is false.

19          We have an affidavit from Reno Logan who also said he

20  didn't send those.

21          Our request has been simple.  Simply show us the

22  native e-mails.  And we have been unable to get those.

23          Now FTI gave three possibilities.  Number one --

24          THE COURT:  Let me stop you for a moment, sir.  These

25  are the three possibilities that are outlined in Mr. Landau's

I9I9CARC

1    letter, pages two and three, correct?

2              MR. LaVIGNE:  I believe that's right.  Mr. Landau did

3    allude to three possibilities that FTI set forth.  I believe

4    it's in page three to four of Mr. Landau's letter from last

5    night.

6              THE COURT:  OK.  But the three that are listed there

7    for Mr. Hammerquist are the same three that you're about to

8    tell me now.

9              MR. LaVIGNE:  Correct.  One possibility is they were

10   fabricated, all these e-mails.

11             This is not something that we can rule out or say

12   definitively.  These are just possibilities that FTI said as to

13   why they could not find the natives.

14             Possibility number two is that it's entirely possible

15   that these e-mails reside in a cloud or an external device such

16   that when plaintiff sent them from the two active accounts it

17   would appear as a forward.  So, in other words, if they were

18   stored in an alternate device, that was a possibility that FTI

19   said.  And that's one that we noted in our letter.

20             And the third possibility is that these e-mails truly

21   were forwarded from like a trendsetter account or another

22   account to one of plaintiff's active accounts and then from

23   there forwarded on to Mr. Landau.

24             Now the reason why that doesn't make sense --

25             THE COURT:  Wait.  One moment, please.  I thought that

I9I9CARC

1    that particular possibility as proposed by Mr. Hammerquist was

2    that upon being forwarded they were deleted from the original

3    account.

4         MR. LaVIGNE:  That's one of the reasons why we submit

5    that possibility does not make sense.  Because the natives

6    aren't there.

7         The natives aren't there so if they were forwarded to

8    one of the two active accounts from the trendsetter account,

9    for example, there is no evidence of that underlying forward,

10   nor is there evidence in the two active accounts of those

11   e-mails in original form.

12        THE COURT:  Well, we'll get to Mr. Landau's concerns

13   in a moment because I know you've read them.

14        I guess I want to understand the second -- well, which

15   you've now presented as the third, the idea of forwarding.

16        According to Mr. Hammerquist, because I wasn't on the

17   call, is the idea that Mr. Carrington forwarded the e-mails and

18   necessarily volitionally deleted them or is there some universe

19   in which merely by forwarding them they would have been

20   deleted?

21        MR. LaVIGNE:  Certainly not the latter.  Certainly not

22   the latter.  And FTI and Mr. Hammerquist can't speak to exactly

23   what happened.  These are just three possibilities.

24        One of the reasons, we submit, that later possibility

25   should be ruled out is because you have e-mails that are

I9I9CARC

 1   forwarded from plaintiff's two active accounts but you don't

 2   have the e-mail coming in that sends that underlying e-mail.

 3           So one would have to forward an e-mail into the two

 4   existing accounts, then delete that e-mail, and then forward it

 5   to Mr. Landau.

 6           Is it possible?  It's possible.

 7           THE COURT:  It's possible.

 8           MR. LaVIGNE:  It's possible.

 9           So we outlined those three possibilities and asked for

10   the devices because to the extent there was an external device

11   all plaintiff has to do, and all we've been asking is to give

12   us the device, consistent with the Court's order on August 7 as

13   amended on August 24.

14           THE COURT:  But we've now both been advised that these

15   devices are not in his possession.

16           MR. LaVIGNE:  We've now both been advised.

17           And as of last night the answer, after the six-week

18   odyssey, is there was a hack and that's the reason.

19           THE COURT:  I'm getting to the hack in a moment.  I'm

20   back at the devices.

21           Do you accept the explanation provided by Mr. Landau

22   that he can't give you the devices because his client no longer

23   has them?

24           MR. LaVIGNE:  Judge, I can't sit here and say that I

25   have a good faith basis that he -- that there's a

I9I9CARC

1   misrepresentation going on.

2          I finally -- candidly I find it suspect that over the

3   last five to six years the only devices that were referenced in

4   plaintiff's letter are iPhones which notoriously are very

5   difficult to mirror image.  There's not one reference to a

6   computer on there.

7          THE COURT:  I thought one of the devices was a

8   BlackBerry.

9          MR. LaVIGNE:  BlackBerry, fine.  Not an actual

10  computer.

11         But I don't have a basis, I can't come in and say I

12  have evidence that that is a misrepresentation.

13         THE COURT:  Let me ask the question a little bit

14  differently, please.

15         At any point before last night were you or any of the

16  defense attorneys advised that these devices were no longer in

17  Mr. Carrington's possession?

18         MR. LaVIGNE:  No.

19         THE COURT:  I'll ask the follow-up question.

20         I issued the order some six, seven weeks ago, correct?

21         MR. LaVIGNE:  Correct.  August 7.

22         THE COURT:  When was the -- were there discussions

23  about turning over the devices for review at any time prior to

24  last night?

25         MR. LaVIGNE:  Yes.  There were discussions on I

I9I9CARC

1    believe it was August 28 where we had -- I can look at my

2    calendar for the exact day.  There were two discussions.  One

3    was on August, I believe, 28 and at that moment in time we had

4    not received a list of devices from the Landaus.  We asked for

5    it.  We were told that they thought they had already supplied

6    it.  We said they had not.  They said all right they'll look

7    into it.

8            And then on September 6, which was last week, we had a

9    follow-up discussion with Zach Landau.  And we asked Zach

10   Landau again:  We need these devices, any devices defined in

11   the order that was used to send an at-issue communication or

12   forward it to counsel, we need to have a list of those.

13           And Zach Landau said the same thing as Mr. Landau,

14   which is we thought we gave that to you; if we didn't give it

15   to you, we'll give it to you tomorrow.  We did not get it.

16           Eleven days has passed by.  We never got this.

17           I can say, in compliance with the Court order, I think

18   the deadline was August 24, myself, counsel for Viacom,

19   Mr. Hwang, counsel for Brad Grey and the estate, we advised

20   plaintiff that we did not have any at-issue communications in

21   our possession nor any devices.  Counsel for Graden did send

22   over native communications via e-mail to Mr. Landau, consistent

23   with the court order, and identified the one device in his

24   possession that was used to transmit or otherwise fall within

25   the parameters of the order.

I9I9CARC

1          So last night hearing about this iPhone was the first

2    time we had heard about it.

3          THE COURT:  Mr. Hwang, did you want to add something

4    to that?

5          MR. HWANG:  I can clarify the timeline.

6          THE COURT:  Please.

7          MR. HWANG:  The deadline to identify the devices was

8    August 24.  On that day all three of the defense counsel

9    advised, again Mr. Graden advised -- disclosed the identity of

10   the device he used to transmit the at-issue communications and

11   Viacom --

12         THE COURT:  Sir, I'm going to ask you to speak slower

13   and louder.  For some reason you're coming in very faintly.

14   Thank you.

15         MR. HWANG:  I apologize, your Honor.

16         THE COURT:  That's OK.  Go ahead.

17         MR. HWANG:  In essence, your Honor, on August 24 that

18   was the deadline to identify all of the devices as that term

19   was defined in the order.  All three sets of defense counsel

20   complied with that obligation on August 24.  We asked,

21   concomitant with our disclosure to the Landaus, that they

22   provide that information to us that day.  That request wasn't

23   complied with.  The deadline to actually produce the devices

24   was August 28.

25         We had e-mail communications on August 24.  We had

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

I9I9CARC

called on August 30, during which one of the Landaus advised

that they thought they already provided the identity devices to

us, which they hadn't, and that they would do it the next day.

On September 6 we had another call.  We reminded them

that that obligation hadn't been satisfied.  Again, they told

us they would provide that information the next day.  And,

again, we didn't get any of that information.  And the letter

submitted last night was the first time we've heard that there

is an iPhone that constitutes one of these devices that was

required to be mirror imaged weeks ago.  And it's the first

time they disclosed to us that all of these other devices that

were used to transmit the at-issue communications no longer

exist.

THE COURT:  Mr. LaVigne, I'm returning to you, please.

Mr. Hammerquist gave his alternatives, his theories as

to how this might have happened on the 6th of September; is

that correct?

MR. LaVIGNE:  That's correct, Judge.

THE COURT:  Between the 6th of September and

yesterday what did you and other defense counsel do to try and

figure out which one of these theories was the one that might

actually explain what was going on?

MR. LaVIGNE:  Well what we did was we looked at the

report.  We reviewed it.  It was a neutral e-discovery vendor.

So to the extent we're going to have discussions with the

1    vendor the Landaus participate.  We did have one discussion

2    with the vendor where these three possibilities were

3    hypothesized.  And the consensus, at least on our end, was

4    obviously fabrication is one possibility.

5              THE COURT:  Is one possibility, yes.

6              MR. LaVIGNE:  And I'm not jumping to conclusions,

7    Judge.  I'll summarize at the end my view on this.

8              The external devices is another possibility.  To the

9    extent these were stored in an external device we're entitled

10   to that under the order, which is why we had the call on

11   September 6 to see that and to actually test it, and we never

12   got a response.

13             THE COURT:  Let me understand what that means.  Does

14   that mean if somewhere there's a thumb drive where all these

15   exist or if it is in iCloud storage --

16             MR. LaVIGNE:  Both.

17             Let me emphasize.  This is an oral presentation that

18   FTI gave to both counsel for the plaintiff and myself.  And

19   Mr. Landau is right it's not in his report.  But I think we're

20   both in agreement on those three possibilities.

