UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROVIER CARRINGTON,<br><br>                     Plaintiff,<br><br>                  -v.-<br><br>BRIAN GRADEN; BRIAN GRADEN MEDIA, LLC; VIACOM, INC.; VIACOM INTERNATIONAL, INC.; PARAMOUNT PICTURES CORPORATION; BRAD GREY; BRAD GREY ESTATE; and BRAD ALAN GREY TRUST,<br><br>                     Defendants. | 18 Civ. 4609 (KPF)<br><br>**ORDER** |

KATHERINE POLK FAILLA, District Judge:

     Plaintiff Rovier Carrington filed an action in state court that was removed to this Court in May 2018.  After 17 months of protracted litigation, the Court dismissed the action with prejudice after determining that Carrington had fabricated, or caused to be fabricated, several key emails, and then lied about their provenance.  Undeterred, Carrington then sought to pursue an order of protection in state court on related claims, again with fabricated documents, and again without success.  Carrington's efforts have resulted in Defendants incurring nearly $1 million in legal fees to prove Carrington's perfidy, to say nothing of the reputational damage caused by his allegations.

     The Court understands that Carrington wishes to restart the cycle of litigation with new counsel, and to bring another lawsuit alleging substantially overlapping claims in another jurisdiction.  Defendants have moved for injunctive relief on an expedited basis, and the Court held a hearing on their motion on September 10, 2020.  As set forth in the remainder of this Order, the

Court retains the authority to enjoin Carrington from engaging in further vexatious litigation, and it does so here by enjoining him from commencing, without express prior leave of this Court, any new action in federal or state court arising from or relating to the same subject matter that was addressed in the instant action.

## BACKGROUND

**A.     The Instant Case and Its Resolution**

### 1.     The Concerns Regarding Fabricated Emails

Carrington filed his initial Complaint in New York County Supreme Court on May 1, 2018, and it was removed to this Court on May 24, 2018. (Dkt. #1). Carrington then filed an Amended Complaint on June 20, 2018. (Dkt. #40). The Amended Complaint included, among others, claims of antitrust violations, fraud, breach of contract, unfair competition, theft of trade secrets, and tortious interference. Such anodyne descriptions, however, fail to capture the heart of Carrington's claims, which was that he was passed around among powerful figures in Hollywood and coerced into sexual relationships, only to see his career prospects stalled and his intellectual property stolen when he refused.

Carrington's allegations were noteworthy for their salaciousness. Very shortly after being served, however, Defendants announced that certain key emails appended by Carrington to his Complaint were fabricated. Between the filing of the original and the amended complaints, Defendants presented evidence of fabrication to Carrington and the Court. (*See, e.g.*, Dkt. #34; *see*

*also* Dkt. #170 at 34-35 (referencing efforts by counsel for the Graden Defendants on May 3, 2018, to explain falsity of allegations to Carrington's counsel)).  Carrington nonetheless continued to include those emails in his Amended Complaint.

From there, the parties and the Court embarked upon a 15-month saga investigating the provenance of the challenged emails.  Defendants presented evidence in support of a request for targeted discovery on this topic (Dkt. #56), and after listening to both sides at a pretrial conference held on July 17, 2018 (Minute Entry for July 17, 2018), the Court signed an Order for Limited Discovery Concerning the Authenticity of Communications (Dkt. #64).  Over the period from August 2018 until October 2019, Carrington's counsel withdrew; Carrington attempted to transfer venue; Carrington attempted to withdraw his lawsuit without prejudice; the parties presented evidence and competing expert testimony on the issue of the emails' provenance; and the Court scheduled, and repeatedly rescheduled, a hearing at which the issue of sanctions could be discussed.  (*See, e.g.*, Dkt. #70, 71, 73-145).  On August 27, 2019, after learning from Carrington that (i) he was no longer experiencing the issues that rendered him unable to travel to this Court, and (ii) counsel would soon be entering an appearance on his behalf, the Court scheduled a hearing on Defendants' sanctions application for October 11, 2019, and made clear that Carrington would be required to attend even if his counsel had failed to appear by that time.  (Dkt. #144).