21             And the second one was these deleted e-mails.

22             Now the consensus we have -- and, Judge, what I feel

23   very strongly about -- is we're asking for these four

24   additional methods of discovery in order to get the answers to

25   that.  Because one of the difficulties we have here is, again,

I9I9CARC

1    at the eleventh hour we found out that the core -- one of the

2    three accounts, which I submit is really the core account from

3    my client's perspective, doesn't exist.  It's deactivated.  And

4    that's been known -- that's been known since the inception of

5    this case, apparently.

6           We have no mechanism of having FTI or any other vendor

7    get in there and look for the native communications.  So that's

8    a gap.

9           So what we want to do -- and, again, to get to the

10   truth and to find out if this is a red herring or not, and this

11   is a straightforward issue:  Do these e-mails exist?  Get a

12   subpoena to Google for the subscriber info and everything else.

13          THE COURT:  And it sounds like Mr. Landau is in

14   complete agreement with you on that.

15          MR. LaVIGNE:  He does not disagree with me based on

16   his last letter.

17          THE COURT:  So that's the easy one.  No one is

18   disagreeing.

19          MR. LaVIGNE:  That's the easy one.

20          And the second point is to direct Mr. Carrington, the

21   plaintiff, who has put these e-mails at issue, to sign a

22   consent so that if this account does exist Google will have the

23   necessary authorization so that they can go, get the content

24   and then send it to FTI.  We're happy to have this go to the

25   neutral e-discovery vendor and we're happy to use the exact

I9I9CARC

1    same protocols as we have in the past.  And then FTI can look

2    for this.

3            Because right now we have a situation, and I was

4    talking about those three possibilities, Judge, and I'll get to

5    this now, plaintiff took issue with my words that the logical

6    inference is that these were fabricated.  And I stand by that.

7    I stand by that yesterday.  I stand by that today.  I'm not

8    saying it's a finding.  I'm not saying it's a conclusion.  I'm

9    saying it's a logical inference because they can't identify the

10   e-mails, they can't access the key account, and they can't

11   explain it.  They can't explain it.  Basic things like this

12   trendsetter account, why was it deactivated.  And some of the

13   most important -- the core issue in this case, contemporaneous

14   communications that corroborate allegations that are explosive,

15   candidly and to be blunt, those are attached to the complaint

16   but they were never preserved.  And I alluded to the hack

17   before because the explanation now was there was a hack.  Well

18   that hack apparently occurred on May 24.

19           THE COURT:  The day the complaint was filed.

20           MR. LaVIGNE:  No.

21           THE COURT:  Within a day.

22           MR. LaVIGNE:  Three days after the complaint was

23   filed, Judge, but three days after -- in state court, your

24   Honor.

25           THE COURT:  Oh, in state court.  I see.

I9I9CARC

1          MR. LaVIGNE:  In state court it was filed May 2.

2          THE COURT:  That's right.  OK.  It came to me on the

3    24th of May.

4          MR. LaVIGNE:  That's right, Judge.  But if you take

5    the sequence and the undisputed facts and you accept that there

6    was a hack, that hack, plaintiff says occurred presumably by

7    Brian Graden, since he apparently had these credentials.  That

8    took place three days after Graden's counsel, Graden's counsel

9    sent a preservation request.  So there is this ghost out there

10   who is sophisticated, clever and cunning enough to go in and

11   delete e-mails to support a case, why would somebody do that

12   after a preservation request was sent?

13          Not only that but when they went in there and were

14   smart enough to delete all these natives, why would they not

15   delete e-mails that were forwarded to counsel?  In addition,

16   why would they not delete the one e-mail where there is no

17   dispute about authentication?  Candidly, it doesn't add up, I

18   submit.

19          In addition that hack only happened on one of the

20   three accounts, the roviercarrington@gmail which was in May.

21   If you take what plaintiff's expert said at face value, and I'm

22   purely arguing the inferences, undisputed facts, then in

23   mid-August you have to accept the fact that this expert went

24   in, tried to find some additional e-mails, found some purged

25   items, and that was deleted.  That was deleted.

I9I9CARC

| | |
|---|---|
| 1 | THE COURT:  I want to understand.  Was the gentleman |
| 2 | from FTI not looking for purged e-mails? |
| 3 | I'm a little bit confused -- let me finish, please. |
| 4 | I want to be sure I'm understanding because I'm |
| 5 | reading Mr. Landau's submission and the report that goes with |
| 6 | it to suggest that his forensic person was able to find certain |
| 7 | things in purged e-mails.  I want to understand what they are |
| 8 | and whether the gentlemen or people from FTI were looking for |
| 9 | those things as well. |
| 10 | MR. LaVIGNE:  My understanding with FTI is, yes, they |
| 11 | were looking for purged e-mails. |
| 12 | My understanding also is that Mr. Landau's expert -- |
| 13 | and this is one of the real issues we have with this disclosure |
| 14 | we read last night -- went into plaintiff's account, one of the |
| 15 | three accounts, thecarringtondiaries, and apparently never made |
| 16 | a mirror image or did anything else but went in and, for lack |
| 17 | of a better word, started sleuthing around trying to do all |
| 18 | this type of work, identified some e-mails that were purged. |
| 19 | And then if you take that report at face value, those findings, |
| 20 | that audit trail -- and the record is not entirely clear on |
| 21 | this, frankly -- was deleted before FTI was given access.  So |
| 22 | by the time FTI was given access to that account, plaintiff's |
| 23 | expert had already gone in there, had already apparently found |
| 24 | some items that were purged and all that stuff, if you accept |
| 25 | this proposition, was deleted. |

I9I9CARC

1          I have no reason to dispute that something was

2     deleted.  The idea that some third-party actor did that and

3     that's why they can't identify, they can't access, they can't

4     explain, to me is highly suspect.

5          THE COURT:  I want to make sure I understand this.

6          I received your letter before I received Mr. Landau's

7     letter.  You are telling me that the progressive review of the

8     account took place immediately prior to FTI's review?

9          MR. LaVIGNE:  That's correct, Judge.

10          THE COURT:  So FTI would not be able to replicate what

11     this individual -- I guess it's PTG was able to do because the

12     deletion -- the purged e-mails had already been deleted.

13          I'm trying to figure -- I'll save that for Mr. Landau

14     because I'm trying to figure out whether what is lost here was

15     the fact of that search or the results of it.  If somewhere

16     there is a purged e-mail account that used to exist but now

17     doesn't, I'd like to understand that.

18          MR. LaVIGNE:  Certainly not an entire -- as I

19     understand it, an entire account has not been purged.

20          THE COURT:  OK.

21          MR. LaVIGNE:  We have three accounts.  The trendsetter

22     account, which, again, has some of the most explosive e-mails.

23     According to plaintiff, the reason why no e-mails are able to

24     be found, identified, or located is because that account was

25     deactivated.

I9I9CARC

1          THE COURT:  But did you say in your letter that there

2    were communications from the trendsetter account more recently

3    than would have been suggested by the date of its closure?

4          MR. LaVIGNE:  No, your Honor.

5          THE COURT:  When was the last account -- when was the

6    last time someone got something from the trendsetter account?

7          MR. LaVIGNE:  I believe the last e-mail from the

8    trendsetter account is 2014 or 2015.  I think it's Exhibit 7.

9          MR. HWANG:  Your Honor, there were forwards, just to

10   clarify, from Mr. Carrington's Microsoft account of e-mails

11   that resided in the trendsetter account to the Landaus as

12   recently as May 6 and May 7 after the filing of this action.

13         MR. LaVIGNE:  But those are forwards, Judge.  The last

14   time we have any evidence of the trendsetter being used

15   contemporaneously by the plaintiff was around 2014 and 2015.

16         THE COURT:  You and I are talking past each other.

17   I'm trying to figure out when the trendsetter account was

18   deactivated.  Mr. Hwang's answer to me suggests that

19   Mr. Carrington was able, in or about May of 2018, to access the

20   account in order to forward these e-mails to his attorney.

21   However, it may be, because I don't know, that these e-mails

22   were saved long, long ago and only more recently were

23   forwarded.  But Mr. Hwang is understanding what I'm trying to

24   say which is that the trendsetter account was invoked at least

25   in May of 20818.

I9I9CARC

1          MR. HWANG:  Your Honor, I have a couple examples that

2     were produced to us by FTI that I think it would be helpful for

3     your Honor to see for context.  And I'm happy to provide to

4     plaintiff's counsel a set as well.

5          THE COURT:  Yes.  Mr. Lopez, would you please get

6     those e-mails.

7          THE DEPUTY CLERK:  Yes, your Honor.

8          MR. HWANG:  Your Honor, if I could just clarify one

9     thing as far as the three scenarios that FTI posited to us.

10          THE COURT:  Yes.

11          MR. HWANG:  One scenario was did they reside on an

12     actual device or in the cloud as of the time these e-mails were

13     forwarded to the Landaus, then they would still exist and could

14     have been forwarded.

15          The second scenario as far as the forwards go was a

16     little more convoluted, that they were forwarded from one of

17     Mr. Carrington's account to another one of his accounts and

18     then forwarded to the Landaus.  But what FTI made clear, as

19     anybody who uses e-mail knows, is that when an e-mail is

20     forwarded -- if I e-mail -- if I forward an e-mail to

21     Mr. LaVigne, and then forwards it to Ms. Schacter, that second

22     forward will show my forward to Mr. LaVigne.  So there should

23     be an intermittent header below the top header showing that

24     initial forward.