## 2. The October 11, 2019 Sanctions Hearing

Carrington's counsel did not enter a notice of appearance, and the hearing went on without Carrington or his counsel on October 11, 2019. (Dkt. #170 (transcript)). At its conclusion, the Court dismissed Carrington's case with prejudice after making the following findings about the resources Defendants, and the Court, were forced to expend because of Carrington's fraud:

> [T]here was an effort made to undertake — to figure out how these emails came to be. There was a subpoena return from Google, which confirmed that the Trendsetter account was, in fact, deactivated on June 19th of 2018, one day after the amended complaint was filed and after the first preservation order was sent.
>
> We also found out, during the course of the hearing in February of 2019, that the plaintiff turned in his iPhone 7, which he represented to me to be the vehicle used to transmit all of the communications after the initial preservation order.
>
> After that, I received several declarations from nonparties, along with the forensic expert declaration, suggesting that these emails did not, in fact, exist in Mr. Graden's, Mr. Logan's, or Darren Stein's accounts. I asked for — I ordered limited discovery and the preservation of any communications concerning any portion of the at-issue communications. I then selected FTI as a neutral examiner.
>
> FTI's investigation found — of the Gmail account and the Carrington Diaries account, found none of the native versions besides the one whose validity was not contested. And plaintiff informed the Court that the Trendsetter account had been deactivated for years, which is why no effort was undertaken to review it.
>
> The investigation by FTI did find the forwards that Carrington sent to the Landau firm, his prior counsel, but none of the underlying emails. Plaintiff provided an

affidavit from his own expert, stating that he had transferred the contents of the Trendsetter account to the Carrington Diaries account in 2017, but no natives of the emails purportedly sent from the Trendsetter account were found in the Carrington Diaries account, and the defendants assert that the absence of these native emails, coupled with the existence of the forwarded emails, just could not be explained.

Plaintiff responded that he had been the victim of a hack. The defendants observed that a hack could not explain why the one valid email still existed and why the forwarded emails from Mr. Carrington to the Landau group remained.

\*\*\*

In February of 2019, I issued an order that subpoenas be issued to GoDaddy, Microsoft, and Google, the Internet service providers for plaintiff's three email accounts, to obtain subscriber information, nonsubscriber information, and that FTI conduct an analysis of the iPhone 10, plaintiff's phone, and emails produced to or by the ISPs. The subpoena to Google revealed that the Trendsetter account had only been deactivated the day after the amended complaint was filed and not years earlier, as had been repeatedly represented.

The GoDaddy returns, which it should be noted are not — I'll be brief about this, because they're not in the public filings, but there was an indication that the Carrington Diaries account had been closed and deleted by plaintiff on or about September 8th of 2018, one month after the Court's order to preserve evidence.

The GoDaddy production also revealed that plaintiff reached out to GoDaddy to confirm that a subpoena would not return information about emails within a deleted account. The returns also show repeated password changes throughout 2018, undercutting a previous claim that had been made that one of the defendants might have known of Mr. Carrington's password and hacked into his account.

5

> The returns for the Gmail account produced no instances of the at-issue communications. FTI [reviewed] the plaintiff's most recent and current iPhone, and it concluded that Mr. Carrington's data had migrated from the previous iPhone, but, again, found no evidence of the at-issue communications in any of those accounts.

(Dkt. #170 at 35-39).

In explaining its decision to dismiss the Amended Complaint with prejudice, the Court emphasized Carrington's evolving, but consistently false, explanations for the emails:

> Mr. Carrington has never provided an explanation for how the forwards exist in the accounts for emails that were sent — let me say that more precisely. The explanation he has not provided is an explanation of how the forwards exist in the Carrington Diaries account for emails that were sent by the Trendsetter account when there is no evidence of the emails being sent from the Trendsetter account to the Carrington Diaries account. It makes no sense to me.
>
> I also do not understand what possessed Mr. Carrington to turn over his iPhone in the middle of this litigation, in the middle of this dispute about the authenticity of these emails. All that I can conclude is that in every instance where the plaintiff appears, again, to use the vernacular, to be caught, he attempts to argue something new, that these issues are the result of someone else's doing, that they are the result of the hacking by one of the defendants or by defense counsel, and it's all just one large conspiracy. I have difficulty, and indeed I cannot, credit that. I have enough sworn statements and enough exploration of what I do have to suggest that this is not the case.
>
> And as I've mentioned, the purported hack does not explain why Mr. Graden has similar-looking emails that match in part, but not in whole, the at-issue communications.

6

> Instead, there is an explanation from plaintiff, but I just don't credit it. It's another coverup involving Mr. Graden and Mr. Stein. Every time the defense has produced compelling evidence of spoliation, of fabrication, of obstruction of the litigation in this case, the plaintiff has provided an explanation. And I believe that going forward, every time it happens, he will provide yet another explanation. They are of increasingly tenuous credibility, and they can't explain what I have in the record.
>
> For these reasons, I can find, even under a clear and convincing evidence standard, that Mr. Carrington has sentiently set in motion some unconscionable scheme, calculated to interfere with the judicial system's ability impartially to adjudicate the action, referring to the *Scholastic* decision I cited earlier to the parties.

(Dkt. #170 at 48-49).