25          THE COURT:  Yes.  Although to be -- just to give an

example.  I have in my lifetime deleted that intermediate

forward as for example if I am -- if something is coming into

my chambers inbox and I am responding to a particular judge,

I'll take out that intermediate part where a clerk sent to me

because that's not pertinent to the judge.  So you can delete

it.  I can at least think of a world where it can be deleted.

All right.  There is nothing in these e-mails to

suggest when they were first -- or whether Mr. Carrington had

downloaded them into some other format and then forwarded them

or whether he was, in fact, accessing the trendsetter account

in May of 2018.

MR. HWANG:  Well, you can rule out the possibility

that they reside somewhere locally because to the extent they

existed on some thumb drive or other device as of May 6 or

May 7, 2018 that device should have been preserved and

disclosed to us.  That was following the commencement of this

litigation.

Facially these e-mails, what's odd about them is they

are trendsetter e-mails exchanged with Reno Logan or some other

third party that were forwarded from Mr. Carrington's Microsoft

account, rovier@thecarringtondiaries.com, to the Landaus.  But

there is no intermittent forward.

And your Honor is absolutely correct.  That could have

been deleted.  But why in this scenario would you delete that?

That would show exactly when they were forwarded.  And did

I9I9CARC

1    Mr. Carrington forward these years ago before the trendsetter

2    account was deactivated to his carringtondiaries account?

3    That's possible.  But that initial forward was located nowhere

4    in the Microsoft account itself.  They should be there because

5    they were forwarded then the Landaus as of a couple of months

6    ago.

7             What the first e-mails from their report show are --

8    the only e-mail they reference in that report is a February 11,

9    2018 forward purportedly from the roviercarrington account to

10   thecarringtondiaries account.  But that itself was a forward of

11   the initial forward from the trendsetter account.  But none of

12   those original forwards exist anywhere.  Nor do the original

13   at-issue communications.

14            So all we have are forwards, upon forwards, upon

15   forwards in almost every instance.  The only plausible

16   scenario, the best case for them, is that there were two

17   forwards.  There is no evidence of the first forward.  There's

18   only evidence of the forward to their counsel.  And that's all

19   that's been purged.

20            So their report, your Honor, it's very confusing.  But

21   once you actually distill the essence of it, clear through the

22   smoke and mirrors, they reference one single e-mail that's a

23   forward of a forward that was supposed to be purged.  So we

24   would submit that that's not really relevant to what we're

25   dealing with here.  All we have, again, are compounded forwards

1    that, as anyone knows, are easily manipulated.

2               THE COURT:  Thank you, sir.

3               MR. LaVIGNE:  Judge, if I may just follow-up on that.

4    That's right.  We do not have, and I can't sit here and tell

5    the Court that I have evidence of when that trendsetter account

6    was used to forward an e-mail to the roviercarrington@gmail or

7    thecarringtondiaries.  As Mr. Hwang said, it's forwards to

8    forwards to forwards and we just don't know.

9               So to answer your Honor's question, May 2018 is the

10   last time we see forwards to the Landaus.  We can't say

11   May 2018 actually came from the trendsetter account onward.

12              THE COURT:  I want to talk about your remedies but I

13   also want to go back to the very disturbing allegation that

14   there's someone hacking into Mr. Carrington's accounts.

15              When is the first time that any of the defense

16   attorneys were made aware of the -- of this issue, of the

17   possibility that Mr. Carrington's accounts had been hacked?

18              MR. LaVIGNE:  When I got the this letter, Judge.  And

19   that's one of my real issues, candidly, with this.  Because if

20   you take this at face value, they were known of a purported

21   hack in May 2018.  Granted, that's based on an automatic

22   notification that Google sent about another device.

23              If you take that as true, that took place three days

24   after they got a preservation request.  And not once during

25   this whole rigmarole, for lack of a better word, the challenges

I9I9CARC

1    over discovery and challenges about authentication and going

2    through the -- having an e-discovery vendor.  We found out

3    about it yesterday when we got the letter.

4            And in addition --

5            THE COURT:  Am I understanding -- and I I'll talk to

6    Mr. Landau momentarily -- that there are two hacks.

7            MR. LaVIGNE:  Two.  On two different accounts.  So the

8    May 2018 they claim -- plaintiff's counsel claims was a

9    potential hack supposedly committed by Brian Graden associated

10   with the roviercarrington@gmail account.

11           THE COURT:  To be clear what they have is the same

12   thing I get when I sign up at a computer that is not my own.

13           MR. LaVIGNE:  Correct.

14           THE COURT:  There is no way yet to figure out where it

15   came from.

16           MR. LaVIGNE:  Correct.

17           THE COURT:  And you're not adverse, none of the

18   defense counsel are adverse to a subpoena to Google that might

19   identify the IP address.

20           MR. LaVIGNE:  Not at all, Judge.  We welcome that.

21           The second hack was on thecarringtondiaries account.

22   That supposedly took place in August.  And the basis for that

23   is that apparently somebody went into that account and

24   basically deleted some work product that plaintiff's counsel's

25   expert did.

I9I9CARC

1          THE COURT:  But there is no comparable or at least

2     I've not been given a comparable notice from Google letting me

3     know about a sign-in from some other account.

4          MR. LaVIGNE:  Nor have we, Judge.  Nor have we.

5          THE COURT:  Let me understand, before I turn to

6     others, the remedies that you seek.

7          The first one you sought was a disclosure of the

8     devices but now it's been represented that most of the devices

9     are no longer in Mr. Carrington's possession.

10          MR. LaVIGNE:  That's true, Judge.

11          But they also represented that an iPhone 10 was used

12     to forward e-mail communications to the Landaus.  So consistent

13     with the order from August 7 and as amended on August 24, we

14     want FTI to be permitted to make a mirror image of that device.

15     We also want --

16          THE COURT:  One moment, sir.  Have I not ordered this

17     to happen already?

18          MR. LaVIGNE:  Yes, Judge, but it hasn't.  And that's

19     one of the reasons why I wrote my letter.  Because it's three

20     weeks after the fact and it took us writing a letter to the

21     Court to get this information.

22          THE COURT:  Please continue.

23          MR. LaVIGNE:  Related to that --

24          THE COURT:  You're also seeking the plaintiff's

25     deposition.  I'm not sure on what basis I'm giving you that.

I9I9CARC

1          MR. LaVIGNE:  Judge, on the basis that we need to have

2     the plaintiff under oath and answer questions about

3     authentication.

4          Right now the explanation as to why these three

5     experts and plaintiff can't identify, can't access, can't

6     explain is because there was a hack.  And we need to know when

7     this trendsetter account was set up, what the various ways were

8     that these accounts, e-mails were forwarded from trendsetter

9     accounts to others.  This goes to the heart of authentication.

10     And at the end of the day, getting an affidavit on paper which

11     simply says these are authentic does not do justice to this

12     issue.

13          There is a real concern here that there's been a fraud

14     on the court.  And we spent a lot of time and a lot of money

15     trying to get a simple answer which is:  Just send me the

16     original e-mail.

17          And, like I said, I submit it's been a six-week

18     odyssey.  And there's been obfuscation going on and delays

19     complying with the Court's order.  It's time to have the

20     plaintiff testify under oath on that limited issue.

21          Nobody wants to have this devolve into a mini-trial on

22     the merits.  This is a narrow issue and we've been as cabin as

23     we can, as cabin as we can.

24          And I submit once we get the process back, if your

25     Honor orders it from Google, for the Rule 45 subpoena and the

1   content of the account, then plaintiff is going to have to

2   answer and explain how these e-mails that he appended to his

3   complaint and put in public and cast a lot of aspersions on

4   different people, and now the two experts can't find them, and

5   plaintiff can't find them and says there's a hack, the logical

6   inference is there was a fabrication.  And I'm not saying it's

7   the conclusion but to get to that conclusion we have to have

8   plaintiff under oath and testify about it.  And it will be

9   limited deposition.

10          THE COURT:  I think I should direct to Mr. Graden's

11   counsel some questions I are have about Mr. Graden because I

12   believe plaintiff is asking as well for reciprocal discovery

13   from Mr. Graden.  Do you agree it is better that I direct that

14   to Mr. Graden's counsel?

15          MR. LaVIGNE:  For Mr. Graden, yes, Judge.

16          THE COURT:  Let me do that in a moment.

17          But I want to game this out with you for a moment.

18          How am I ever able going to be able to figure out what

19   happened here?

20          In a perfect world Google will give you IP addresses

21   and information that will allow us to figure out who accessed

22   what and we either will or will not be able to rule out

23   Mr. Graden or anyone else as the putative hacker.

24          Because what I don't relish is the prospect that a

25   couple of months from now we will be sitting here with these

I9I9CARC

1      same three alternatives and no way of knowing which is which.

2                  MR. LaVIGNE:  We have a way, Judge.  We have a way.

3                  And the way is, number one, we start with the basics.

4      If that account exists, if that account exists, Google knows

5      about it.  We get a subpoena to them.  We find out what the

6      dates were, who the subscriber was, what the IP addresses were,

7      and Mr. Carrington provides the necessary consent, Google can

8      look for it and tell us if there's content.  There either is or

9      there isn't.  If there is, and if those e-mails are gone,

10     that's telling.  That's very, very telling.

11                 As part of this, and this is not going to boil down to

12     a credibility issue, this is a ground truth issue.  The e-mails

13     either existed or they did not.

14                 The plaintiff, Mr. Carrington, has to be put under

15     oath and to explain how exactly it was that this account was

16     set up, why these were forwarded on, when he did it, all of

17     those specifics are things that can be corroborated by Google

18     or another internet service provider.

19                 And at the end of the day, your Honor, I think the

20     truth is going to come out.  I think the truth is going to come

21     out.