### 3. The Explanations for Carrington's Non-Appearance

As noted, Carrington did not appear for the October 11 hearing, though an individual purporting to be his attorney requested an adjournment two days prior to the hearing, which request was denied. Two months later, in January 2020, Carrington emailed the Court to advise that he had in fact failed to appear because he had been threatened by Defendant Graden with murder, and that he had instead spent the day obtaining an *ex parte* restraining order in Los Angeles.[1] The news struck the Court as implausible, given the procedural history that had immediately preceded the hearing; it advised Carrington that it could not accept his *ex parte* submission, but that he could

---

[1] The Court repeats this information in this Order because the underlying allegations of threats by Graden are now known to all Defendants.

7

file it under seal, where it would be viewable to the Court and parties only. (Dkt. #172). Carrington elected not to file anything under seal.

## B. The Proceedings in Los Angeles Superior Court

At a telephonic hearing held on September 10, 2020, on Defendants' motion for injunctive relief, to which Carrington and his current counsel (the Court understands that he prefers the term "future," in part to explain why counsel declined to appear at the hearing) were invited, the Court learned more about Carrington's order of protection, and his *modus operandi* was brought into sharper relief. A transcript of the September 10 telephonic hearing has not yet been prepared, and so the Court presents this information from its own notes:

Counsel for Graden represented — as an officer of the Court and without dispute from anyone else at the hearing — that Carrington obtained a temporary order of protection on or about October 11, 2019. Graden filed his opposition on or about November 1, 2019. The opposition included, among other things, evidence that Graden had had no contact with Carrington during the relevant time period; that Graden's phone records evidenced no contact; and that Graden had work-related meetings with others at times he was supposed to be communicating with Carrington. At a hearing on the order of protection held on or about November 5, 2019, the presiding judge observed the disconnect in the parties' phone records and asked counsel to exchange the records. Thereafter, an expert witness in cellular telephones explained to Graden's counsel how Carrington had "spoofed," or caused to be "spoofed,"

8

Graden's telephone number(s) to make it appear that Graden had contacted Carrington, when in fact the calls had been placed through a web application. For this reason, Carrington (the putative recipient) showed Graden's phone numbers in his records, while Graden (the putative caller) showed nothing in his. After counsel for Graden provided this information to prior counsel for Carrington, the latter "stopped responding."

At the next hearing on the order of protection, held in February 2020, neither Carrington nor his counsel appeared. The court advised counsel for Graden that counsel for Carrington had contacted the court to advise it of Carrington's intention to withdraw his application without prejudice to its refiling. After hearing from counsel for Graden, the court dismissed the matter with prejudice, and scheduled briefing on Graden's application for sanctions.

Whether to justify his failure to appear in this Court or to start over in a different court, Carrington resorted, again, to a trifecta of obstructive conduct: fabrication of evidence, efforts to withdraw his litigation without prejudice when the fraud was uncovered, and, ultimately, non-appearance in court. Though the conduct was limited to only one of the Defendants in this case, the litigation and reputational costs remained significant.

**C.    The Threatened Litigation**

By letters dated September 4 and 8, 2020 (Dkt. #174, 178), Defendants advised the Court that Carrington intends to sue them again. The Court has reviewed the demand letters from Carrington's current counsel. In large measure, the contemplated causes of action, and the factual support therefor,

9

replicate those in the Amended Complaint; however, Carrington's additional claims are no less troubling. Carrington accuses counsel for Graden of acting in a manner that, if true, would assuredly subject him to not just professional discipline, but also disbarment and perhaps even criminal prosecution. Worse yet, Carrington puts a false gloss on the sanction proceedings in this Court, suggesting among other things that the Court either colluded with, or was bribed by, one or more Defendants. At the September 10 hearing, Defendants explained at length the toll — financial and emotional — that Carrington's conduct had exacted from their clients, and sought redress.

## DISCUSSION

### The Court Grants Defendants' Request for Injunctive Relief

It "is beyond peradventure" that this Court possesses the authority to enjoin Carrington from further vexatious litigation. *Safir* v. *U.S. Lines, Inc.*, 792 F.2d 19, 23 (2d Cir. 1986). "In determining whether to restrict a litigant's future ability to sue, a court must consider 'whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties.'" *Eliahu* v. *Jewish Agency for Israel*, 919 F.3d 709, 713-14 (2d Cir. 2019) (quoting *Safir*, 792 F.2d at 24). Specifically, the Second Circuit has required district courts to consider the following factors:

> [i] the litigant's history of litigation and in particular whether it entailed vexatious, harassing[,] or duplicative lawsuits; [ii] the litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; [iii] whether the litigant is represented by counsel; [iv] whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their

10

> personnel; and [v] whether other sanctions would be adequate to protect the courts and other parties.