22                 Because we've been dancing around this for seven or

23     eight weeks, and it's not that hard.  It's not that hard.  If

24     these were important enough to be appended to an amended

25     complaint, how is it that nobody can show us what they are?

1          And I don't want to be standing before your Honor two

2     months from now making these same arguments.  I'm confident I

3     won't have to because if plaintiff is put under oath, which he

4     should have to be after making these accusations and after

5     submitting that we should have a neutral e-discovery vendor and

6     all this stuff when the e-mails supposedly were hacked and

7     deleted and we find out about it at the eleventh hour, I think

8     that deposition is going to be very telling.  And I think we

9     can test those answers with the information we get from Google

10    and other internet service providers.

11          THE COURT:  Thank you.  Let me speak, please, with

12    Mr. Graden's counsel.

13          Ms. Sanders, is that correct?

14          MS. SANDERS:  Yes.

15          THE COURT:  Ms. Sanders, you've seen last evening's

16    submission from Mr. Carrington's counsel; is that correct?

17          MS. SANDERS:  Yes.  That's correct.

18          THE COURT:  I'd like to -- I'd like you to respond to

19    what's in there because I want -- I'm saving Mr. Landau for

20    third because there are so many things we want to discuss and a

21    hack is such a -- I think I don't even want to contemplate, but

22    it's been suggested that your client had access to these

23    accounts; is that correct?

24          MS. SANDERS:  That is what has been suggested and it's

25    an explosive accusation and we were just as surprised as I

I9I9CARC

1    guess everybody else in this room about that.

2              THE COURT:  It may be that you haven't had enough time

3    and I'm not here -- let's be clear.  I'm saying this to all

4    counsel.  I don't want to intrude on privileged communications.

5    I do not.

6              But have you had occasion to speak with your client

7    about the contention that it was your client who had access?

8              MS. SANDERS:  I have had that opportunity to speak

9    with my client.  And he's advised that he has not had access to

10   any of these accounts and has not used any methods to access

11   any of these accounts at any time.

12             THE COURT:  I'll ask the question more pointedly.

13             At any time ever did your client have the ability to

14   access one of Mr. Carrington's e-mail accounts?

15             MS. SANDERS:  No.

16             THE COURT:  Never?  He never had the password?

17   Because I can figure out -- let's just -- let's just use my

18   husband, for example.  I can figure out his e-mail account.  I

19   don't know his password.  So I can figure out what an e-mail

20   account is but not necessarily be able to access it.

21             Your client would know just from looking at e-mails

22   what certain of the Gmail accounts that Mr. Carrington

23   possessed or used were.  But you're saying to me, as an officer

24   of the court, that he never, not ever, was given or otherwise

25   obtained the information that would permit him to access any of

I9I9CARC

1    Mr. Carrington's e-mail accounts?

2              MS. SANDERS:  Yes.  Based on my communications with my

3    client yesterday evening, I have been advised that he has never

4    accessed the account.  He doesn't believe he was ever provided

5    any access information.

6              I'm sure we can go back to all of these accounts and

7    check to see if there has ever been any e-mail communication or

8    text message where such information has been provided.  But he

9    has unequivocally stated to me that he never used any access

10   information of any kind whatsoever to access any of

11   Mr. Carrington's accounts.

12             THE COURT:  And by extension that he did not access

13   them on or about the 24th of May?

14             MS. SANDERS:  That is correct.

15             THE COURT:  And that he did not access them in August?

16             MS. SANDERS:  That is correct.

17             THE COURT:  And he knows now not to access them?

18             I suppose you'll tell me he can't because he doesn't

19   have the password information.

20             MS. SANDERS:  Exactly.

21             THE COURT:  Is your client -- what is your reaction or

22   your client's reaction to the request for reciprocal discovery

23   from your client?

24             MS. SANDERS:  So we understand the optics and the

25   desire for reciprocity and that's why we've been so open during

1    this entire process.  We have supplied all of the natives in

2    his possession, custody and control that even allude to any of

3    the at-issue communications.  We have done our due diligence to

4    get in contact with various witnesses who have supplied

5    declarations.  We have retained experts and forensic

6    professionals to do all of these things.

7           So, we believe we've done our due diligence.  And

8    there has been nothing that Mr. Graden has submitted to the

9    Court that has been questioned.  The authenticity of the native

10   e-mails that he submitted on August 24 was not even referenced

11   in plaintiff's submission.  So there is no reason to believe

12   that what he has done should be questioned.

13          So we would just submit that there is nothing to

14   warrant any additional discovery of Mr. Graden's devices.

15          We've also identified his device that he's used and

16   are ready, willing and able to supply that device.

17          But additional discovery whether it's a subpoena or

18   whether it's a deposition, I'm not sure I quite understand what

19   more that can show.

20          THE COURT:  All right.  Thank you.

21          Mr. Landau, I appreciate very much your patience.  I

22   candidly don't even know where to begin because there are so

23   many things you and I should be covering.

24          But I guess I'd like to understand, and with the same

25   proviso I said earlier about not wanting to intrude on

I9I9CARC

```
 1    attorney-client communications, why is it that defense counsel
 2    were only made aware yesterday that your client was not in
 3    possession of a number of the devices at issue and is it --
 4    first of all, is it correct that they were not told until your
 5    letter of last evening?
 6              MR. LANDAU:  Your Honor, we had a conversation on I
 7    believe August 16 at which point I did indicate that the
 8    trendrovheir account was deactivated prior to our involvement
 9    in this case representing Mr. Carrington in any capacity
10    whatsoever.
11              THE COURT:  Tell me please, sir, when to the best of
12    your client's understanding was that account deactivated.
13              MR. LANDAU:  To my recollection, it was around 2014 or
14    '15, within that timeframe.
15              THE COURT:  How did he have the documents that he sent
16    to you in 2018?  Did he download them for some reason?
17              MR. LANDAU:  From what I understand he forwarded from
18    the trendrovheir account to either the roviercarrington@gmail
19    account or thecarringtondiaries account.
20              THE COURT:  So it's not as though he's printed them
21    out and kept them in a folder somewhere.  Before he deactivated
22    the trendsetter account, he forwarded these e-mails?
23              MR. LANDAU:  Yes, your Honor.
24              THE COURT:  And you knew that all along?
25              MR. LANDAU:  We knew that we were the recipient of
```

I9I9CARC

```
1    forwarded e-mails.

2              THE COURT:  I asked the wrong question.

3              In -- right after I issued my order you were aware

4    that the trendsetter account had been closed?

5              MR. LANDAU:  Yes, your Honor.  And we advised

6    accordingly.

7              THE COURT:  And you were also aware that any -- these

8    other e-mails had been forwarded from the trendsetter account

9    to one of two other accounts?

10             MR. LANDAU:  Yes, your Honor.  And we supplied all

11   three of the accounts, to our knowledge, the trendsetterrovheir

12   account we indicated was deactivated, the two other accounts

13   that were the recipient of the e-mails from the

14   trendsetterrovheir.

15             THE COURT:  When did you first come to understand that

16   your client had been hacked, his e-mail accounts had been

17   hacked?

18             MR. LANDAU:  I'm not certain the exact date, your

19   Honor, but we were made aware.  He did forward that

20   notification to us.  It was prior to the Court's order.

21             THE COURT:  It was prior to the Court's order?

22             MR. LANDAU:  It was prior to the Court's order.

23             THE COURT:  Was it prior to the conference where I

24   issued the order?

25             MR. LANDAU:  I need to doublecheck on that.
```

I9I9CARC

```
1          THE COURT:  Am I correct, sir, that at that conference

2     you never once mentioned your client's concerns that his

3     e-mails had been compromised, his e-mail accounts had been

4     compromised?

5          I'm confident you didn't.

6          MR. LANDAU:  I don't believe so.

7          THE COURT:  Don't you think that's something we all

8     should have known?

9          Let me step backwards a moment, please.  We're trying

10    to figure out the bona fides of these e-mails.  If you had

11    reason to believe that we would never get to that point or that

12    we would be impaired in getting to that point because your

13    client's e-mail system had been hacked, why didn't you tell us

14    back then?

15         MR. LANDAU:  Your Honor, at that point in time we were

16    still figuring out what exactly was required from a discovery

17    standpoint.

18         THE COURT:  That's not a helpful answer to me.

19         Let me -- did you tell defense counsel at any time

20    prior to last evening or last -- yesterday afternoon that your

21    client believed his accounts had been hacked?

22         MR. LANDAU:  Yes.  We made them aware as well as FTI

23    was aware of it as well.

24         THE COURT:  You've told them in the conference --

25    there are multiple conferences that are being discussed.
```

I9I9CARC

You've actually said to them in these, what I'll call meet and confers pursuant to my order, when they were asking for devices and asking for other information, you said, in words or substance, By the way, my client has had -- someone hacked into his account?  You told them about -- you told them about the May hack?

MR. LANDAU:  We didn't issue the fact that whether or not it was hacked because I did not want to draw that conclusion.

But the account was accessed on May 24 by an unauthorized user.  Subsequent to that --

THE COURT:  Sir, please answer the question that I am asking.

Did you tell any of the defense counsel prior to yesterday's letter that your client had had an unauthorized access of his e-mail accounts in May of 2018?

MR. LANDAU:  I believe we did, your Honor.

THE COURT:  You believe you did?

MR. LANDAU:  Yes.

THE COURT:  And you told them in words or in writing?

MR. LANDAU:  In words.

THE COURT:  And when did you tell them, if at all, or did you tell them prior to yesterday's letter that your client's account had been accessed a second time in August?

MR. LANDAU:  I don't know about that, your Honor.