*Id.* at 714 (quoting *Iwachiw* v. *N.Y. State Dep't of Motor Vehicles*, 396 F.3d 525, 528 (2d Cir. 2005) (per curiam)).

Upon consideration of the above factors, the Court finds that an injunction enjoining Carrington from filing further lawsuits is both warranted and necessary. *First*, the Court finds that Carrington's past and present behavior evinces a clear intent to further abuse the judicial process. Although the Court acknowledges that Carrington has, as of yet, only filed two lawsuits against Defendants, the Second Circuit has been clear that "[t]here is no[] … strict numerosity requirement that must be met … to enjoin a litigant from filing future actions. Rather, the court must consider the record as a whole and the likelihood that the litigant will continue to abuse the judicial process." *Eliahu*, 919 F.3d at 714 (citing *Safir*, 792 F.2d at 24). Carrington has now twice engaged in a pattern of filing outrageous claims, fabricating evidence, attempting to escape the consequences of such fabrication, and then refusing to appear in court, and all evidence indicates that he is preparing for a third attempt. The first factor therefore weighs in favor of granting the injunction.

*Second*, there is no reason to afford Carrington any special solicitude, as the Court would were he a *pro se* litigant. *See Eliahu*, 919 F.3d at 715 (noting that, "[i]n considering a litigant's status, we have recognized that *pro se* litigants, in many cases, are entitled to special solicitude"). Although Carrington has at times been unrepresented, his vexatious conduct cannot be attributed to lack of counsel. Indeed, Carrington had the assistance of counsel

11

when he fabricated evidence in the instant action and when he filed the protective action in California, and he seemingly is represented by counsel now. The third factor therefore similarly weighs in favor of injunctive relief.

*Third*, it is beyond dispute that Carrington's actions have caused needless expense to Defendants and placed an unnecessary burden on this Court. As represented by Defendants' counsel in their pending applications for attorneys' fees, Carrington's actions in just the instant case have resulted in almost $1 million in legal fees. (*See* Dkt. #151-58). Moreover, both this Court and the California state court have been burdened with adjudicating Carrington's increasingly salacious claims, and then managing the fallout from his perfidy. The fourth factor, too, favors precluding Carrington from further burdening Defendants and the judicial system.

*Fourth*, and finally, the Court is persuaded that other sanctions are inadequate. The Court has already deployed one of the most severe sanctions in its arsenal — the dismissal with prejudice of the instant action (*see* Dkt. #147) — and has pending before it applications for attorneys' fees amounting to almost $1 million. None of this has hindered Carrington from making ever more outrageous claims, and even going so far as to impugn the integrity of this Court. Given Carrington's recent threat to begin anew his deceitful pattern of behavior, the Court believes that the only path available to it is to preempt

12

Carrington from carrying out his threat.  Therefore, the fifth factor weighs in favor of granting Defendants' request for an injunction.

To summarize, four of the five factors outlined by the Second Circuit counsel in favor of enjoining Carrington from filing future lawsuits arising out of or relating to the subject matter in the instant action.  Moreover, the second factor — Carrington's motive in bringing his various lawsuits — is, at best, neutral.  Due to Carrington's dishonest behavior, the Court never had, and will never have, the opportunity to learn which, if any, of Carrington's claims are meritorious.  However, Carrington's repeated fabrications and obstructive behavior do lead the Court to view his claims with a skeptical eye.  The Court therefore finds that an injunction enjoining Carrington from filing, without the express approval of this Court, future claims arising from or relating to the subject matter of the instant litigation is more than justified.[2]

## CONCLUSION

For the reasons set forth in this Order, the Court GRANTS Defendants' request for a permanent injunction against Carrington.  The Court hereby ORDERS that Carrington be forbidden from filing any future suits in federal or state court arising from or relating to the subject matter in the instant action

---

[2] The Court makes this finding with the understanding that such injunctions should be narrowly tailored to the specific circumstance.  *See Safir* v. *U.S. Lines, Inc.*, 792 F.2d 19, 25 (2d Cir. 1986) (modifying a district court's injunction due to it being "overly broad").  The Court believes that it has tailored its injunction to the extent required to prevent Carrington from doing further harm to Defendants and the judicial system.

without the prior authorization of this Court. The Clerk of Court is directed to terminate the motion at docket entry 174.

Counsel for Defendants are directed to serve this Order on Carrington and his current counsel by whatever means they have used to communicate with each of them in the past.

SO ORDERED.

Dated:   September 11, 2020
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*Sent by First Class Mail to:*
Rovier Carrington
5901 Encina Road
Suite C-2
Goleta, CA 93117