I9I9CARC

 1          But from what I understand with respect to the -- our

 2     expert's report, PTG's report, they were able to preserve

 3     everything so that shouldn't have made any technological

 4     difference for FTI's evaluation.

 5          THE COURT:  But that's what confuses me so, and I

 6     really do need your help in understanding how the two forensic

 7     organizations can work together.

 8          Again, don't give me privileged communications that I

 9     don't want to know.  But your client, in the early stages of

10     this case, said to you in words or substance:  I'm concerned I

11     may have been hacked?

12          MR. LANDAU:  Yes, your Honor.

13          THE COURT:  And he said:  I'm concerned I may have

14     been hacked by Brian Graden?  Or did he not --

15          MR. LANDAU:  That was one of -- yeah.  That was one.

16          THE COURT:  Well it wasn't Brad Grey?

17          MR. LANDAU:  Without, without --

18          THE COURT:  Yes.  Without.

19          MR. LANDAU:  Yes, your Honor.

20          THE COURT:  And all right.  I wish -- no, let me just

21     finish.

22          I wish you had said something to me, because I sent

23     people off on a seven-week frolic and detour that may

24     ultimately never get to the answer that we want because you

25     didn't tell me way back when that your client believed his

I9I9CARC

1    account was compromised at the outset.  And I can't understand

2    why you didn't think that was something that we'd want to know.

3    And you still can't explain it.  So let's understand what did

4    happen.

5              So PTG reviewed your client's e-mail accounts before

6    FTI did?

7              MR. LANDAU:  Yes, your Honor.

8              THE COURT:  And did the other side know that they were

9    going to do that preliminary review.

10             MR. LANDAU:  I advised the other side that we did have

11   an expert that was working on it.

12             THE COURT:  And so PTG, of course, wanted to look --

13   maybe get a sense of what FTI might encounter in their review?

14             MR. LANDAU:  However the experts do their e-discovery.

15             THE COURT:  May I understand why you felt PTG had to

16   do a review separate and apart from FTI before FTI got to it?

17             MR. LANDAU:  Your Honor, based upon the activity in

18   this case and based upon the manner in which our client's

19   correspondence were deleted by some unauthorized third party,

20   we wanted to get a better sense as to what was going on as

21   well.  And as a result of that we had a very qualified expert

22   go ahead and analyze the accounts to the extent that they

23   could.  And their analysis was such that we provided to the

24   Court.

25             THE COURT:  But I guess I still don't understand why.

I9I9CARC

1    I know that you and your client were disappointed that I

2    permitted FTI to be retained as the forensic provider in this

3    case because you believed that there might be some conflict,

4    which there was none.

5              Was it before or after I authorized FTI that you

6    retained PTG?

7              MR. LANDAU:  Before.

8              THE COURT:  And you wanted them to sort of get a sense

9    of the lay of the land before FTI started looking at the

10   account?

11             MR. LANDAU:  Absolutely, your Honor.

12             We had the affidavits.  We had the forwarded e-mails.

13   We take candor very seriously.  And as a result of that, we

14   wanted to make sure as well that we weren't having the

15   proverbial wool pulled over our eyes as well because of the

16   fact that the natives did not exist and the forwards from our

17   client to us did.

18             THE COURT:  So let me be clear.  So at the time that

19   PTG came onboard, you knew that there was at least a question

20   raised by the defendants about the validity of these e-mails

21   and so, of course, you wanted to get in there and see what was

22   what.

23             Your expert, PTG, themselves concluded that there were

24   no native original versions of most of the -- the vast majority

25   of the e-mails in question; is that correct?

I9I9CARC

1          MR. LANDAU:  Correct, your Honor.

2          THE COURT:  And this is where I get confused and I

3    really do need your help and you can take me along in baby

4    steps.

5          But your expert was able to find certain of these

6    e-mails in a purged e-mail account?  Let me understand that.

7          MR. LANDAU:  From what I understand, based on the

8    reports, there are different elements of an e-mail account.

9          THE COURT:  Yes.

10         MR. LANDAU:  There's your inbox, your sent box, and I

11   guess there's a deleted items or purged box as well.  I'm not

12   technologically sophisticated so I apologize if it's not the

13   right terminology.

14         But what they were able to detect from a purged e-mail

15   account were certain authentic headers that had been forwarded

16   from the original trendsetter account.

17         THE COURT:  But I have no knowledge of the contents.

18   I just have the header.  I would never be able to tell you what

19   was the content that was forwarded?

20         MR. LANDAU:  From what I understand, based upon them

21   tracing the lineage from the trendsetter through

22   thecarringtondiaries or roviercarrington Gmail account and then

23   the forwarded on perhaps to us, being his legal counsel at the

24   time, they were able to assess certain headers as to timestamps

25   upon which that original native was formed.

1        THE COURT:  This I understand.  And you might be able

2   to trace certain e-mails.  But you could not guarantee that the

3   very first e-mail was -- you couldn't guarantee or couldn't

4   ascertain from looking at the purged e-mail account that the

5   contents of the e-mail, the very earliest e-mail in the chain,

6   were the exact contents that were forwarded the first time and

7   maybe even the second time.

8        So you can't -- I'm assuming PTG could not and would

9   not be comfortable telling me that for sure the e-mails you

10  have, had received from your client, are the precise e-mails

11  that are -- for which there were headers found in the purged

12  e-mail account?

13        MR. LANDAU:  As far as the content of the e-mail?

14        THE COURT:  Indeed, sir.

15        MR. LANDAU:  I think that's fair.  Yes, your Honor.

16        THE COURT:  We may know if the Google subpoena helps

17  us out but right now today we don't know.

18        MR. LANDAU:  Yes.

19        THE COURT:  I want to understand better what happened

20  in August, that PTG was doing -- was working in the account but

21  then the very searches that it conducted, the very analysis

22  that it did, there is no record of?  It's lost?  What happened?

23        MR. LANDAU:  That's I think --

24        THE COURT:  That's what it says.

25        MR. LANDAU:  Yeah, yeah, and from what I understand

I9I9CARC

1   there is I guess they call it an e-discovery tool.  And the

2   e-discovery tool is such that it creates an audit over a period

3   of time.  I think it can go back as far as maybe 30 days

4   prior -- 30 days prior to when that mechanism was turned on

5   which means that from the moment that they were able to begin

6   conducting their search through the period of some other breach

7   that seems to have occurred, they were able to preserve all of

8   that information.  So nothing was lost from the period of time

9   when they began through FTI's investigation, primarily because

10  they turned this e-discovery tool which began in August.  So as

11  a result of their own expert analysis they were actually -- did

12  a service to FTI and everyone else in this room by preserving

13  whatever was attempted to be deleted in the first place because

14  they had some type of audit already in place.  To me, that's my

15  understanding.

16          THE COURT:  Does it not cause you a little bit of

17  concern --

18          MR. LANDAU:  It does.

19          THE COURT:  Let me finish -- that someone was trying

20  to delete what was there?

21          MR. LANDAU:  I don't know what they were doing but it

22  causes me concern that somebody was going back into the account

23  absolutely, yes.

24          THE COURT:  Your client is adamant that Mr. Graden was

25  given whatever information he needed to access these accounts;

I9I9CARC

1   is that correct.

2          MR. LANDAU:  Yes, your Honor.

3          THE COURT:  So that would be the password, right?

4   It's nothing else?

5          MR. LANDAU:  Yes.

6          THE COURT:  I just want to make sure there's nothing

7   else.

8          MR. LANDAU:  Yeah.

9          THE COURT:  There are certain -- I have certain

10  accounts that are two types of activation.

11         MR. LANDAU:  Oh, yeah.  I don't think so.

12         THE COURT:  So can I imagine that at some point --

13  well your client says he gave this information to Mr. Graden in

14  or about 2015, correct?

15         MR. LANDAU:  I'm sorry.  Can you rephrase?

16         THE COURT:  I understood, I thought, from your

17  submission and from your client's declaration that the

18  information -- the access information was given to Mr. Graden

19  in or about April of 2015.  That's paragraph two of his

20  supplemental declaration.

21         Is that correct?

22         MR. LANDAU:  Yes, your Honor.

23         THE COURT:  Does your client indicate -- has your

24  client indicated to you, and if you're willing to share, of any

25  other instances in which the password information was given to

I9I9CARC

1   Mr. Graden?

2           MR. LANDAU:  Your Honor, to my recollection, no.  I

3   don't recall having that conversation as to multiple times.

4           THE COURT:  So your client recalls an instance.

5           MR. LANDAU:  At least one, yes, your Honor.

6           THE COURT:  Well I hope you asked him about others but

7   I'll leave that to you.

8           There was at least an instance in April of 2015 when

9   Mr. Graden is alleged to have received this information.  Are

10  you telling me your client has not changed his Gmail passwords

11  since 2015?

12          MR. LANDAU:  So his trendsetterrovheir account was

13  deactivated right around that time.  And as a result of that,

14  he just had the Gmail and thecarringtondiaries.

15          THE COURT:  Yes, sir.

16          MR. LANDAU:  On which he used.

17          THE COURT:  Yes.

18          MR. LANDAU:  So from our understanding of the

19  conversations, he did not need to change his passwords.

20          THE COURT:  I should have asked a better question.

21  Excuse me.

22          The trendsetter account -- well, for which accounts

23  did Mr. Carrington give Mr. Graden access?  All three?

24          MR. LANDAU:  From my understanding it was the same

25  password for all three.

I9I9CARC

1        THE COURT:  OK.  That's unwise but that's another

2   issue.

3        When the trendsetter account was closed we were left

4   with two accounts, thecarringtondiaries account and the Gmail

5   account, correct?

6        MR. LANDAU:  Yes, your Honor.

7        THE COURT:  The password for the three has now become

8   the password for two extant accounts, correct?

9        MR. LANDAU:  Yes, your Honor.

10        THE COURT:  Did your client at that point change his

11   password?

12        MR. LANDAU:  At which point?

13        THE COURT:  In -- when the trendsetter account was

14   closed.

15        MR. LANDAU:  To my knowledge, no.

16        THE COURT:  So Mr. Graden shortly after April of 2015

17   in your client's recollection had the password for two of his

18   accounts, the two that still worked?

19        MR. LANDAU:  Yes, your Honor.

20        THE COURT:  In May of this year he received this

21   indication that there had been -- that it had been accessed

22   from an unusual location, I'll just say, a not usual location.

23   At that moment was he concerned?

24        MR. LANDAU:  Yes, your Honor.

25        THE COURT:  Did he change his password?

I9I9CARC

1      MR. LANDAU:  I need to ask, your Honor.

2      THE COURT:  I'm trying to figure out.

3      MR. LANDAU:  I would suspect so.  I mean it would make

4  sense to me that he would, yes.

5      THE COURT:  Well then how did the August hack happen?

6      MR. LANDAU:  I don't know.

7      THE COURT:  Well isn't that our concern?

8      MR. LANDAU:  It is.

9      THE COURT:  I thought I read your letter to be saying

10  to me, you were outlining the three alternatives that

11  Mr. Hammerquist presented to the parties.  On your pages two

12  and three, this is your -- you believe this still to be an

13  accurate recollection of what happened, what the three

14  alternatives were, yes?

15      MR. LANDAU:  Yes, Judge.

16      THE COURT:  So I want to make sure -- I want to make

17  sure I understand this sentence, it's just two paragraphs down

18  on page three of your letter.  The e-mail contained in Exhibit

19  5 of plaintiff's complaint -- oh, it's -- I'm sorry.  I believe

20  the report states that it was able to recover a number of

21  previously deleted e-mails.  And from this you intuit that it

22  is the second scenario that must be the case?

23      I want to understand -- if I may, sir, what does that

24  paragraph mean?  If you could break it down for me, if you need

25  to dumb it down for me, please, go ahead.  But I want to

I9I9CARC

1   understand what it means.  Because I read it to mean that there

2   were three alternatives and you think it's alternatives two.

3           MR. LANDAU:  Yes, your Honor.  That's fair.

4           THE COURT:  Let me figure out what the yes means.  The

5   yes means that of the three alternatives presented -- I'm sure

6   you don't believe it's alternative three because that would be

7   a very bad thing.

8           MR. LANDAU:  Of course not.

9           THE COURT:  Of course.  So we have instead one and

10  two.  Have you explored the possibility of one?

11          MR. LANDAU:  We have, your Honor.  And we attempted to

12  have Google contacted.  And at this juncture it appears that

13  the only way that we would be able to obtain any in-depth

14  analysis would be based on subpoena.  So that's why we are in

15  full agreement with that.

16          THE COURT:  Let's make sure I understand what that

17  means.  You're fine with the disclosure of the IP addresses and

18  the contents too?

19          MR. LANDAU:  Well we want to keep the contents

20  confidential so we can provide it to the e-discovery vendor to

21  the extent that there is certain information that is irrelevant

22  to this case because if they go into the account they may, you

23  know, obtain more than just the at-issue communications.

24          THE COURT:  But I've got two allegations of hacking.

25  How can I ensure that any forensic computer person would have

I9I9CARC

1    this information and would be able -- I don't want anyone

2    touching what comes from Google.  Can I --

3             MR. LANDAU:  That's fine, your Honor.

4             THE COURT:  So what's coming from Google?

5             MR. LANDAU:  Nothing yet because.

6             THE COURT:  Let me be more clear.  What do you think

7    the subpoena is going to call for?

8             MR. LANDAU:  From our perspective?

9             THE COURT:  Yes.

10            MR. LANDAU:  We want the truth as well, your Honor.

11            THE COURT:  Of course.

12            MR. LANDAU:  So with respect to the Gmail for Google

13   or carringtondiaries or anything else that will help us arrive

14   at the truth, then we can make that subpoena as detailed as

15   your Honor would like and ensure that there is some type of

16   security around who receives it as opposed to the parties.

17            What we've also tried to do is, absent the natives and

18   trying to figure out exactly what the lineage of these e-mails

19   that were forwarded, what ended up happening to them, we have

20   provided some additional affidavits from nonparties as well as

21   text messages.

22            THE COURT:  But they don't help me at all in this

23   regard.  They are, if anything, corroborative of events and in

24   no way helpful to me on the issue of the validity or not of

25   these e-mails.  So I've read them all.

I9I9CARC

1          But other than the one from your client which, again,

2     speaks to the e-mails, having someone who may have shown up at

3     an event or may have been told about something does nothing for

4     me.

5          MR. LANDAU:  Understood.

6          THE COURT:  I saw them.  They don't move the needle

7     for me.

8          So I'll let you continue.

9          MR. LANDAU:  So to that point, short of deposing our

10    client, we are in full agreement with the subpoenas and

11    whatever is manifest based on that is manifest.

12         THE COURT:  Do you believe it's appropriate to comply

13    with court orders?

14         MR. LANDAU:  Yes, your Honor.

15         THE COURT:  Why haven't you turned over the iPhone X?

16         MR. LANDAU:  We had a discussion as to it and that was

17    only one discussion with FTI.  We still made scheduling

18    arrangements for some person to go.

19         THE COURT:  Did I not provide a schedule by which this

20    had to be done that you've now gone past?

21         Yes is the answer.

22         MR. LANDAU:  Yes, your Honor.

23         THE COURT:  Why do you think that I would allow that?

24         MR. LANDAU:  Your Honor, it was not us that was

25    preventing anyone from accessing the iPhone.

I9I9CARC

```
 1                THE COURT:  Who has the iPhone?

 2                MR. LANDAU:  Our client.

 3                THE COURT:  So he was preventing?

 4                MR. LANDAU:  No, not at all.  It was the -- the

 5      schedule wasn't made between the two parties.  It was a

 6      conversation that didn't continue.

 7                THE COURT:  At what point did you come to me and say

 8      we cannot agree on a schedule for the production of the device?

 9                MR. LANDAU:  We did not, your Honor.

10                THE COURT:  Right.  So how was I to know prior to

11      yesterday's submissions from the parties that you had not, in

12      fact, abided by my order?

13                MR. LANDAU:  You were not.

14                THE COURT:  What possessed you to think that I was

15      going to be pleased to hear that you had not abided by my

16      order?  Because I'm not.  At all.  And I don't understand how

17      you think that it's -- if it's convenient for you it's

18      something that should be abided by.  Because I wanted this on a

19      compressed schedule because you yourself and your cocounsel

20      wanted this case to move forward, as do I.  We can't until we

21      get to the heart here.  And, sadly, we've opened up, I feel, a

22      Pandora's box -- this is not how I thought this was going to

23      turn out.  Never -- since you never told me that there was a

24      hack, this was the most surprising outcome for me.

25                The point is you have to turn it over.  When are you
```

I9I9CARC

1      turning it over?

2              MR. LANDAU:  Your Honor, we have been available to do

3      so.

4              THE COURT:  By the end of the month of September you

5      are turning it over to FTI.

6              MR. LANDAU:  Fine.  OK.

7              THE COURT:  There will be no further discussions about

8      it, correct?

9              MR. LANDAU:  That's fine.

10             THE COURT:  Fine.  You will find a mutually convenient

11     time between now and the end of September to do that.

12             Sir, let me hear from you.

13             You want discovery.  And I've spoken with Mr. Graden's

14     counsel and you've heard the representations that she has made

15     to me.

16             Let me understand what Mr. Graden's –– has Mr. Graden,

17     in fact, produced e-mails in original native format to you?

18             MR. LANDAU:  I believe the only e-mail that was

19     produced was from Mr. Stein; is that correct?

20             MS. SANDERS:  That's not correct.

21             MR. LANDAU:  I don't have those but I'm going to take

22     counsel at her word.

23             THE COURT:  Well why I care is it's in part important

24     that they be produced but it's also in part important that you

25     tell me if there's anything wrong with them.

I9I9CARC

1          I am assuming that since they were produced on or

2    about the 24th of August that you have found nothing wrong

3    with his e-mails.  You've done whatever searching you had to do

4    and there's nothing strange about them.

5          MR. LANDAU:  Well, your Honor, from what I do recall,

6    the e-mails produced were not from at-issue communications.  So

7    I don't know if those are all of the e-mails and I don't know

8    the relevance of them.  But, unfortunately, I don't have them

9    in front of me.

10          THE COURT:  Yes.  That is unfortunate.  I'm sorry.

11          Ms. Sanders, let me talk to you.  What did you

12    produce?

13          MS. SANDERS:  On August 24, in compliance with your

14    order, we produced ten e-mails.  One of them was the Darren --

15    the native Darren Stein e-mail and the remaining nine were

16    native e-mails from Brian Graden's e-mail account that

17    referenced any sort of test that was in the at-issue

18    communications appended to the complaint.

19          So, no, there were no, you know, Exhibit 8, 9, and 10

20    as they were appended to the complaint, because those e-mails

21    don't exist.  But portions of the text of those e-mails that

22    appeared in other e-mails that Mr. Graden had, those were

23    produced.

24          THE COURT:  Ms. Sanders, please tell me if I'm

25    remembering this incorrectly.  I thought I understood from our

I9I9CARC

1    prior conference that there was an argument that one of the

2    e-mails was an assemblage of prior e-mails.  There was a piece

3    taken from one -- it is alleged.  I don't know because I wasn't

4    there -- there is a sentence that or a portion of it that

5    appears in one e-mail, a sentence that appears in still another

6    e-mail and a sentence that appears -- they were, if you will,

7    picked from prior e-mails and put into an e-mail that is

8    attached as an exhibit to the complaint.  Is that correct?

9              MS. SANDERS:  That is correct.

10             THE COURT:  So when you talk about the ten that you're

11   producing, one of them is one that is, if you will, at issue,

12   part of an e-mail string and the others include -- are either

13   relevant because they speak to the issues of this case or

14   they -- speak to the issues of this antecedent issue of the

15   validity of the e-mails or they are important because they are,

16   in your reckoning, the constituent elements of another e-mail?

17             MS. SANDERS:  Yes.

18             And the ten also comprise of different e-mails within

19   all of the commune -- within the chain of communications that

20   all reference portions of the e-mails that have been appended

21   to the complaint.

22             THE COURT:  To the best of your knowledge,

23   Ms. Sanders, were these e-mails made available to FTI?

24             MS. SANDERS:  They have not been.  So they were

25   e-mailed on August 24 to all counsel in two different native

I9I9CARC

1    formats, in an MSG file and in an FTP file.

2              THE COURT:  Could they have been given to FTI?

3              MS. SANDERS:  Absolutely.  I'm more than happy to do

4    that today.

5              THE COURT:  I'm not asking you to.  I just want to

6    know what was done with them.

7              They went from you to the Landau firm, correct?

8              MS. SANDERS:  That's correct.

9              THE COURT:  And after that you don't know what

10   happened to them?

11             MS. SANDERS:  That's correct.

12             THE COURT:  To the best of your recollection, no one

13   representing plaintiff or plaintiff's counsel called you to

14   request further information about those e-mails?

15             MS. SANDERS:  That is correct.

16             THE COURT:  OK.  Thank you.

17             Mr. Landau -- I thank you very much -- come on back.

18   Thank you.

19             Sir, were you the individual to whom these e-mails

20   were sent?

21             MR. LANDAU:  I believe I was on that e-mail.

22             THE COURT:  Was it your -- what were you hoping to do

23   with them when you had them?

24             MR. LANDAU:  Well the e-mail in and of itself doesn't

25   necessarily tell the whole story unless we did have access to

I9I9CARC

1   that account.  What --

2                  THE COURT:  Would you not have been able to give those

3   e-mails in original native format to FTI to look at and see if

4   there was anything strange about them, anything suggesting they

5   had been fabricated or manipulated in any way?

6                  MR. LANDAU:  I'm sure we could have, your Honor.

7   But --

8                  THE COURT:  I thought that's what you were doing.

9                  My understanding was the reason for producing those

10  e-mails was so that you could counter Mr. Graden's claims that

11  these things had been fabricated by saying no, it is your

12  e-mails that have been fabricated and I don't know that you've

13  done that.

14                  MR. LANDAU:  We have not, your Honor.

15                  THE COURT:  I see.

16                  All right.  What then do you want, sir, other than the

17  Google subpoena?  What do you think you need from Mr. Graden or

18  his attorneys?

19                  MR. LANDAU:  Your Honor, given the aspersions on our

20  client as to the possibility of fabrication or as to the

21  possibility of doing something that he should not have done, in

22  response to that I think it would be logical to have the same

23  type of access through FTI, of course, not us, not our expert,

24  but through FTI to assess Mr. Graden's e-mails in the same

25  fashion that they assessed our client's as well, which may help

I9I9CARC

1    get closer to the truth.

2            THE COURT:  You're not asking today for a Google

3    subpoena for any of his accounts?

4            MR. LANDAU:  Yes, your Honor.

5            THE COURT:  You are?

6            MR. LANDAU:  We're asking for, to the extent that

7    Google is able to produce information relative to our client, I

8    think we start there.  And then -- I just don't know enough

9    about Mr. Graden's accounts.

10            THE COURT:  I don't know enough about what you're

11    asking me to do.

12            You're asking -- is it the same subpoena?  One would

13    be everything relating to the two Carrington accounts and one

14    related to, what, any of Mr. Graden's communications with

15    Mr. Carrington?

16            MR. LANDAU:  Yes, your Honor.

17            THE COURT:  How would Google be able to identify that,

18    sir?

19            MR. LANDAU:  I'm assuming that they can identify

20    correspondence between particular e-mail accounts perhaps

21    between particular dates.  So there is a variety of ways.

22            But the problem is, is if we were to start with the

23    timestamp in the original account, that's probably what we

24    would need to subpoena between the trendrovheir and the Gmail

25    account and thecarringtondiaries, not the most recent forwarded

I9I9CARC

1    accounts of course.  So I don't know how far back they'll go

2    but we'll agree and assert that if Mr. Graden's accounts are

3    subpoenaed in a similar fashion it will help all of us arrive

4    at the truth.

5              THE COURT:  All right.  What else would you like me to

6    know?

7              MR. LANDAU:  I think you've been pretty thorough, your

8    Honor.

9              THE COURT:  Thank you.

10             Ms. Sanders, I want to hear from you in reply and then

11   I'll hear from either Mr. Hwang or Mr. LaVigne in reply.

12             Thank you.

13             MS. SANDERS:  Do you mean as to the Google subpoena?

14             THE COURT:  Oh, yes.

15             MS. SANDERS:  Again --

16             THE COURT:  I presume you object but I want to

17   understand why.  Because he's making what, in the Failla

18   parlance, not crazy argument that if what we're trying to do is

19   figure out the truth a way of doing that is to look at both

20   sides.

21             MS. SANDERS:  Yes.  And, your Honor, we have been

22   trying to figure out the truth since this action was filed.

23   We've supplied the at-issue communications that Mr. Graden has

24   in his possession custody and control.  We have submitted an

25   affidavit from a forensic professional who acquired those

I9I9CARC

1   e-mails, who also submitted those with his declaration, and

2   that was from James Kelshaw.  That was in July of this year.

3   And plaintiff's counsel has not represented any reason to

4   believe that any of that information is inaccurate.  And so I

5   still don't quite understand what the purpose of a Google

6   subpoena on Mr. Graden would be other than for the sheer optics

7   of it because it's in the spirit of reciprocity.  The issue

8   here is whether Mr. Carrington's e-mails are authentic, not

9   whether Mr. Graden's e-mails are authentic.

10           THE COURT:  Anything else?

11           Mr. Hwang or Mr. LaVigne.

12           MR. LaVIGNE:  Thank you, Judge.

13           It sounds like there's not opposition to issuing these

14   subpoenas to the internet service providers.

15           It also sounds to get content I believe we're going to

16   need consent, and it sounds like Mr. Landau is not objecting to

17   consent for the trendsetter account.

18           The one issue where it sounds like there is dispute is

19   this deposition.

20           THE COURT:  I think the other issue where there's

21   dispute is to who would receive the contents of any subpoena.

22           MR. LaVIGNE:  What we propose in our letter, Judge,

23   and I'm sensitive to that, is that Google would be directed to

24   turn over the content to FTI and we handle it using the same

25   protocol.  So essentially FTI would conduct the same searches

I9I9CARC

1   as a neutral e-discovery vendor and would look in the

2   trendsetter account for any evidence of the at-issue

3   communications.  On our side we're fine with that.  Because all

4   we're looking to do is focus on authentication.  We want to

5   keep this as narrow as possible.

6          THE COURT:  Mr. Landau, disagree?

7          MR. LANDAU:  Your Honor is there a way that Google can

8   supply the Court directly?

9          THE COURT:  To me?

10          MR. LANDAU:  Well --

11          THE COURT:  No.

12          MR. LANDAU:  To the tech department here.

13          THE COURT:  No.  With all respect to our tech

14   department, I don't want them -- I don't know that they have

15   the capability of doing this.  And why would -- no --

16          MR. LANDAU:  OK.

17          THE COURT:  -- is the short answer.  We are not FTI

18   and I'm not going to make myself that.

19          MR. LANDAU:  Although I know that the Court did

20   determine that no conflicts exist and I respect the Court's

21   decision as to that, is there perhaps a different third party

22   that would be able to be the custodian of these e-mails so that

23   neither of the parties have access to them that could analyze

24   them accordingly.

25          THE COURT:  I don't understand -- I hear the words

I9I9CARC

1     that you're saying, sir.  But, if it's going to FTI neither

2     party is going to have access to them.  Isn't that the point?

3             MR. LANDAU:  Yes, your Honor.

4             It appears, though, that with FTI's analysis they

5     didn't go as expansive as our expert's analysis did.  And I

6     just want to make sure that if FTI or whomever else receives it

7     that it's very clear instructions as to what they should do as

8     opposed to what is perhaps convenient for them to otherwise

9     have done.

10            So, for instance, there is no reason why FTI couldn't

11    have performed the same analysis that our experts did and would

12    have determined similarly that an e-mail that was forwarded in

13    2011 maintained the same header, which is what our expert had

14    found.  So there is a little bit more investigation that, from

15    our perspective, does benefit the plaintiff's position.

16            So just so long as whoever the custodian will be

17    understands that there is an expectation that there needs to be

18    full analysis of these e-mails, not just for the purposes of

19    one or the other, but full analysis.  I would want to make sure

20    that that party, that company does do that thorough

21    investigation.

22            THE COURT:  Why couldn't you and defense counsel sit

23    in a room with the provider and explain or show them the

24    reports that were prepared in connection with this round and

25    make sure that they understand that all we care about is

I9I9CARC

1   figuring out an answer and not what is the answer that we

2   figure out.

3            MR. LANDAU:  That's fine, your Honor.

4            THE COURT:  Then it can be produced to FTI.

5            I'm assuming, perhaps incorrectly, that counsel

6   collectively can agree on the terms of a subpoena.  If you want

7   me to endorse it, I will.  Just send me something that you've

8   all agreed on.  If you can't agree, you'll send me both sides.

9            Mr. LaVigne, what else do you wish to say in reply?

10           I'm interested in Mr. Landau's representation to me as

11   an officer of the court that you were aware in or about August

12   or July that there was a May hack.

13           MR. LaVIGNE:  That's incorrect and false.

14           THE COURT:  OK.

15           MR. LaVIGNE:  I found out about a hack when I read

16   that letter last night.  I can represent to the Court on

17   September 6 there was a phonecall.  Everybody at this table was

18   on it.  FTI was laying out what it found.  And the exact words

19   from Kevin Landau's partner, Zach Landau, was this doesn't make

20   any sense.  How can there be forwards that he then forwarded to

21   his counsel to us and then the deleted them, that doesn't make

22   any sense.  And I distinctly remember that.  And jump in if I'm

23   misstating that, but the exact words used by Zach Landau were

24   that doesn't make any sense.  The first I learned about a hack

25   was when I read the letter yesterday.

I9I9CARC

1          THE COURT:  What's Mr. Kevin Landau present at this

2     meeting?

3          MR. LaVIGNE:  No.

4          THE COURT:  Is it possible that Mr. Kevin Landau was

5     aware of the hack and Mr. Zachary Landau was not?

6          MR. LaVIGNE:  I can't speak to what's going on at the

7     Landaus.  The first I heard about it was yesterday.

8          THE COURT:  Mr. Landau, did you want to be heard on

9     this?

10         MR. LANDAU:  Just note for the record that Zachary

11    Landau is not present, your Honor.

12         THE COURT:  Absolutely.

13         MR. LANDAU:  And it may be a mischaracterization.

14         THE COURT:  That may be but you just said to me

15    shortly, not that long ago, you said to me that they were made

16    aware.  So you knew that they were made aware.  I want to know

17    how you know that they were made aware.

18         MR. LANDAU:  We had a conversation about it.

19         THE COURT:  We, you, Kevin Landau spoke with any of

20    the three folks at the back table about the May 2018 hack?

21         MR. LANDAU:  As I indicated before, to my recollection

22    we did have a conversation as to the account being accessed by

23    an unauthorized third party.

24         THE COURT:  Is it maybe that you didn't use the word

25    hack?

I9I9CARC

1          MR. LANDAU:  Probably.

2          THE COURT:  You've said unauthorized access.

3          MR. LANDAU:  Yes.

4          THE COURT:  Mr. LaVigne, do you know that an

5     unauthorized access is the same thing as a hack?

6          MR. LaVIGNE:  I do.

7          THE COURT:  Had you been made aware of an unauthorized

8     access, would you have --

9          MR. LaVIGNE:  I had not.  I personally had not.

10         THE COURT:  Is there someone at your firm who might

11    have been aware of it when you were not?

12         MR. LaVIGNE:  Anything is possible but I think we

13    typically participate on phonecalls together and if my

14    partner --

15         MR. FISHBEIN:  I was on at least one of the phonecalls

16    and I was never made aware of unauthorized access, hack, or

17    anything else close to that.

18         THE COURT:  Mr. Hwang.

19         MR. HWANG:  Your Honor, I was on every single

20    phonecall that Mr. LaVigne or Mr. Fishbein was on.  I was

21    spearheading most of the communications with the Landaus during

22    this process.  And at no point was I made aware that there was

23    any unauthorized access or hack into any of these accounts.

24         And Mr. LaVigne's representation as to the September 6

25    call in which Zach Landau professed confusion as to how these

I9I9CARC

1   original e-mails would no longer reside in these accounts is an

2   accurate rendition of that call.

3           THE COURT:  Thank you.  Ms. Sanders, do you want to

4   chime in?

5           MS. SANDERS:  I was also on each one of those calls

6   that all the parties are alluding to and neither of the Landaus

7   represented to us that there was any unauthorized access of any

8   kind of any of Mr. Carrington's e-mail accounts.

9           THE COURT:  OK.  Thank you.

10           And, Mr. Stein, you've been very patient in listening

11   to this call if you are still -- listening to this meeting, if

12   you are still on the line, could you please let me know if you

13   have a recollection of any unauthorized accesses or hacks being

14   discussed in the last two-month period.

15           MR. STEIN:  I was on every call with the other

16   counsel.  I never heard anything about an unauthorized access

17   or hack or any explanation even close to that.

18           THE COURT:  All right.  Thank you.

19           Mr. LaVigne, something else?

20           MR. LaVIGNE:  Yes, Judge.  This is one of the reasons

21   why, I submit, a deposition is warranted, because for the

22   last -- I'm not trying to use fancy, catchy words like odyssey,

23   but this is a moving target.  We take two steps forward and

24   then there's a response like a hack, and it comes at the

25   eleventh hour.

I9I9CARC

1        We need to get the plaintiff under oath.  We need to

2   put these issues to him.  And they're straightforward issues.

3   This is not going to be a fishing expedition or long, but

4   basically:  Where did you get the e-mails you forwarded to your

5   counsel?  Why was this account deactivated?  When it was

6   deactivated, did you save them?  That's going to get to the

7   truth.  OK.

8        If we get more information from Google, I think it

9   will help.  It will advance the ball.  But at the end of the

10  day, we spent a lot of time and a lot of money and a lot of

11  energy, candidly, and we're paying for FTI, OK.  And we're

12  getting to the same answer.  You know, they can't explain, they

13  can't identify, they can't access.

14       So we need to get the plaintiff under oath to have him

15  layout exactly what happened, not -- so two months from now if

16  we get more information from Google, we can then get an

17  explanation that well there was a hack by somebody's brother or

18  sister.  Enough is enough.  It's time to get him under oath.

19       He put these -- he and his lawyer put these in public,

20  attached them to his complaint, and they're standing by them,

21  fine.  Then get him under oath and we'll ask him questions.

22  And they will be limited and cribbed and cabined, I can assure

23  the Court, but now is the time for that.

24       THE COURT:  All right.  Thank you all.

25       As should be apparent from this conference I am

I9I9CARC

1  disappointed on a number of fronts and I don't like finding out

2  about things at the last minute.  I never have.  Just know that

3  for future communications.  Don't tell me things at the

4  eleventh hour.

5       I also don't like and am concerned about the way in

6  which this is evolving, that I'm being given one explanation

7  and then being given another explanation, and then still

8  another.  They are not yet fantastical, but they are also

9  beginning to strain credulity.

10       I'm authorizing the subpoena to Google with the

11  contents to be delivered to FTI.  I am assuming, I'm

12  understanding that Mr. Landau is going to have his client make

13  whatever -- issue whatever consents he needs to so that the

14  content is released as well.

15       I'd ask you to get that subpoena to me if you want me

16  to issue it or sign it as early as possible and I will do so.

17  And let it go to FTI and have them look at it.

18       At the moment -- at the moment I'm not authorizing the

19  deposition of the plaintiff but I need to see what comes back

20  from Google and I may well do that.  If I do that, it will be

21  on a very short timeframe.

22       I am not authorizing or requiring discovery of

23  Mr. Graden.  Mr. Graden has produced ten e-mails.  No one has

24  yet complained about their bona fides so I'm not going to and I

25  don't think he needs to be deposed.

I9I9CARC

1      There is a possibility, there is a suggestion that he

2   may have access to this account.  But the evidence I have of

3   that is a recollection that he was given account access

4   information in 2015 and then the very fact that someone may

5   have accessed the account in 2018.  I'll just note for the

6   record I'm not -- I'm neither believing nor disbelieving that

7   the account was hacked.  I get those same Google alerts when I

8   use another computer in this courthouse and log in to my

9   network.  So I'm not yet ready to say that something has been

10  hacked.  But I also have an insufficient basis to warrant

11  additional discovery of Mr. Graden.  If things change, you will

12  all let me know but right now I don't have it.

13      So I want the subpoena.  I want the device to be

14  produced.  And I will listen to you all as soon as you get

15  something from FTI if it is worth my listening to.

16      Mr. Hwang, something you wanted to add?

17      MR. HWANG:  Yes, your Honor.  I think there was no

18  objection from Mr. Landau that the subpoenas should cover all

19  three of the accounts, especially in light of the explanation

20  we first received last night that the e-mails were forwarded to

21  the roviercarrington@gmail account and to thecarringtondiaries

22  Microsoft account, especially also in light of the purported

23  hacks of those two accounts.  I think there's agreement with

24  Mr. Landau that the subpoena should cover all three of those

25  accounts as to content and subscriber and IP information.

I9I9CARC

1              MR. LANDAU:  Yes.  No objection, your Honor.

2              THE COURT:  There is no objection.  And that is what

3    it will be.  Thank you.

4              Anything else today, counsel?

5              MR. LaVIGNE:  Not from the defense, your Honor.

6              MR. HWANG:  Nothing from us.

7              MS. SANDERS:  Not from us.

8              THE COURT:  And some day I do want an answer so you'll

9    all get me to that point.

10             Mr. Stein, we're going to end this conference.  Thank

11   you very much for participating.

12             MR. STEIN:  Thank you for letting me, your Honor.

13             THE COURT:  We're adjourned on this conference.  I

14   will give the parties in the next case time to set up.  Thank

15   them for their patience and maybe you guys can apologize on

16   your way out.

17             (Adjourned)

18

19

20

21

22

23

24

25